AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No.    MJ21-182
The locations more fully described in Attachments A )
and A1 through A50 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

the locations more fully described in Attachments A and A1 through A50, incorporated herein by reference.

located in the     Western     District of     Washington     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1), 841(b)(1) and 846 | Distribution of and possession with intent to distribute controlled substances, conspiracy to commit these offenses and additional offenses described in the attached affidavit |
| 18 USC §§ 1956 and 1957 | Money laundering and conspiracy to launder money |

The application is based on these facts:

✓ See attached affidavit of FBI Special Agent Shawna McCann.

☐ Delayed notice of        days (give exact ending date if more than 30 days:                ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Shawna McCann, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:     03/31/2021

*Judge's signature*

City and state:  Seattle, Washington                Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

USAO: 2019R01083

**AFFIDAVIT OF SHAWNA MCCANN**

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

     I, Shawna McCann, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

     1.    I am employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since September 2017. I am currently assigned to the Seattle Field Division where I am a member of the violent crime, gang, and Transnational Organized Crime – Western Hemisphere squad. In this capacity, I investigate, *inter alia*, violations of the Controlled Substance Act, Title 21, United States Code, Section 801 *et seq*., and related offenses. I have received specialized training in the enforcement and investigation of the Controlled Substance Act. I have received over 400 hours of classroom training including, but not limited to, drug identification, drug interdiction, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, manufacturing, and trafficking of controlled substances.

     2.    In my role as a Special Agent for the FBI, I have participated in narcotics investigations (e.g., heroin, cocaine, marijuana, and methamphetamine) that have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotics-related evidence and the forfeiture of narcotics-related assets. I have been involved in the service of federal and state search warrants as part of these investigations. I have encountered and have become familiar with various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to import, export, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations,

AFFIDAVIT OF SHAWNA MCCANN –- 1
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and how they code their conversations to disguise their unlawful activities. I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds. Additionally, through my training and experience, I can identify illegal drugs by sight, odor, and texture.

3.      I have also worked on drug investigations involving the use of court-authorized wiretaps under Title III. In that capacity, I have had the opportunity to monitor, listen to, and review transcripts and line sheets (prepared by linguists) documenting the content of hundreds of intercepted conversations involving the trafficking of cocaine, methamphetamine, heroin, and other narcotics, by persons who used some form of code to attempt to thwart law enforcement detection. I have also interviewed defendants at the time of their arrest and have debriefed, spoken with, and/or interviewed numerous drug dealers or confidential sources (informants) at proffer and field interviews who were experienced in speaking in coded conversation over the telephone. From these interviews, and also from discussions with other experienced agents, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by drug traffickers in the course of their criminal activities, including their use of firearms to protect their narcotics-related activities and of cellular telephones and other electronic means to facilitate communications while avoiding law enforcement scrutiny.

4.      I have written affidavits in support of court-authorized federal warrants and orders in the Western District of Washington for GPS tracking of telephones, Pen Register/Trap and Trace, and search warrants. Additionally, I have testified in grand jury proceedings, written investigative reports, and conducted and participated in numerous interviews of drug traffickers of various roles within drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate.

5.      I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered to conduct investigations

AFFIDAVIT OF SHAWNA MCCANN -- 2
USAO #2019R01083

1  of, and to make arrests for, violations of the Controlled Substance Act, Title 21, United

2  States Code, Section 801 *et seq*., and related offenses.

3  ## PURPOSE OF THE AFFIDAVIT

4  6.     As described herein, there is probable cause to believe that the following

5  offenses have been committed, and are being committed, by Michael Walker aka BD

6  Miguel aka BG Miguel aka Binkey, Cesar Clemente, Stevie Allen aka Tiger, Gregory

7  Mason aka Saucy aka Sauce, Aaron Wood, James Lowe aka Supopo aka Jaguar James,

8  Douglas Wrenn, Kevin Gipson aka KG, Jimmy Carter aka J-Bone, Kenneth Lee,

9  Kefentse Olabisi aka Kefentse Lumumba-Olabisi aka KO aka Lil Man, Edward Coleman,

10 Mohammad Safaiezeab aka Brian, Larry Collins aka L-Candy aka L, Jonathan

11 Harrington, Eugene McGee aka Jericho, and Jermaine Brooks.

12          a.     Distribution of, and possession with intent to distribute, controlled

13 substances, and conspiracy to commit these offenses, in violation of Title 21,

14 United States Code, Sections 841(a)(1), 841(b)(1), and 846;

15          b.     Money laundering and conspiracy to launder money, in violation of

16 Title 18, United States Code, Sections 1956 and 1957;

17          c.     Use of communication facilities to commit, facilitate, or further an

18 act or acts which constitute a felony in violation of Title 21, United States Code,

19 Section 843(b);

20          d.     Interstate and foreign travel to promote, manage, establish, carry on,

21 or facilitate unlawful activity, in violation of Title 18, United States Code, Section

22 1952;

23          e.     Possession of a firearm in furtherance of a drug trafficking crime, in

24 violation of Title 18, United States Code, Section 924(c); and

25          f.     Prohibited person in possession of a firearm, in violation of Title 18,

26 United States Code, Section 922(g).

27

28

AFFIDAVIT OF SHAWNA MCCANN –- 3
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    7.    I make this Affidavit in support of an application for warrants authorizing

2  searches of the subject locations and vehicles,[1] which are further described below and in

3  Attachments A and A1 through A50 (attached hereto and incorporated by reference as if

4  fully set forth herein), for evidence, fruits, and instrumentalities, as further described in

5  Attachment B (attached hereto and incorporated by reference as if fully set forth herein),

6  of violations of the above-listed statutes, committed by the subjects listed above, and

7  others, as described herein.

8    8.    For each of the following locations, I request that authority to search extend

9  to all parts of the property, including the main structure, garage(s), storage structures,

10  outbuildings, and curtilage, and all vehicles, containers, compartments, or safes located

11  on the property, whether locked or not, where the items described in Attachment B (list

12  of items to be seized) could be found. For each of the following vehicles, I request that

13  authority to search extend to all parts of the vehicle and any cases, containers,

14  compartments, or safes located in the vehicle, whether locked or not, where the items

15  described in Attachment B (list of items to be seized) could be found. Additionally, I

16  know based on my training and experience that drug traffickers have been known to use

17  vehicles with hidden compartments. For this reason, I am requesting that if agents are

18  unable to thoroughly search or access a particular area of a vehicle at the location where

19  the vehicle is found, the vehicle may be transported to another location where they would

20  have at their disposal the appropriate tools and equipment to properly search the vehicle,

21  and the search may continue at that location.

22    9.    I am seeking warrants for the following subject locations[2] and subject

23  vehicles, to search for and seize the items described in Attachment B:

24

25

26

27  [1] The residences and vehicles to be searched are highlighted in bold font in this affidavit.

28  [2] I have verified the descriptions of the subject properties and vehicles, either by personally viewing them myself, or
through my discussions with other law enforcement officers who have personally viewed them.

AFFIDAVIT OF SHAWNA MCCANN –- 4
USAO #2019R01083

a.     18008 114th Avenue Southeast, Renton, Washington (**Subject Premises 13**), as further described in Attachments A and A1.[3] Michael Walker resides here. The probable cause with respect to this residence is discussed at paragraphs 24-41.

b.     A gold 2006 Honda Accord bearing Washington license plate BKY5357 (**Subject Vehicle 15**), as further described in Attachments A and A2. Michael Walker uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 24-41.

c.     A white 2012 Isuzu NPR construction truck bearing Washington license plate C35313N (**Subject Vehicle 16**), as further described in Attachments A and A3. Michael Walker uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 24-41.

d.     12120 SE 186th Street, Renton, Washington (**Subject Premises 14**), as further described in Attachments A and A4. Cesar Clemente resides here. The probable cause with respect to this residence is discussed at paragraphs 42-56.

e.     A black 2003 BMW X5 bearing Washington license plate BRU7044 (**Subject Vehicle 19**), as further described in Attachments A and A5. Cesar Clemente uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 42-56.

f.     A 2014 Audi Q7 bearing Washington license plate BUB0667 (**Subject Vehicle 48**), as further described in Attachments A and A6. Cesar Clemente owns this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 42-56.

---

[3] During this investigation, agents have already identified several residences and vehicles as Subject Premises 1-12 and Subject Vehicles 1-14. For consistency, agents are continuing the numbering of target premises and vehicles here.

AFFIDAVIT OF SHAWNA MCCANN –- 5
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      3922 S Sullivan Street, Seattle, Washington (**Subject Premises 15**), as further described in Attachments A and A7. Stevie Allen resides here. The probable cause with respect to this residence is discussed at paragraphs 57-72.

h.      4727 Beacon Avenue S, Apt. 2, Seattle, Washington (**Subject Premises 16**), as further described in Attachments A and A8. Stevie Allen keeps his drug supply at this location as a stash house and Gregory Mason resides at this location. The probable cause with respect to this residence is discussed at paragraphs 57-81.

i.      A silver 2007 Audi Q7 bearing Washington license plate BQV2133 (**Subject Vehicle 20**), as further described in Attachments A and A9. Stevie Allen uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 57-72.

j.      A black 2000 Range Rover bearing Washington license plate BHY1298 (**Subject Vehicle 21**), as further described in Attachments A and A10. Gregory Mason uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 73-81.

k.      2405 E Helen Street, Apt. C, Seattle, Washington (**Subject Premises 17**), as further described in Attachments A and A11. Aaron Wood resides here. The probable cause with respect to this residence is discussed at paragraphs 82-95.

l.      A 2015 Subaru Forester bearing Washington state license plate number AQR4300 (**Subject Vehicle 22**), as further described in Attachments A and A12. Aaron Wood uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 82-95.

m.      11463 Rainier Avenue S, Suite #B, Seattle, Washington (**Subject Premises 51**), as further described in Attachments A and A13. This is Aaron Wood's business. The probable cause with respect to this business is discussed at paragraphs 82-95.

AFFIDAVIT OF SHAWNA MCCANN –- 6
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

n.      412 E Novak Lane, Apt. H102, Kent, Washington (**Subject Premises 18**), as further described in Attachments A and A14. This is a residence for James Lowe. The probable cause with respect to this residence is discussed at paragraphs 96-107.

o.      11718 64th Lane S, Seattle, Washington (**Subject Premises 19**), as further described in Attachments A and A15. This is a secondary residence for James Lowe. The probable cause with respect to this residence is discussed at paragraphs 96-107.

p.      A 2010 Chevy Camaro bearing Washington state license plate number BUE5594 (**Subject Vehicle 46**), as further described in Attachments A and A16. James Lowe uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 96-107.

q.      A white 2011 Jaguar XJL bearing Washington state license plate number BVZ2441 (**Subject Vehicle 47**), as further described in Attachments A and A17. James Lowe owns this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 96-107.

r.      18411 36th Avenue W, Apt. B205, Lynnwood, Washington (**Subject Premises 20**), as further described in Attachments A and A18. Douglas Wrenn resides here. The probable cause with respect to this residence is discussed at paragraphs 108-118.

s.      A blue 2018 Hyundai Sonata bearing Washington state license plate number BWN7793 (**Subject Vehicle 43**), as further described in Attachments A and A19. Douglas Wrenn uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 108-118.

t.      4727 Beacon Avenue S, Apt. #9, Seattle, Washington (**Subject Premises 21**), as further described in Attachments A and A20. Kevin Gipson resides here. The probable cause with respect to this residence is discussed at paragraphs 119-126.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

u.      A red 2003 Ford Explorer bearing Washington state license plate number BGK5297 (**Subject Vehicle 24**), as further described in Attachments A and A21. Kevin Gipson uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 119-126.

v.      19301 5th Avenue East, Spanaway, Washington (**Subject Premises 23**), as further described in Attachments A and A22. Jimmy Carter resides here. The probable cause with respect to this residence is discussed at paragraphs 127-144.

w.      12805 Occidental Avenue South, Burien, Washington (**Subject Premises 24**). as further described in Attachments A and A23. Jimmy Carter also resides here. The probable cause with respect to this residence is discussed at paragraphs 127-144.

x.      12902 SE 312th Street, Apt. K207, Auburn, Washington (**Subject Premises 33**), as further described in Attachments A and A24. Jimmy Carter also frequents this residence. The probable cause with respect to this residence is discussed at paragraphs 127-144.

y.      Glacier West Self Storage, 1407 Central Avenue South, Kent, Washington, Unit 176. (**Subject Premises 25**), as further described in Attachments A and A25. Jimmy Carter rents this storage unit. The probable cause with respect to this location is discussed at paragraphs 127-144.

z.      A gray 2009 Chevrolet Silverado bearing Washington state license plate number C32244G (**Subject Vehicle 25**), as further described in Attachments A and A26. Jimmy Carter uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 127-144.

aa.     A 2013 Audi Q7 bearing Washington license plate BWK4351 (**Subject Vehicle 49**), as further described in Attachments A and A27. Jimmy Carter owns this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 127-144.

AFFIDAVIT OF SHAWNA MCCANN –- 8
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

bb.     3584 Portland Avenue East, Tacoma, Washington (**Subject Premises 26**), as further described in Attachments A and A28. Kenneth Lee resides here. The probable cause with respect to this residence is discussed at paragraphs 145-154.

cc.     2542 55th Avenue NE, Tacoma, Washington (**Subject Premises 27**), as further described in Attachments A and A29. Kefentse Olabisi resides here. The probable cause with respect to this residence is discussed at paragraphs 155-168.

dd.     A blue 2007 Chevrolet Impala bearing Washington license plate number BOJ4787 (**Subject Vehicle 26**), as further described in Attachments A and A30. Kefentse Olabisi uses this vehicle and allows Edward Coleman to use this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 155-179.

ee.     5008 East Q Street, Tacoma, Washington (**Subject Premises 28**), as further described in Attachments A and A31. Edward Coleman resides here. The probable cause with respect to this residence is discussed at paragraphs 169-179.

ff.     14518 22nd Place West, Lynnwood, Washington (**Subject Premises 29**), as further described in Attachments A and A32. Mohammad Safaiezeab aka Brian resides here. The probable cause with respect to this residence is discussed at paragraphs 180-190.

gg.     A black 2003 Honda Accord coupe bearing Washington state license plate number AGS9353 (**Subject Vehicle 27**), as further described in Attachments A and A33. Mohammad Safaiezeab aka Brian uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 180-190.

hh.     10409 56th Avenue South, Seattle, Washington (**Subject Premises 30**), as further described in Attachments A and A34. Larry Collins resides here. The probable cause with respect to this residence is discussed at paragraphs 191-210.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ii.   A black 2006 Kia Sedona bearing Washington license plate BPV7873 (**Subject Vehicle 28**), as further described in Attachments A and A35. Larry Collins uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 191-210.

jj.   A 2020 Acura MDX bearing Washington state license plate number BQW9453 (**Subject Vehicle 29**), as further described in Attachments A and A36. Larry Collins uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 191-210.

kk.   212 24th Avenue, Seattle, Washington (**Subject Premises 31**), as further described in Attachments A and A37. Jonathan Harrington resides here. The probable cause with respect to this residence is discussed at paragraphs 211-217.

ll.   A blue 2002 Buick Park Avenue bearing Washington license plate AAN7807 (**Subject Vehicle 30**), as further described in Attachments A and A38. Jonathan Harrington uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 211-217.

mm.   29112 9th Place South, Federal Way, Washington (**Subject Premises 32**), as further described in Attachments A and A39. Eugene McGee resides here. The probable cause with respect to this residence is discussed at paragraphs 218-232.

nn.   A white 2012 Dodge 1500 bearing Washington license C42162U (**Subject Vehicle 31**), as further described in Attachments A and A40. Eugene McGee uses this vehicle. The probable cause with respect to this vehicle is discussed at paragraphs 218-232.

oo.   3034 South Holden Street, Seattle, Washington (**Subject Premises 48**), as further described in Attachments A and A41. Jermaine Brooks resides here. The probable cause with respect to this residence is discussed at paragraphs 233-241.

AFFIDAVIT OF SHAWNA MCCANN –- 10
USAO #2019R01083

1           pp.    The person of Cesar Y. Clemente III, as further described in

2    Attachments A and A42. The probable cause with respect to this person is

3    discussed at paragraphs 42-56.

4           qq.    The person of Stevie T. Allen, as further described in Attachments A

5    and A43. The probable cause with respect to this person is discussed at paragraphs

6    57-72.

7           rr.    The person of Gregory D. Mason, as further described in

8    Attachments A and A44. The probable cause with respect to this person is

9    discussed at paragraphs 73-81.

10          ss.    The person of Aaron S. Wood, as further described in Attachments

11   A and A45. The probable cause with respect to this person is discussed at

12   paragraphs 82-95.

13          tt.    The person of James D. Lowe, as further described in Attachments A

14   and A46. The probable cause with respect to this person is discussed at paragraphs

15   96-107.

16          uu.    The person of Douglas E. Wrenn-El, as further described in

17   Attachments A and A47. The probable cause with respect to this person is

18   discussed at paragraphs 108-118.

19          vv.    The person of Mohammad Safaiezeab, as further described in

20   Attachments A and A48. The probable cause with respect to this person is

21   discussed at paragraphs 180-190.

22          ww.    The person of Jermaine A. Brooks, as further described in

23   Attachments A and A49. The probable cause with respect to this person is

24   discussed at paragraphs 233-241.

25          xx.    The person of Michael L. Walker, as further described in

26   Attachments A and A50. The probable cause with respect to this person is

27   discussed at paragraphs 24-41.

28   /// 

AFFIDAVIT OF SHAWNA MCCANN -- 11
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## SOURCES OF INFORMATION

10.     I have obtained the facts set forth in this Affidavit through my personal participation in the investigation described below; from my review of intercepted calls to date; from oral and written reports of other law enforcement officers; from records, documents, and other evidence obtained during this investigation; and from confidential sources who are associated with and knowledgeable about the subjects of this investigation. I have obtained and read official reports prepared by various law enforcement officers participating in this and other investigations. I have not included every fact known concerning this investigation. I have set forth the facts that I believe are necessary for a fair determination of probable cause for the requested search warrants. During this investigation, investigators have made use of numerous investigative techniques, including but not limited to making controlled purchases of controlled substances; executing search warrants; seizing drugs and drug proceeds; conducting video and physical surveillance; and conducting a financial investigation.

11.     When I refer to vehicle ownership or driver's licenses in this Affidavit, I have reviewed the relevant state vehicle records from the Washington State Department of Licensing, or the equivalent agency in other states or countries. When I refer to the criminal history of a subject, I have read the available criminal history from state or federal agencies. When I refer to telephone subscription records, I have read the subscriber records obtained from the telephone company by administrative subpoena or court order, or I have obtained the information from other law enforcement officers familiar with this investigation. When I refer to telephone toll records, I have received the information from the telephone company pursuant to an administrative subpoena or court-authorized pen registers. When I refer to customer information regarding utilities, power, or vehicle rentals, I obtained this information pursuant to an administrative subpoena. When I refer to GPS data for telephones, that data was obtained pursuant to court authorization, granted in the Western District of Washington.

12.     During the course of this investigation, we have obtained authorization in the Western District of Washington to intercept wire communication over multiple target telephones, including but not limited to the telephones summarized in the following table:

| Target Telephone | User | Date of Order | Date Ended |
|---|---|---|---|
| TT6 – (206) 393-7387 | Kevin Gipson | July 9, 2020 | August 7, 2020 |
| TT7 – (206) 409-2826 | Stevie Allen | July 9, 2020 | August 7, 2020 |
| TT8 – (425) 496-0964 | Michael Walker | July 9, 2020 | August 7, 2020 |
| TT12 – (206) 939-8973 | Jerrell Ingram | September 3, 2020 | October 2, 2020 |
| TT13 – (702) 275-6703 | Jimmy Carter | September 3, 2020 | October 2, 2020 |
| TT14 – (206) 898-8457 | Jamar Howard | September 3, 2020 | October 2, 2020 |
| TT16 – (206) 898-4155 | Larry Collins | September 3, 2020<br>February 8, 2021 | October 2, 2020<br>March 9, 2021 |
| TT19 – (206) 915-6994 | David Kelley | September 3, 2020<br>October 23, 2020 | October 2, 2020<br>November 21, 2020 |
| TT20 – (206) 397-7007 | Jimmy Carter | September 3, 2020 | October 2, 2020 |
| TT30 – (404) 988-2897 | Kefentse Olabisi | October 23, 2020 | November 21, 2020 |
| TT39 - 206-231-8368 | Curtis Snipes | October 23, 2020 | November 2, 2020[4] |
| TT43 - 253-331-0358 | Yusef Parrish | October 23, 2020 | November 21, 2020 |
| TT23 - 206-280-9706 | Eugene McGee | February 8, 2021 | March 9, 2021 |

13.     During this investigation, investigators intercepted thousands of drug-related conversations and text messages. In this Affidavit, I discuss some of these intercepted calls and text messages. Communications occurred in English. A combination of agents, task force officers, detectives, and professional staff have listened to these calls and summarized their content. I have relied upon the written summaries (line sheets and transcripts) prepared by the monitors for the description of the calls referenced below, and I have also personally listened to the calls. I know through training and experience, including experience with this investigation, that individuals involved in the distribution

---

[4] On October 28, 2020 and October 30, 2020 investigators executed search warrants on three homes, three vehicles, and one person, all connected to Curtis Snipes and his associates. At the conclusion of the execution of these search warrants, collectively seven guns, six phones, more than $92,000, and approximately one quarter kilogram of cocaine was seized. One of the phones seized was TT39, used by Curtis Snipes. Because that phone came into police custody, interception was intentionally discontinued on November 2, 2020.

AFFIDAVIT OF SHAWNA MCCANN –- 13
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    of controlled substances and other criminal activity often use coded communications

2    when referring to their illegal activity. I have used this training and experience, as well as

3    the training and experience of other experienced law enforcement officers familiar with

4    this investigation who have reviewed these summaries and have listened to the calls, to

5    explain what I believe to be an accurate interpretation for these coded communications,

6    which are included in brackets in this Affidavit.

7          14.    In this Affidavit, I discuss some of the pertinent portions of intercepted

8    calls and generally do not include the entire intercepted conversation. I indicate where

9    possible the parties who were intercepted on the call. In so doing, I often rely on voice

10   recognition/comparison by myself, other agents, and/or the monitors. For example, if we

11   have identified an individual as the user of a particular phone (through use of a ruse call,

12   surveillance/GPS, etc.), and that person starts using a different phone, we will typically

13   recognize the voice of that person when using the new phone.

14         15.    Some examples of coded terms used by members of the drug trafficking

15   organization being investigated, referred to as the "Michael Walker DTO" for the reasons

16   described below, include "hard," "heezy," and "heezard" (crack cocaine); "soft," "seezy,"

17   and "seezoft" (powder cocaine); and "fire" (often marijuana, but also used to describe

18   high potency of cocaine). Some terms to indicate quantity have been "nino," "neen," or

19   "nina" (nine ounces of cocaine); "baby" (four and a half ounces of cocaine); "half" or

20   "heezy" (half ounce); "ball" (eightball referring to one-eighth of an ounce); and "queezy"

21   (quarter-ounce). Drug customers are often referred to as "jug" or "joog."

22         16.    DTO members also use the word "need" and "on" to convey the desire to

23   be supplied with drugs. DTO members often say, "I need to see you," "I need you," "I

24   need on" to arrange a drug transaction. Oftentimes when this is said, no other discussion

25   occurs regarding amounts or prices. Based upon my training and experience, I believe the

26   expected transaction is already known by both parties because of the length of time and

27   frequency the parties have been dealing with each other.

28

AFFIDAVIT OF SHAWNA MCCANN –- 14
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

17.     Context is also important in interpreting coded language; for example, when someone says "one" is selling for "14-5," that indicates that the speaker is discussing an ounce of cocaine for $1,450. Based on my training and experience, including during this investigation, I am familiar with current and recent price ranges of drugs in the Seattle area, which depends on quality; I know that an ounce of cocaine can cost anywhere from $1,100 to $2,000 per ounce. The price has fluctuated significantly over the last year, due at least in part to the global pandemic and its effect on the ease of transporting goods and crossing borders. Additionally, price is affected by the volume, such that larger amounts are sold at some discount as compared to smaller amounts.

18.     In this Affidavit, I am seeking authority to search locations and vehicles associated with drug distributors. To give perspective as to the amount of drugs being distributed, and because most of the distribution in this investigation centered on cocaine, I will draw the distinction as to user amounts and distributor amounts of this drug based upon my training, experience, and knowledge of this investigation.

19.     Crack cocaine is often sold on the street in the open-air drug markets of the Seattle area. Street dealers often sell $10 or $20 rocks or wafers of crack cocaine to users. These rocks are often .1 or .2 grams of cocaine each. User amounts of cocaine also includes "teeners" (1/16 of an ounce or 1.75 grams), single grams, and "eight balls" (1/8 of an ounce or 3.5 grams). Street dealers themselves may be supplied quarter-ounce (7 grams), half-ounce, and ounce (28 grams) quantities or more. Currently, when purchasing an ounce of cocaine, the price is around $1,400 to $1,800, give or take a couple of hundred dollars. Often those purchasing multiple ounces or more of cocaine are distributing to other distributors. Larger amounts of cocaine and associated prices are discussed throughout this Affidavit.

## **SUMMARY OF THE INVESTIGATION**

20.     Investigators believe Michael Walker to be a trafficker of narcotics in this District. To summarize, according to historical reports, Michael Walker has been a subject or person of interest in drug investigations at least as far back as 2016, including

AFFIDAVIT OF SHAWNA MCCANN –- 15
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  reports of Michael Walker making trips to and from Los Angeles to pick up narcotics and

2  supplying cocaine to numerous individuals. In 2019, two separate individuals stated they

3  had purchased cocaine from Michael Walker and/or Michael Walker's associates,

4  Maghan Stenson, Stevie Allen, and Jamaal Davis, on several occasions in the past.

5      21.    Based upon historical confidential source information, investigators

6  identified Michael Walker as a large-scale cocaine source of supply and also a source of

7  supply of marijuana. Information provided by confidential sources, the use of traditional

8  investigative techniques, and the use of wiretaps have led to the identification of

9  numerous individuals suspected to be involved with the drug trafficking and money

10  laundering activities of Michael Walker. Investigators refer to this network of suspected

11  drug traffickers as the Michael Walker Drug Trafficking Organization (DTO).

12      22.    Many of the target subjects and their associates have affiliation with

13  Seattle-area gangs, predominantly those originating from the Central District

14  neighborhood of Seattle. These gangs include, but are not limited to, Union Street Black

15  Gangster Disciples (BGD), Deuce 8 BGD, and other local Crip and Blood gangs.

16  Because of these associations, investigators believe that the Michael Walker DTO may be

17  a significant source of supply of drugs being distributed by these gangs. Many involved

18  with these gangs have been investigated for crimes ranging from street-level narcotics to

19  robbery, shootings, and murder. Many target subjects and associates have long-standing

20  relationships with others engaged in criminal activity. Many of these relationships span

21  decades.

22      **SUBJECT LOCATIONS AND VEHICLES TO BE SEARCHED**

23      23.    In this section, I discuss the identification of individual subjects, examples

24  of their drug calls and transactions, seizures of their contraband, and their associated

25  locations and vehicles for which search warrants are sought.

26      **A.  Michael Walker's Residence and Two Vehicles**

27      24.    Based upon confidential source information, agents identified Michael

28  Walker as a marijuana source of supply. In the fall of 2019, investigators identified

AFFIDAVIT OF SHAWNA MCCANN –- 16
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Michael Walker's residence as 18008 114th Avenue Southeast, Renton, Washington (**Subject Premises 13**) based on the address listed on his driver's license. Subsequently, investigators conducted physical and remote surveillance of 18008 114th Avenue Southeast, Renton, Washington, and observed Michael Walker, identified based on a comparison to his driver's license photograph and social media photographs on a Facebook account under the username "Bd Miguel," entering and exiting the residence through a secured garage gate. Investigators observed several vehicles at this residence and have observed Michael Walker operating different vehicles on different dates during physical surveillance, including a gold Honda Accord (**Subject Vehicle 15**). Investigators also observed a construction truck parked at Michael Walker's residence (**Subject Vehicle 16**). The construction truck has "Walker Construction Preservation" and "Call Now For A Quote 206 354 8457" written on the side, advertising TT3 as the business phone line. Finally, investigators observed a female, identified as Tiarra L. Hodges based on a comparison to her driver's license photograph, also residing at Michael Walker's residence and determined to be his wife based on CLEAR database checks.

25.     In the fall of 2019, investigators interviewed a confidential source (CS2)[5] who was familiar with and willing to provide information on Michael Walker. CS2 obtained Michael Walker's cell phone number of (425) 524-5985 (TT1). In November

---

[5] CS2 was a confidential source with FBI Seattle from January 2020 to November 2020. CS2 has been a confidential source with SPD from late 2019 to November 2020. CS2 was closed for cause in November 2020 by both SPD and FBI for unauthorized criminal activity that occurred after CS2 conducted all the controlled purchases in this investigation. CS2 provided reliable information, confirmed through independent investigations, on individuals involved in illegal activity, including drug trafficking. CS2 had also conducted more than eight controlled buys under the supervisions of agents. CS2 has eight felony convictions related to narcotics and firearms delivery and possession, escape, and robbery. CS2 has ten gross misdemeanor and misdemeanor convictions related to driving violations, disorderly conduct, assault, phone harassment and no contact order violations, and making false/misleading statement to a public servant. CS2 previously worked as a confidential source for another FBI office from January 2018 to May 2018, during which time CS2 provided reliable information, leading to at least one arrest, on narcotics trafficking and unlawful possession of firearms. CS2 was closed by that FBI office in May 2018 after CS2 had a local warrant issued for a community custody violation. CS2 was not closed for cause at that time, and that handling agent recommended CS2's re-opening as a confidential source. The identity of CS2 is not being disclosed in this application. I believe that doing so could place CS2's safety and security in jeopardy and compromise this and other ongoing investigations in which CS2 was involved and was being utilized.

AFFIDAVIT OF SHAWNA MCCANN –- 17
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   2019, at the instruction of and under the supervision of investigators, a confidential

2   source (CS2) conducted a controlled purchase[6] of approximately 37.2 grams of marijuana

3   from Michael Walker, arranged using TT1. In or around December 2019, CS2 obtained a

4   new phone number for Michael Walker of (206) 741-8633 (TT2). In December 2019, at

5   the instruction of and under the supervision of investigators, CS2 conducted a controlled

6   purchase of approximately 15.5 grams of marijuana from Michael Walker, arranged

7   using TT2. In January 2020, at the instruction of and under the supervision of

8   investigators, CS2 conducted a controlled purchase of approximately 25.3 grams of

9   marijuana from Michael Walker, also arranged using TT2.[7] In or around April 2020, CS2

10   obtained a new phone number for Michael Walker of (425) 428-9267 (TT4). In April

11   2020, at the instruction of and under the supervision of investigators, CS2 conducted a

12   controlled purchase of approximately 15.0 grams of marijuana from Michael Walker,

13   arranged using TT4.[8] In late spring of 2020, CS2 obtained a new phone number for

14   Michael Walker of (425) 496-0964 (TT8). In June 2020, at the instruction of and under

15

16

17

---

18   [6] During a controlled purchase, the confidential source is first searched for money, narcotics, and narcotics
     paraphernalia. After being found free of these items, the CS is provided with funds and sent to the target location to

19   obtain the narcotics. The CS is kept under constant observation to and from the target location. The CS is not to
     contact anyone while approaching or returning from the location. After obtaining the delivery from the target

20   location, the CS returns directly to the investigator and releases the delivered controlled substance. The CS is again
     searched for money, narcotics, and narcotics paraphernalia, and is debriefed.

21   [7] For these three controlled purchases in November 2019, December 2019, and January 2020, CS2 was not equipped
     with a live audio transmitter device or recording device.

22

23   [8] During this controlled purchase, via a live audio transmitter device, investigators heard Michael Walker tell CS2
     that "my boy who I get the fire [marijuana] from stay in Tacoma. I got the shit from him. [Customers] didn't like it

24   … so I didn't want to take some shit [marijuana] back and have some more fire [marijuana] on me…" Based on my
     training and experience, I believe Michael Walker told CS2 that some customers did not like the last batch of

25   marijuana and that Michael Walker had to go back to his supplier in Tacoma to address the issue. Michael Walker
     also told CS2 that "[Michael Walker] wouldn't even know who to buy that shit [cocaine] from, all my boys got

26   popped, so I wouldn't even know who to call or who to even trust to buy that shit [cocaine]…." Michael Walker
     then told CS2 that "if [someone] want [unintelligible], you gotta buy that shit undone [uncut/uncooked cocaine]".

27   Based on my training and experience, I believe Michael Walker told CS2 that he does not sell cocaine anymore and
     did not know anyone who was selling cocaine, but that if CS2 was going to get cocaine then it should be

28   uncut/uncooked to ensure good quality.

AFFIDAVIT OF SHAWNA MCCANN –- 18
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the supervision of investigators, CS2 conducted a controlled purchase of approximately 13.2 grams of marijuana from Michael Walker, arranged using TT8.[9]

26.     Accordingly, during this investigation, agents identified Michael Walker's residence as 18008 114th Avenue Southeast, Renton, Washington (**Subject Premises 13**) and his vehicles as a gold 2006 Honda Accord bearing Washington license plate BKY5357, registered to Tiarra L. Hodges at 18008 114th Ave SE, Renton, Washington (**Subject Vehicle 15**), and a white 2012 Isuzu NPR construction truck bearing Washington license plate C35313N registered to Walker Construction Preservation[10] at 18008 114th Ave SE, Renton, Washington (**Subject Vehicle 16**). Agents obtained GPS location data on several of Michael Walker's cell phones, including TT8, which showed that Michael Walker remained at **Subject Premises 13** overnights from July to August 2020.[11] Additionally, agents installed a pole camera near **Subject Premises 13**, which

---

[9] During this controlled buy, agents conducted a pre-buy search of CS2 and CS2's vehicle and located a small pistol in the center console with a loaded magazine inserted but no round chambered. CS2 was confronted by agents about the firearm, and CS2 stated that CS2's boyfriend/girlfriend had been driving the vehicle and must have left the firearm in the vehicle after last driving the vehicle the night before. Agents observed that CS2 seemed genuinely unaware of the firearm's presence in the vehicle when confronted by agents. While CS2 remained in the presence of agents, agents contacted CS2's boyfriend/girlfriend who confirmed that the firearm was theirs, describing the make and model of the pistol, the location of purchase, and providing details of using the firearm last night, which matched CS2's statement; the boyfriend/girlfriend also stated that the firearm was stored at home in a lock box with a key that only he/she had. The boyfriend/girlfriend sounded genuinely upset that he/she had forgotten to remove the weapon from the vehicle. Agents conducted a records check and confirmed that the boyfriend/girlfriend had a valid license to carry a firearm. After verifying CS2's statements, agents took possession of the firearm and conducted another search of CS2's person and vehicle, which was clear of drugs, currency, and weapons. The firearm was retained by agents for return to the owner. Agents later obtained an eTrace report regarding the firearm, and also contacted the firearms dealer that the boyfriend/girlfriend claimed had sold him/her the firearm; both of these confirmed that that purchase had taken place as reported. Finally, investigators test-fired the firearm and submitted the spent casing for entry into the NIBIN database. Based on a comparison of the spent casing to other casings in the database, there appears to be no evidence that the firearm in question was used in a gun offense or shots-fired incident.

    During this controlled purchase and some prior controlled purchases, CS2 has worn a body recorder that allowed agents to live monitor and record the conversation. Agents have not located any drugs, weapons, or other illegal items during searches of CS2's person or vehicle (conducted both before and after each controlled purchase) on any prior controlled purchase operation during this investigation or other investigations in which CS2 has been used.

[10] Based on open source resources, agents identified Walker Construction Preservation as a business owned/operated by Michael Walker. However, during the course of this investigation, including the wiretap on Michael Walker's cell phone TT8, agents did not observe Michael Walker performing legitimate construction work. At most, Michael Walker discussed and coordinated occasional minor yard work and tree removal jobs for friends. Accordingly, agents believe that Walker Construction Preservation is a sham business.

[11] Agents collected location data for TT8 during June through August 2020.

AFFIDAVIT OF SHAWNA MCCANN –- 19
USAO #2019R01083

1    provided images of the driveway; a review of that video showed that Michael Walker

2    regularly remained at **Subject Premises 13** overnights from September 2019 to the

3    present. Agents conducted several controlled purchases of marijuana from Michael

4    Walker in the fall of 2019 to the spring of 2020 utilizing a confidential source; based on

5    these controlled purchases, physical and video surveillance, toll analysis, and other

6    investigative techniques, agents obtained a court-authorized wire and electronic

7    communications interception on TT8 used by Michael Walker. During this investigation,

8    and specifically the period of wire and electronic communications interception, agents

9    observed Michael Walker conducting multiple marijuana transactions on a daily to

10   weekly basis. Agents observed Michael Walker leaving from and coming back to

11   **Subject Premises 13** immediately before and after these drug transactions, and agents

12   observed Michael Walker driving **Subject Vehicles 15** and **16** to and from these drug

13   transactions. Some of these drug transactions and agents' observations are noted below

14   for purposes of establishing probable cause to search **Subject Premises 13** and **Subject**

15   **Vehicles 15** and **16**.

16         27.    Michael Walker has a criminal history which includes three felony

17   convictions for drug possession.[12] As set forth above, Michael Walker has two gross

18   misdemeanor convictions in 2018, which render him unable to hold a marijuana

19   producer, processor, and/or retailer license in the state of Washington.[13] On March 15,

20   2021, agents were advised by an investigator with the Washington State Liquor and

21

22

23

24

25   [12] The Washington Supreme Court has recently held that Washington's state law prohibiting mere possession of controlled substances is unconstitutional.

26   [13] According to the Washington State Liquor and Cannabis Board (WSLCB): "When the board processes a criminal history check on an applicant, it uses a point system to determine if the person qualifies for a license. The board will

27   not normally issue a marijuana license to an applicant who has accumulated eight or more points . . . " *See* https://lcb.wa.gov/mjlicense/criminal_history_check. The WSLCB awards 12 points for any felony convictions in

28   the last ten years and 5 points for any gross misdemeanor convictions in the last three years. *Id.* The gross misdemeanor convictions alone would be sufficient to disqualify Michael Walker for a marijuana license.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Cannabis Board that Michael Walker does not hold any active marijuana producer,
2  processor, or retailer license.[14]

3       28.   On July 12, 2020, at approximately 10:12 a.m., agents intercepted a call
4  between Michael Walker using TT8 and Kevin Gipson using TT6 (identification of
5  Kevin Gipson as the user of TT6 is described below in the section on Kevin Gipson).
6  (Session 244.) During the call, Kevin Gipson told Michael Walker "hit me up because
7  I'm trying to get back right." Based on other intercepted communications in this
8  investigation, Kevin Gipson consistently used the term "get right" when trying to get
9  resupplied with marijuana and cocaine.

10       29.   On July 13, 2020, at approximately 7:53 a.m., agents intercepted a call
11  between Michael Walker using TT8 and Stevie Allen using TT7 (identification of Stevie
12  Allen as the user of TT7 is described below in the section on Stevie Allen). (Session
13  345.) Michael Walker told Stevie Allen that he was going to see Kevin Gipson and that
14  he would see Stevie Allen as well. Based on physical surveillance, discussed further
15  below in the sections on Kevin Gipson and Stevie Allen, agents know that Stevie Allen's
16  stash apartment[15] and Kevin Gipson's apartment are in the same apartment building,
17  4727 Beacon Avenue South, Seattle, Washington. At approximately 9:14 a.m., agents
18  observed Michael Walker arrive at 4727 Beacon Avenue South, Seattle, Washington in
19  **Subject Vehicle 16**. Michael Walker parked in front of the apartment building and then
20  went inside Kevin Gipson's apartment located at 4727 Beacon Avenue South, #9, Seattle,
21  Washington (**Subject Premises 21**). At approximately 9:20 a.m., Michael Walker came
22  back to his truck, **Subject Vehicle 16**, and left the area. At approximately 9:30 a.m.,
23  agents intercepted calls between Michael Walker using TT8 and Stevie Allen using TT7.

24

25  [14] In Washington, marijuana can only be sold and purchased at state-licensed retail stores. *See* RCW 69.50.302–
26  69.50.303. Moreover, home grown marijuana for sale remains illegal in Washington. *Id.*; *see also* RCW 69.50.360,
    69.50.363, 69.50.366, 69.50.401, and 69.50.4013. Recreational use marijuana must be purchased from a state-
27  licensed retailer. *Id.*
    [15] A "stash house" or "stash" is a location, other than a drug trafficker's own residence, where a trafficker stores his
28  drug supply and sometimes other related paraphernalia or records in order to keep them safe but at a location that is
    separate from his residence in order to avoid detection by law enforcement and/or to protect himself or his family.

(Sessions 371 and 372.) Michael Walker asked, "You up that way now [at the stash house]?" and Stevie Allen said, "Yep, yep. We're headed up that way now." Michael Walker replied, "Ok yep, I need two minutes, but I'll meet you up there." After hanging up, Michael Walker called Stevie Allen right back and asked, "Hey Tig, what's the name of it [marijuana] again?" Stevie Allen replied, "Icing." Michael Walker said, "Ok, yeah yeah I'll be up there in a second." Based on my training and experience, I believe that Michael Walker discussed meeting at Stevie Allen's stash house located at 4727 Beacon Avenue South, Seattle, Washington (**Subject Premises 16**) to purchase the icing strain of marijuana from Stevie Allen. At approximately 10:03 a.m., agents observed Stevie Allen arrive at the stash house in his silver 2007 Audi Q7 bearing Washington license BQV2133 (**Subject Vehicle 20**). Stevie Allen got out of the silver Audi Q7, **Subject Vehicle 20**, and went inside the stash house located at 4727 Beacon Avenue South, #2, Seattle, Washington (**Subject Premises 16**). At approximately 10:06 a.m., agents intercepted a call between Michael Walker using TT8 and Stevie Allen using TT7. (Session 380.) Michael Walker said he was on his way over there now. At approximately 10:24 a.m., agents observed Michael Walker arrive in **Subject Vehicle 16** and park in front of the apartment building. Michael Walker walked towards the stash apartment. At approximately 10:28 a.m., agents observed Michael Walker walk back to **Subject Vehicle 16** with a water bottle in one hand and something cupped in his other hand. Michael Walker then departed in **Subject Vehicle 16**. Based on my training and experience, I believe that Michael Walker initially met with Kevin Gipson, using **Subject Vehicle 16** to drive to Kevin Gipson's apartment, sold Kevin Gipson marijuana, and left, and that Michael Walker then returned and met with Stevie Allen, again using **Subject Vehicle 16** to drive to Stevie Allen's stash house, and was supplied marijuana by Stevie Allen.

30.     On July 16, 2020, at approximately 11:41 a.m., agents observed Michael Walker, via video surveillance, leave his residence at 18008 114th Avenue Southeast, Renton, Washington (**Subject Premises 13**), holding a black plastic bag, and

AFFIDAVIT OF SHAWNA MCCANN –- 22
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

get into a gold Honda Accord bearing Washington state license plate number BKY5357 (**Subject Vehicle 15**). Michael Walker then drove out of the area. At approximately 11:50 a.m., investigators intercepted a call between Michael Walker using TT8 and Kevin Gipson using TT6. (Session 803.) During the call, Michael Walker told Kevin Gipson that he was "on my way." At approximately 12:12 p.m., agents observed Michael Walker arrive at 4727 Beacon Avenue South, Seattle, Washington in **Subject Vehicle 15**. As set forth below, agents know that 4727 Beacon Avenue South, #9, Seattle, Washington is Kevin Gipson's residence. At approximately 12:10 p.m., video surveillance captured Michael Walker walk up the stairs towards the area of Kevin Gipson's apartment with an item in his hand that appeared to be a cell phone. At approximately 12:13 p.m., agents observed Michael Walker walk down the stairs from Kevin Gipson's apartment with an item in his hand that again appeared to be a cell phone and get back into **Subject Vehicle 15**. Based on my training and experience, I believe that Michael Walker exited his residence, **Subject Premises 13**, with a black plastic bag that contained marijuana and then drove to Kevin Gipson's apartment in his gold Honda Accord, **Subject Vehicle 15**, to sell marijuana to Kevin Gipson. I know based on prior physical surveillance and controlled purchases from Michael Walker that he stores and transports marijuana in black plastic bags.

31.     A few minutes later, at approximately 12:16 p.m., investigators intercepted a conversation between Michael Walker using TT8 and an unidentified male using phone number (206) 822-5127 (referred to as UM5127). (Session 812.) During this call, Michael Walker told UM5127 that his "guy says it's only two available," and UM5127 asked if Michael Walker could "meet my nephew with it" and "shoot me a picture of it." At approximately 12:22 p.m., Michael Walker using TT8 sent the following MMS picture message to UM5127 (PID 401760):

AFFIDAVIT OF SHAWNA MCCANN -- 23
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5



6      32.      Based on my training and experience, I believe that UM5127 was seeking

7  to purchase marijuana, and Michael Walker indicated he only had two pounds of

8  marijuana available. UM5127 asked Michael Walker to bring the marijuana to his

9  nephew. Michael Walker then sent a picture of the marijuana to UM5127. At

10  approximately 12:17 p.m., agents observed Michael Walker pull away from Kevin

11  Gipson's apartment. At approximately 12:42 p.m., investigators intercepted a call

12  between Michael Walker using TT8 and an unidentified male using phone number (206)

13  271-3440 (referred to as UM3440). (Session 819.) During the call, Michael Walker and

14  UM3440 discussed meeting in front of Fry's Electronics in Renton in five minutes. At

15  approximately 12:50 p.m., investigators intercepted a text message from Michael Walker

16  to UM3440 stating, "I'm here unc." (Session 821.) At approximately 12:52 p.m., agents

17  observed Michael Walker sitting in **Subject Vehicle 15** in a parking spot of the Fry's lot.

18  At approximately 12:54 p.m., investigators intercepted a phone conversation between

19  Michael Walker using TT8 and UM5127. (Session 826.) During the call, UM5127

20  discussed Michael Walker meeting with UM5127's nephew at the Fred Meyer off of

21  Benson. At approximately 12:55 p.m., agents observed a maroon 2000 Dodge Caravan

22  bearing Washington state license plate number BQX1443 pull into a parking spot next to

23  Michael Walker at Fry's Electronics in Renton. Agents observed Michael Walker get out

24  of **Subject Vehicle 15** and get into the front seat of the Caravan. A short time later,

25  Michael Walker got out of the Caravan, retrieved an unknown item from **Subject Vehicle**

26  **15**, and got back into the front passenger seat of the Caravan. Agents observed Michael

27  Walker and the unknown male driver of the Caravan both leaning over and looking inside

28  a plastic bag that Michael Walker was holding. Agents then observed Michael Walker

AFFIDAVIT OF SHAWNA MCCANN –- 24
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and the unknown male counting money. At approximately 1:05 p.m., agents observed

2   Michael Walker get out of the Caravan and back into **Subject Vehicle 15**. Michael

3   Walker then drove out of the area. About ten minutes later, at approximately 1:15 p.m.,

4   video surveillance showed Michael Walker arriving back at his residence, **Subject**

5   **Premises 13**. Based on my training and experience, I believe that Michael Walker left

6   Kevin Gipson's apartment and immediately drove to conduct another marijuana

7   transaction with UM3440, that Michael Walker used **Subject Vehicle 15** to facilitate the

8   drug transaction, that Michael Walker kept the marijuana in **Subject Vehicle 15** and went

9   back into **Subject Vehicle 15** to retrieve the marijuana in the plastic bag to sell to

10  UM3440, and lastly that Michael Walker returned to **Subject Premises 13** immediately

11  after the drug transaction.

12          33.     Later that same day, at approximately 1:24 p.m., investigators intercepted

13  another phone conversation between Michael Walker using TT8 and UM5127. (Session

14  835.) During the call, UM5127 said "Joe…he's right here" and put "Joe" on a three-way

15  call with UM5127 and Michael Walker. Agents believed Joe (also referred to as JoJo on

16  the call by UM5127) was UM5127's nephew based on the context of the intercepted

17  conversations. Joe and Michael Walker agreed to meet by the gas pumps at Fred Meyer;

18  they discussed that Joe would be driving a "gray Magnum" and Michael Walker would

19  be driving a "gold Honda" (**Subject Vehicle 15**), and agreed to meet in ten minutes. At

20  approximately 1:37 p.m., video surveillance showed Michael Walker leaving **Subject**

21  **Premises 13** in **Subject Vehicle 15**. At approximately 1:40 p.m., agents observed

22  Michael Walker arrive in **Subject Vehicle 15** at the gas pumps at the Fred Meyer store in

23  Renton. A gray 2005 Dodge Magnum bearing Washington state license plate number

24  AFJ8757 then pulled up next to Michael Walker. At approximately 1:41 p.m., agents

25  observed an unknown male get out of the driver's seat of the Magnum and into the front

26  passenger seat of **Subject Vehicle 15** with Michael Walker. At approximately 1:46 p.m.,

27  agents observed the unknown male get back out of the front passenger seat of **Subject**

28  **Vehicle 15** and get into the driver's seat of the Magnum; the unknown male was

AFFIDAVIT OF SHAWNA MCCANN –- 25
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  observed with a plastic bag in his hands. Michael Walker then drove out of the area, and

2  the Magnum drove out of the area. Based on my training and experience, I believe that

3  Michael Walker left **Subject Premises 13** in **Subject Vehicle 15** and drove directly to

4  the drug transaction with UM5127's nephew. Based on the multiple drug transactions

5  observed on this day conducted by Michael Walker, I believe that Michael Walker stores

6  marijuana in **Subject Premises 13** and **Subject Vehicle 15** and that Michael Walker gave

7  the plastic bag containing marijuana to UM5127's nephew during the drug deal

8  conducted inside **Subject Vehicle 15**.

9         34.    On July 18, 2020, at approximately 7:42 a.m., Michael Walker using TT8

10  called an unidentified male, referred to as "Short," at phone number (253) 876-4115.

11  (Session 1059.) Michael Walker and "Short" discussed meeting at a Safeway in Renton,

12  Washington for "Short" to purchase marijuana from Michael Walker. Michael Walker

13  told "Short" that Michael Walker had "four different kinds, what kind you want? I got

14  wedding cake, I got some shit called icing, I got some really good gorilla glue number 4,

15  and then I got some shit called coffee cake. You want to see them when you get there?"

16  Short said he "wants just two of them though" and that he was "throwing on my socks

17  right now." At approximately 7:45 a.m., agents observed, via remote video surveillance,

18  Michael Walker exit **Subject Premises 13** wearing a red hoodie. The front pocket/pouch

19  of Michael Walker's red hoodie had a bulge and was weighed down, indicating there was

20  an item with some weight in his front hoodie pocket. Michael Walker got into the driver's

21  seat of a white 2012 Isuzu NPR construction truck bearing Washington license plate

22  C35313N (**Subject Vehicle 16**) and departed his residence at approximately 7:57 a.m. At

23  approximately 8:04 a.m., Michael Walker using TT8 called Short at phone number (253)

24  876-4115. (Session 1060.) The parties agreed to meet at the AM/PM. At approximately

25  8:11 a.m., Short called Michael Walker at TT8 and told Michael Walker that he would be

26  there in two minutes. Michael Walker said he was there. (Session 1063). Agents did not

27  have physical surveillance in place to observe this drug transaction; however, Michael

28  Walker was observed driving **Subject Vehicle 16** that day. Based on my training and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  experience, I believe that Michael Walker discussed selling Short two units of marijuana.

2  I know that wedding cake, icing, gorilla glue 4 and coffee cake are marijuana strains, and

3  that Michael Walker was selling these strains during the period of wire and electronic

4  communication interceptions on TT8.

5          35.     Later that same day, at approximately 11:56 a.m., investigators intercepted

6  a phone conversation between Michael Walker using TT8 and an unknown male using

7  phone number (206) 661-1127 (referred to as UM1127). (Session 1092.) During the

8  conversation, the parties discussed meeting at the AM/PM off of Grady in Renton,

9  Washington.[16] Agents went to the area of the AM/PM located at 710 South Grady Way,

10  Renton, Washington. At approximately 12:11 p.m., agents located a gray 2008 Lexus LS

11  bearing Washington state license plate number LEM983G parked at the gas pumps. At

12  approximately 12:12 p.m., investigators intercepted a phone conversation between

13  Michael Walker using TT8 and UM1127. (Session 1093.) During the conversation,

14  UM1127 told Michael Walker that he was in a Lexus by the gas pumps. An unknown

15  male was observed getting out of the driver's seat of the Lexus and going to the trunk

16  before getting back into Lexus. At approximately 12:14 p.m., agents observed Michael

17  Walker arrive in the Isuzu work truck, **Subject Vehicle 16**. Michael Walker parked,

18  walked over to the Lexus, and got into the front passenger seat. At approximately 12:17

19  p.m., Michael Walker got back out of the Lexus and went into the AM/PM, and the

20  Lexus drove out of the area. At approximately 12:20 p.m., Michael Walker came back

21  out of the AM/PM, got into **Subject Vehicle 16**, and drove out of the area. At

22  approximately 12:28 p.m., investigators intercepted a phone conversation between

23  Michael Walker using TT8 and UM1127. (Session 1095.) During the conversation,

24  Michael Walker told UM1127 to "take a picture of the whole p." Investigators believe

25  Michael Walker was instructing UM1127 to take a picture of a whole pound of

26

27  _____

28  [16] Two days prior, on July 16, 2020, Michael Walker using TT8 called UM1127, and UM1127 said that he had
something to show Michael Walker. (Session 920.) Based on my training and experience, I believe that UM1127
had marijuana that he was trying to sell to Michael Walker.

AFFIDAVIT OF SHAWNA MCCANN –- 27
USAO #2019R01083

1    marijuana. Michael Walker told UM1127 that his guy runs through a lot of it and will

2    want to spend. Based on my training and experience, I believe Michael Walker told

3    UM1127 that he has an associate who sells a lot of marijuana and has money to buy a

4    significant amount for redistribution. At approximately 12:28 p.m., surveillance video

5    showed Michael Walker arriving back to **Subject Premises 13** in the Isuzu work truck,

6    **Subject Vehicle 16**. When Michael Walker got out of the truck, he was observed holding

7    two plastic bags. At approximately 12:34 p.m., surveillance video showed Michael

8    Walker leaving **Subject Premises 13** in his gold Honda Accord, **Subject Vehicle 15**;

9    Michael Walker had both of the plastic bags with him when he got into the gold Honda

10   Accord. Based on my training and experience, I believe that UM1127 had marijuana to

11   supply to Michael Walker and that Michael Walker drove **Subject Vehicle 16** to meet

12   UM1127 to look at the marijuana and then asked UM1127 to take a picture of the whole

13   pound of marijuana so Michael Walker could show his customers.

14        36.    Prior to wiretaps on Michael Walker, on April 14, 2020, at approximately

15   1:07 p.m., agents observed, via remote surveillance, Michael Walker depart his residence

16   at **Subject Premises 13** driving the gold Honda Accord, **Subject Vehicle 15**. At

17   approximately 1:24 p.m., agents observed Michael Walker park in a business complex

18   parking lot at 8011 S 224th Street, Kent, Washington, and meet with an unknown male

19   who got into the front passenger seat of the **Subject Vehicle 15**. At approximately 1:39

20   p.m., agents observed the unknown male exit **Subject Vehicle 15** and Michael Walker

21   drive off. At approximately 1:50 p.m., agents observed Michael Walker parked in the

22   Safeway parking lot at 210 Washington Ave S, Kent, Washington, in **Subject Vehicle

23   15**. At approximately 2:02 p.m., agents observed a Nissan Altima bearing Oregon license

24   plate 301LPG park near Michael Walker. A male, positively identified as Carl Justice III,

25   based on a comparison to his driver's license photograph, surveillance photographs, and

26   social media photographs, exited the Nissan Altima and got into the front passenger seat

27   of **Subject Vehicle 15** and met with Michael Walker. At approximately 2:03 p.m., agents

28   observed Carl Justice III get out of **Subject Vehicle 15** carrying a light brown paper bag,

AFFIDAVIT OF SHAWNA MCCANN -- 28
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  measuring approximately 6" x 6", wrapped tightly and carried closely to Carl Justice III's

2  chest as a means of concealing the bag. Carl Justice III, carrying the brown bag, got into

3  the driver's seat of the Nissan Altima and departed the parking lot. Shortly after meeting

4  with Michael Walker, at approximately 2:25 p.m., agents who had been regularly

5  monitoring Carl Justice III's Snapchat account[17] observed a new social media post on the

6  account bragging about just having acquired marijuana to sell with a photograph of the

7  marijuana. Based on my training and experience, I believe that Michael Walker met with

8  the unknown male and Carl Justice III to sell them marijuana and that Michael Walker

9  left his residence, **Subject Premises 13**, and immediately went to the first drug deal using

10  **Subject Vehicle 15**, and eventually returned to **Subject Premises 13** after the second

11  drug deal with Justice, as set forth below.

12        37.    After conducting the drug deal with Carl Justice III, at approximately 2:20

13  p.m., agents observed, via remote surveillance, Michael Walker arrive at his residence,

14  **Subject Premises 13**, driving the gold Honda Accord, **Subject Vehicle 15**. Just prior to

15  that, at approximately 2:17 p.m., data from a Pen Register and Trap and Trace device

16  installed on Michael Walker's cell phone number (425) 428-9267 (TT4) showed that

17  Michael Walker received and answered a call from phone number (206) 422-4378, which

18  based on law enforcement database checks was associated with Cesar Clemente. At

19  approximately 2:41 p.m., agents observed, via remote surveillance, a white Toyota

20  Highlander bearing Washington license plate BCW0719 (**Subject Vehicle 18**) depart the

21  vicinity of a residence located at 12120 SE 186th St, Renton, Washington (**Subject**

22  **Premises 14**). Per law enforcement database checks, this vehicle is a white 2008 Toyota

23  Highlander registered to Cesar Clemente at 2103 E Republican Street, Seattle,

24  Washington. At approximately 2:43 p.m., agents observed, via remote surveillance, the

25  white Toyota Highlander bearing Washington license plate BCW0719 (**Subject Vehicle**

26

27  ———————————

28  [17] Agents identified the social media Snapchat account of Carl Justice III, under the username "2daze8," based on observing photographs of Carl Justice III posted on the account, including the main profile picture. Agents are familiar with Carl Justice III from prior investigations and are able to recognize him on sight.

**18**) pull into the driveway of Michael Walker's residence, **Subject Premises 13**. Via remote video surveillance, a male, identified as Cesar Clemente III based on a comparison to his driver's license photograph, exited the white Toyota Highlander, opened the rear driver's side door, retrieved a black backpack, and walked into **Subject Premises 13**. At approximately 2:44 p.m., data from a Pen Register and Trap and Trace device installed on TT4 showed that Michael Walker received and answered a call from Cesar Clemente using (206) 422-4378. At approximately 2:49 p.m., agents observed, via remote surveillance, Cesar Clemente exit **Subject Premises 13** carrying the black backpack in one hand, which appeared to be lighter/weigh less than when Cesar Clemente carried the backpack into the residence. Cesar Clemente put the black backpack in the rear driver's side of the Toyota Highlander and departed Michael Walker's residence. At approximately 2:57 p.m., agents observed Cesar Clemente park at an apartment complex located at 1104 S 18th Street, Renton, Washington. Agents then observed Cesar Clemente meeting with an unknown male in the front passenger seat of the white Toyota Highlander. At approximately 3:14 p.m., agents observed Cesar Clemente and the unknown male standing in the parking lot of the apartment complex smoking marijuana, determined based on the odor emitted from the smoke. At approximately 4:09 p.m., agents observed the unknown male go inside an upstairs apartment unit door, either unit #7 or #4, by entering a code on the door. At approximately 4:11 p.m., agents observed the unknown male exit the apartment unit carrying a black and red shoe box in one hand and accompanied by a small child. The black male handed the shoe box to Cesar Clemente and then Cesar Clemente departed the apartment complex lot driving the white Toyota Highlander.

38.     At approximately 4:15 p.m., agents initiated a vehicle stop on Cesar Clemente. Cesar Clemente failed to stop his vehicle and continued driving. Cesar Clemente stopped at a red light in the far left lane at the intersection of Benson Road S and 515/Benson Drive S in Renton, Washington, but still refused to pull over. An agent with activated emergency lights pulled up alongside Cesar Clemente and told Cesar

AFFIDAVIT OF SHAWNA MCCANN –- 30
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Clemente that he was the police and instructed Cesar Clemente to pull over. Cesar

Clemente refused to pull over and proceeded to run the red light, crossing other lanes of

stopped traffic, and turned right onto 515/Benson Drive S. Agents observed Cesar

Clemente eventually park on the street across from a residence located at 1032 S 32nd

Place, Renton, Washington. Cesar Clemente quickly exited the white Toyota Highlander,

grabbed the black backpack and another bag from the backseat of the white Toyota

Highlander, and ran across the street towards the residence at 1032 S 32nd Place, Renton,

Washington. Agents observed Cesar Clemente run to the side of the house, through a

wooden fence/side gate, and into the backyard of 1032 S 32nd Place, Renton,

Washington. At approximately 4:35 p.m., agents observed Cesar Clemente exit the

residence at 1032 S 32nd Place, Renton, Washington followed by an unknown male later

identified as Cesar Clemente's cousin. Cesar Clemente was placed into handcuffs and

temporarily detained by agents as a result of his failure to pull over for law enforcement

and then fleeing on foot with a backpack and another bag into his cousin's residence.

Cesar Clemente was read *Miranda* warnings by agents. Cesar Clemente verbally stated

that he understood his rights and agreed to waive his rights and speak with law

enforcement without a lawyer present. Cesar Clemente admitted that he had four pounds

of marijuana in the backpack and a firearm, all of which he had retrieved from the white

Toyota Highlander before running across the street to his cousin's house.[18] Cesar

Clemente stated that he had a valid firearms carry permit and carried the firearm for

protection. Cesar Clemente admitted he often traveled with large amounts of cash and

marijuana and was worried about being robbed. Agents located a firearm, a cell phone,

and keys to the white Toyota Highlander on Cesar Clemente's person when he exited his

cousin's house and was detained. Cesar Clemente provided agents with verbal consent to

---

[18] Agents consulted with a Washington State Liquor and Cannabis Board investigator who was shown photographs of the marijuana seized from Cesar Clemente and advised that the marijuana was not legally packaged for processing, transportation, or sale, nor did Cesar Clemente have the required inventory form for transporting marijuana legally.

AFFIDAVIT OF SHAWNA MCCANN –- 31
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  search his cousin's house, including the belongings he put in his cousin's house, and

2  separate verbal consent to search the house was also obtained from Cesar Clemente's

3  cousin. In the cousin's residence, agents located a backpack that Cesar Clemente

4  acknowledged was his and contained approximately four pounds of marijuana. Agents

5  also located an additional pound of marijuana in the garage and a cell phone in the house.

6  Cesar Clemente denied going into the garage, but his cousin told agents that Cesar

7  Clemente went into the garage before exiting the house and being detained by law

8  enforcement and that the one pound of marijuana in the garage was not his. Cesar

9  Clemente eventually admitted that the cell phone found in his cousin's house was his, and

10  that he had two cell phones. Cesar Clemente provided agents with verbal consent to

11  search his white Toyota Highlander. Agents located a wallet inside the vehicle that

12  contained a driver's license for Cesar Clemente, various credit/bank cards, an EBT card,

13  and approximately $30.00 in the center console of the vehicle. The white Toyota

14  Highlander smelled strongly of marijuana, as did Cesar Clemente's clothes. Cesar

15  Clemente declined to provide consent to search his cell phones. While agents were

16  submitting Cesar Clemente's cell phones into evidence approximately one to two hours

17  after releasing Cesar Clemente, both cell phones were remotely wiped/restored to factory

18  settings. Based on my training and experience, I believe that Cesar Clemente went to

19  Michael Walker's residence, **Subject Premises 13**, to supply Michael Walker with

20  marijuana, which was contained in the black backpack that Cesar Clemente carried into

21  **Subject Premises 13**. As set forth below, remote video surveillance showed Cesar

22  Clemente going into **Subject Premises 13** on a weekly basis carrying bags into **Subject**

23  **Premises 13**.

24        39.     Michael Walker continues to reside at **Subject Premises 13** and use

25  **Subject Vehicles 15** and **16**. For example, on February 16, 2021, agents observed, via

26  remote video surveillance, Michael Walker walking in the driveway of **Subject Premises**

27  **13** and pulling **Subject Vehicle 15** into the driveway; **Subject Vehicle 16** was already

28  parked in the driveway, and agents had earlier observed via remote video surveillance

1    Michael Walker driving **Subject Vehicle 16** into the driveway of **Subject Premises 13**.

2    Additionally, agents believe that Michael Walker continues to traffic marijuana based on

3    observing, via remote video surveillance, Michael Walker making frequent and quick

4    trips to and from his residence, similar to the pattern of activity he demonstrated during

5    the wiretap on TT8 when Michael Walker was making quick and frequent trips to meet

6    with marijuana customers and suppliers.

7           40.    On March 17, 2021, at approximately 7:40 p.m., agents observed, via

8    remote video surveillance, a vehicle pull into the driveway of **Subject Premises 13** and

9    an unknown male wearing neon green pants exit the vehicle, without any bags in his

10   hands, and walk inside **Subject Premises 13**. At approximately 7:52 p.m., the same

11   unknown male in the neon green pants exited **Subject Premises 13** carrying a plastic

12   grocery-style bag that was full. The male got into his vehicle and drove off. Based on my

13   training and experience and prior physical surveillance during this investigation, I know

14   that Michael Walker traffics marijuana using plastic bags to transport the drugs.

15          41.    I know, based on my training and experience, that drug traffickers

16   frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

17   stash locations in order to protect their supply and to have the narcotics on hand for

18   transactions. I also know that drug traffickers maintain records and other trafficking-

19   related materials in their premises, including residences, for a long period of time,

20   including current and prior cell phone devices that contain text messages and contact lists

21   of drug trafficking associates and pay-owe sheets. Accordingly, I believe that Michael

22   Walker was supplied marijuana by Cesar Clemente, among others, has stored and likely

23   continues to store marijuana in **Subject Premises 13**, and has used and likely continues

24   to use **Subject Vehicles 15** and **16** to conduct drug transactions.

25          **B.   Cesar Clemente III's Residence and Two Vehicles**

26          42.    During this investigation, based on physical surveillance and remote video

27   surveillance, agents identified Cesar Clemente III's residence as 12120 SE 186th Street,

28   Renton, Washington (**Subject Premises 14**) and two of his vehicles as a black 2003

AFFIDAVIT OF SHAWNA MCCANN –- 33
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  BMW X5 bearing Washington license plate BRU7044 registered to Cesar Y. Clemente at

2  2103 E Republican Street, Seattle, Washington[19] (**Subject Vehicle 19**), and a 2014 Audi

3  Q7 bearing Washington license plate BUB0667 registered to Cesar Y. Clemente III at

4  304 N Wycoft Avenue, Unit 2, Bremerton, Washington[20] (**Subject Vehicle 48**). Agents

5  installed a pole camera capturing the street in front of **Subject Premises 14**, which

6  showed that Cesar Clemente remained at **Subject Premises 14** overnights from April

7  2020 to around August 2020 when the pole camera was taken down; additionally, the

8  utilities at **Subject Premises 14** have been billed to Cesar Clemente from at least January

9  2019 through the most recent bill in February 2021. Agents observed Cesar Clemente

10 conducting multiple suspected marijuana transactions, supplying marijuana to Michael

11 Walker and smoking marijuana with an unknown male. Agents observed Cesar Clemente

12 leaving from and coming back to **Subject Premises 14** immediately before and after

13 these drug transactions, and agents observed Cesar Clemente driving **Subject Vehicle 19**

14 to and from these drug transactions. Some of these drug transactions and agents'

15 observations are noted below for purposes of establishing probable cause to search

16 **Subject Premises 14** and **Subject Vehicles 19** and **48**.

17      43.      Beyond the April 14, 2020 transaction described above in the section on

18 Michael Walker, agents observed Cesar Clemente make short visits consistent with drug

19 transactions at Michael Walker's residence, **Subject Premises 13**, on numerous

20 occasions. On March 27, 2020, at approximately 10:08 a.m., agents observed, via remote

21 video surveillance, Cesar Clemente, identified based on a comparison to his driver's

22 license photograph, arrive at Michael Walker's residence, 18008 114th Avenue SE,

23

24

25 [19] Agents conducted physical surveillance at the residence located at 2103 E Republican Street, Seattle, Washington, and observed a vehicle registered to Cesar Clemente with a date of birth indicating that the likely user was Cesar

26 Clemente III's father. Accordingly, agents believe 2103 E Republican Street, Seattle, Washington is a family residence of Cesar Clemente III. I know based on my training and experience, that drug traffickers often have

27 vehicles, cell phones, and other assets registered to family members and family members' residences in order to avoid law enforcement detection and the seizure of their assets and that the drug traffickers frequently reside at

28 and/or stash drugs at locations other than their family residence.
[20] Agents have not observed Cesar Clemente III at this location on prior surveillance.

AFFIDAVIT OF SHAWNA MCCANN –- 34
USAO #2019R01083

1   Renton, Washington, driving a black BMW 550 bearing Washington license plate

2   BST0317 (Subject Vehicle 17). Cesar Clemente walked into Michael Walker's residence

3   (**Subject Premises 13**) carrying a dark-colored backpack worn on his back, which

4   appeared to be full. Agents then saw Subject Vehicle 17 depart at approximately 10:17

5   a.m. with Cesar Clemente driving; the surveillance camera did not capture Cesar

6   Clemente exiting **Subject Premises 13**, entering Subject Vehicle 17, or what, if anything,

7   he was carrying.

8        44.    On March 31, 2020, 12:50 p.m., video surveillance showed Cesar Clemente

9   arrived at Michael Walker's residence (**Subject Premises 13**) driving a white Toyota

10  Highlander bearing Washington license plate BCW0719 (Subject Vehicle 18). Cesar

11  Clemente walked into Michael Walker's residence carrying in one hand a large brown

12  paper bag with the top of the bag rolled down. Cesar Clemente then exited Michael

13  Walker's residence at approximately 12:58 p.m., carrying a smaller, flatter brown paper

14  bag/envelope held with two hands tightly to his chest, got into Subject Vehicle 18, and

15  departed.

16       45.    On April 1, 2020, at approximately 10:59 a.m., video surveillance showed

17  Cesar Clemente arrived at Michael Walker's residence (**Subject Premises 13**) driving

18  Subject Vehicle 18. Cesar Clemente departed Michael Walker's residence in Subject

19  Vehicle 18 at approximately 11:01 a.m. The surveillance did not capture Cesar Clemente

20  walking between Subject Vehicle 18 and **Subject Premises 13**.

21       46.    On April 8, 2020, at approximately 7:19 p.m., video surveillance showed a

22  black BMW SUV with no front license plate (believed to be **Subject Vehicle 19**) depart

23  Cesar Clemente's residence located at 12120 SE 186th St, Renton, Washington (**Subject**

24  **Premises 14**); the images were insufficient for agents to identify the model of BMW or

25  the rear license plate. Three minutes later, at approximately 7:22 p.m., video surveillance

26  showed Cesar Clemente arrived at Michael Walker's residence (**Subject Premises 13**)

27  driving a black BMW X5, an SUV, bearing Washington license plate BRU7044 (**Subject**

28  **Vehicle 19**). Agents noted that the distance between Cesar Clemente's residence in

AFFIDAVIT OF SHAWNA MCCANN -- 35
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Renton and Michael Walker's residence in Renton is approximately .8 miles, consistent with a three-minute drive between the two locations. Cesar Clemente walked into Michael Walker's residence (**Subject Premises 13**) carrying in one hand a large black duffel bag with white marking on the side. Cesar Clemente exited Michael Walker's residence at approximately 7:29 p.m., carrying the black duffel bag slung on his shoulder; based on the way Cesar Clemente carried the bag, it appeared noticeably lighter in weight and less full. Cesar Clemente put the bag in the passenger side of **Subject Vehicle 19** and departed.

47.     On April 9, 2020, at approximately 6:31 p.m., video surveillance showed **Subject Vehicle 19** departed Cesar Clemente's residence (**Subject Premises 14**). About three minutes later, at approximately 6:34 p.m., video surveillance showed Cesar Clemente arrived at Michael Walker's residence (**Subject Premises 13**) driving **Subject Vehicle 19**. Cesar Clemente departed Michael Walker's residence in **Subject Vehicle 19** at approximately 6:37 p.m.

48.     On April 13, 2020, at approximately 6:47 p.m., video surveillance showed Subject Vehicle 18 departed Cesar Clemente's residence (**Subject Premises 14**). About three minutes later, at approximately 6:50 p.m., video surveillance showed Cesar Clemente arrived at Michael Walker's residence driving Subject Vehicle 18. Cesar Clemente walked into Michael Walker's residence carrying in one hand a large brown paper tote bag with red stripes. Cesar Clemente exited Michael Walker's residence at approximately 6:54 p.m., carrying the same brown paper tote bag with red stripes, which appeared lighter than before based on the way that Cesar Clemente carried the bag. Cesar Clemente put the bag in the rear driver's side of Subject Vehicle 18 and departed.

49.     As set forth above, on April 14, 2020, at approximately 2:41 p.m., agents observed, via remote surveillance, Subject Vehicle 18 depart Cesar Clemente's residence (**Subject Premises 14**). At approximately 2:43 p.m., agents observed, via remote surveillance, Subject Vehicle 18 pull into the driveway of Michael Walker's residence, **Subject Premises 13**. Cesar Clemente walked into Michael Walker's residence (**Subject**

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Premises 13**) carrying a black backpack that he retrieved from Subject Vehicle 18. At approximately 2:49 p.m., agents observed Cesar Clemente exit Michael Walker's residence carrying the black backpack in one hand, which appeared to be lighter/weigh less than when Cesar Clemente carried the backpack into the residence. Cesar Clemente put the black backpack in the rear driver's side of Subject Vehicle 18 and departed. A vehicle stop on Cesar Clemente driving Subject Vehicle 18 later that same day resulted in agents seizing approximately five pounds of marijuana and a firearm from Cesar Clemente.

50.     Based on the frequent, short trips Cesar Clemente made to Michael Walker's residence, often carrying a bag inside Michael Walker's residence and exiting with a bag that appeared lighter, and the vehicle stop shortly after Cesar Clemente visited Michael Walker's residence that resulted in the seizure of about five pounds of marijuana and a firearm, I believe that Cesar Clemente supplied Michael Walker with marijuana during each of these meetings. On several of these meetings, agents observed Cesar Clemente leave his residence at **Subject Premises 14** and drive immediately to Michael Walker's residence to supply Walker with marijuana, indicating that Cesar Clemente stores illegal marijuana in **Subject Premises 14**, and that Cesar Clemente used **Subject Vehicle 19** to transport the marijuana from his residence at **Subject Premises 14** to Michael Walker's residence at **Subject Premises 13**. During agents' interview of Cesar Clemente, it would have been evident to Cesar Clemente that agents were investigating Michael Walker. Cesar Clemente has not been seen to return to Michael Walker's house since the stop on April 14, 2020.[21]

51.     On April 15, 2020, at approximately 11:09 p.m., agents observed, via remote video surveillance, a male, identified as Cesar Clemente based on a comparison to

---

[21] After the stop of Cesar Clemente on April 14, 2020, agents determined that Cesar Clemente had sold Subject Vehicle 18, the vehicle he was stopped in, based on Washington Department of Licensing Records showing a new owner of this vehicle in fall 2020. Additionally, agents have not observed Subject Vehicle 17 since fall of 2020 at **Subject Premises 14**, even though this vehicle appears to still be registered to him.

AFFIDAVIT OF SHAWNA MCCANN –- 37
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his driver's license photograph, walking down the sidewalk from the vicinity of **Subject Premises 14**.

52.     On September 28, 2020, agents intercepted a call between Kefentse Olabisi using TT30 and Jimmy Carter using TT20.[22] (Session 3175.) At the beginning of the call, Jimmy Carter told Kefentse Olabisi that he had inadvertently left some "work [cocaine]" there the night before, and when he came back to get it, Kefentse Olabisi was already asleep. Kefentse Olabisi looked and confirmed that he found it, that it had fallen on the ground. The topic of the conversation then shifted to law enforcement. Jimmy Carter told Kefentse Olabisi that someone "told me last night, he said they doing a lot of stings . . . They doing, they setting a lot of people up, right now." As part of this discussion, Jimmy Carter mentioned that a male referred to as "Sac" [Jamaal Davis aka J-Sac] who had just opened up another restaurant called Tequila and Tacos in Columbia City[23] was "hot [the subject of law enforcement interest]." Kefentse Olabisi agreed and said that his "partner runs, my partner manages the spot. He did it with my Asian partner, Cesar. There is a dude named Cesar. He got his little dispensary too, but man, I ain't fuck with them cats." Jimmy Carter replied, "them motherfuckers is hot bro. My dude already talking about that shit [possibly referring to the April 2020 traffic stop on Cesar Clemente]. Oh all he's doing is he's tripping, he's done, he's done. . . he's liz-aundering [money laundering] through that shit [Jamaal Davis is money laundering through his restaurant], he's done."[24]

---

[22] Identification of Kefentse Olabisi as the user of TT30 and Jimmy Carter as the user of TT20 is discussed below in the sections related to Kefentse Olabisi and Jimmy Carter.

[23] Based on physical surveillance and confidential source information, agents identified Jamaal Davis as a Michael Walker DTO associate who owns restaurant businesses in Seattle, including City Teriyaki and a taco restaurant. A confidential source, CS3, discussed further below in the section on Stevie Allen, advised that Jamaal Davis uses the restaurants to launder drug trafficking proceeds. Agents conducted open source research and located a restaurant named Taco City Taqueria in the Columbia City, Seattle area that is affiliated with City Teriyaki and Jamaal Davis.

[24] On October 1, 2020, agents intercepted a call between Larry Collins using TT16 and Jamaal Davis at phone number (206) 422-3300 (TT32). (Session 987.) During this call, Jamaal Davis said, "it's there but it's not signed or filled out." Larry Collins replied, "who is gonna fill it out?" and Larry Collins stated that "Cesar [Clemente]'s here." Jamaal Davis said that "his signature won't work." Agents believe that Larry Collins was referring to a check that Jamaal Davis had not signed and that Larry Collins was trying to get the check signed by someone authorized to sign. As discussed below, Cesar Clemente was identified as a business partner of Jamaal Davis and thus might have had authority to sign the check.

AFFIDAVIT OF SHAWNA MCCANN -- 38
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The two men then discussed who might be "cooperating" and that people were working with "the feds." Based on my training and experience, I believe that Kefentse Olabisi and Jimmy Carter were discussing that Cesar Clemente, who is Asian/Pacific Islander, was working with Jamaal Davis, whom agents know through prior investigations and confidential source information goes by the alias J-Sac and owns several restaurants/food trucks in the Seattle area including a taco restaurant, and that Jamaal Davis was laundering money through his restaurants. Kefentse Olabisi also referenced Cesar Clemente selling marijuana in addition to working with Jamaal Davis.

53.     In September 2020, a confidential source (CS8)[25] advised agents that CS8 knew Jamaal Davis aka Jay, identified by CS8 based on Jamaal Davis's driver's license photograph. CS8 stated that Jamaal Davis owns Taco City and City Teriyaki in Seattle. CS8 reported that Jamaal Davis offered to introduce CS8 to narcotics dealers who can move multiple ounces to kilos of narcotics and informed CS8 that he would talk to his people and get back to CS8 in a few days. CS8 stated that Jamaal Davis always had a lot of cash on hand and believed that Jamaal Davis was laundering narcotics proceeds through his restaurant businesses. Later in September 2020, Jamaal Davis informed CS8 of prices for cocaine, pills, methamphetamine, and heroin. CS8 advised agents that Jamaal Davis had a business partner that went by the name "Cesar" who CS8 positively identified as Cesar Clemente based on his driver's license.

54.     On March 2, March 15, and March 17, 2021, agents observed **Subject Vehicle 19** parked in the driveway of **Subject Premises 14**. On March 18, 2021, agents observed **Subject Vehicle 19** and **48** parked in the driveway of **Subject Premises 14**, indicating that Cesar Clemente still resides at **Subject Premises 14**.

---

[25] CS8 has been a confidential source for the DEA since 2014. CS8 is a paid informant and is receiving immigration benefits. CS8 has provided credible and reliable information in the past on other narcotics, firearms, and gang investigations, which has been corroborated by physical surveillance, wire interceptions, and open source research. CS8 has worked on previous investigations that led to criminal charges and has successfully completed multiple controlled purchases of narcotics in various investigations. Information and assistance provided by CS8 has led to the seizure of narcotics and United States currency. CS8 has a felony conviction for conspiracy to distribute cocaine and a misdemeanor conviction for reckless endangerment.

AFFIDAVIT OF SHAWNA MCCANN –- 39
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

55.     Agents obtained reported earnings/wages for Cesar Clemente from Washington State Employment Security Department, which showed that he had no reported wages from January 1, 2016, through December 31, 2019. This amount of reported income is inconsistent with his apparent lifestyle of owning two luxury vehicles outright with no financing[26] (**Subject Vehicles 19** and **48**) and does not appear to reflect his actual income, acquired through drug trafficking based on his association with the Michael Walker DTO and its members involved in drug trafficking. Accordingly, I believe that **Subject Vehicles 19** and **48** are themselves evidence of Cesar Clemente's drug trafficking and purchased with illicit drug proceeds.

56.     I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Additionally, most illegal marijuana traffickers supply more than one customer. Cesar Clemente's possession of five pounds of marijuana even after being seen leaving Michael Walker's residence in fact indicates that he had additional customers beyond Michael Walker. Although investigators believe Cesar Clemente stopped supplying Michael Walker with marijuana after the April 2020 traffic stop, they have no reason to believe he stopped his marijuana trafficking entirely. Rather, the information from CS8, and the intercepted calls described above, indicate that he is still involved in distributing marijuana. Moreover, even if agents believed that Cesar Clemente had stopped distributing marijuana altogether (which they do not), they would still expect to find evidence of prior drug trafficking in Cesar Clemente's residences and

---

[26] Washington Department of Licensing records show that Cesar Clemente is the current owner of these vehicles, and the records do not list any other entity, such as a lender, with an ownership interest in the vehicles.

AFFIDAVIT OF SHAWNA MCCANN –- 40
USAO #2019R01083

1   vehicles, in the form of current and prior cell phone devices and pay-owe sheets, among

2   other forms of evidence. Accordingly, there is probable cause to believe that Cesar

3   Clemente's residence, **Subject Premises 14**, and vehicles, **Subject Vehicles 17** through

4   **19**, contain evidence of drug trafficking, firearms trafficking, money laundering, and the

5   overall conspiracy.

6         **C.**     **Stevie Allen's Residence, Stash House, and Vehicle**

7        57.    In late spring of 2020, a confidential source, CS3,[27] provided a phone

8   number for Stevie Allen of (206) 409-2826 (TT7). In early June 2020, agents instructed

9   CS3 to contact Stevie Allen at TT7 to conduct a controlled purchase of marijuana from

10  Stevie Allen. CS3 contacted Stevie Allen at TT7 and asked to purchase marijuana; Stevie

11  Allen told CS3 to come to the "spot" to purchase marijuana; once CS3 was at the "spot,"

12  Stevie Allen told CS3 to leave the money for the marijuana with "Greg." On this

13  occasion, CS3 purchased 472.6 grams of marijuana from Stevie Allen, facilitated by

14  Gregory Mason at Stevie Allen's stash house, aka the "spot," at 4727 Beacon Avenue S,

15  Apartment 2, Seattle, Washington (**Subject Premises 16**).

16       58.    During this investigation, based on physical surveillance, a mail cover,

17  remote video surveillance, GPS location data for Stevie Allen's cell phone (TT7), and

18  intercepted communications, agents identified Stevie Allen's residence as 3922 S

19  Sullivan Street, Seattle, Washington (**Subject Premises 15**), his narcotics stash house as

20  4727 Beacon Avenue S, Apt. 2, Seattle, Washington (**Subject Premises 16**), and his

21  vehicle as a silver 2007 Audi Q7 bearing Washington license plate BQV2133 registered

22  to Stevie T. Allen at **Subject Premises 15** (**Subject Vehicle 20**). Agents obtained GPS

23

24  [27] CS3 has been a confidential source with SPD and FBI for over six years. CS3 has worked as a paid informant.
25  CS3 has provided reliable information in the past, including information that led to successful prosecutions of a
    number of individuals; CS3 has also conducted more than five controlled buys under the supervision of agents. CS3
26  has felony convictions involving assault/robbery, firearm possession, and witness tampering (all more than 7 years
    ago). CS3 also has gross misdemeanor convictions for no contact order violations, obstructing law enforcement, and
27  reckless endangerment (all more than 7 years ago) and several misdemeanor and other minor convictions for assault,
    driving violations, code violations, and obstructing a public servant (all more than 7 years ago). The identity of CS3
28  is not being disclosed in this Application. I believe that doing so could place CS3's safety and security in jeopardy
    and compromise this and other ongoing investigations in which CS3 is involved and is being utilized.

AFFIDAVIT OF SHAWNA MCCANN –- 41
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

location data on TT7, which showed that Stevie Allen remained at **Subject Premises 15** overnights from June to August 2020[28] and frequented **Subject Premises 16**. Additionally, agents installed a pole camera capturing the driveway of **Subject Premises 15**, which showed that Stevie Allen remained at **Subject Premises 15** overnights from June 2020 to September 2020, when the pole camera was removed. In June and July 2020, agents deployed a drop car remote video surveillance capturing the street in front of and door of **Subject Premises 16**, which showed that Stevie Allen frequently visited **Subject Premises 16** from June 2020 to July 2020. Agents conducted two controlled purchases of marijuana from Stevie Allen in the spring and summer of 2020 utilizing CS3; based on these controlled purchases, physical and video surveillance, toll analysis, and other investigative techniques, agents obtained a court-authorized wire and electronic communications interception on TT7 used by Stevie Allen. During this investigation, and specifically the period of wire and electronic communications interception, agents observed Stevie Allen conducting multiple marijuana transactions on a daily to weekly basis. Agents observed Stevie Allen leaving from and coming back to his residence (**Subject Premises 15**) immediately before and after these drug transactions; agents observed Stevie Allen meet customers and conduct drug transactions at his stash house (**Subject Premises 16**); and agents observed Stevie Allen driving **Subject Vehicle 20** to and from these drug transactions. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 15** and **16** and **Subject Vehicle 20**.

59.     Stevie Allen has a criminal history which includes a felony conviction for drug possession. Stevie Allen also has numerous misdemeanor convictions, including attempted unlawful possession of a firearm. On March 15, 2021, agents were advised by

---

[28] Agents collected location data for TT7 during June through August 2020. During this period, agents conducting physical surveillance in the vicinity of the GPS location data for TT7 and observed Stevie Allen, identified based on a comparison to his driver's license photograph, in the area of the GPS pings for TT7 at multiple different times and locations, confirming Stevie Allen is the user of TT7.

AFFIDAVIT OF SHAWNA MCCANN –- 42
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  an investigator with the Washington State Liquor and Cannabis Board that Stevie Allen

2  does not hold any active marijuana producer, processor, or retailer license.

3        60.     On July 23, 2020, at approximately 8:32 p.m., agents intercepted a phone

4  conversation between Stevie Allen using TT7 and Larry Collins using TT16

5  (identification of Larry Collins as the user of TT16 is described below in the section on

6  Larry Collins). (Session 614.) During the call, Larry Collins asked if Stevie Allen was at

7  home, and Stevie Allen said, "No I'm on the hill right now [**Subject Premises 16**]."

8  Larry Collins asked Stevie Allen, "Did you get those other ones [type of marijuana] or

9  you still got those [different type of marijuana]?" Stevie Allen confirmed he did, and

10  Larry Collins said he would be there in about "three or four minutes." Based on

11  interceptions and surveillance in this case, I know that Michael Walker DTO members,

12  including Michael Walker, Stevie Allen, Gregory Mason, and Kevin Gipson, refer to

13  Stevie Allen's stash house (**Subject Premises 16**) as "Beacon," "Beacon Hill," or "the

14  Hill." At approximately 8:34 p.m., agents observed **Subject Vehicle 20** parked in front of

15  **Subject Premises 16**. GPS location data for TT7 showed Stevie Allen's cell phone

16  within range of that location. At approximately 8:39 p.m., agents observed a black 2006

17  Kia Sedona bearing Washington state license plate number BPV7873, registered to Larry

18  Collins (**Subject Vehicle 28**), known to be driven by Larry Collins as discussed below,

19  pull up and park in front of **Subject Premises 16**. A male got out of the driver's seat and

20  went towards the area of apartment #2 (**Subject Premises 16**). At approximately 8:56

21  p.m., agents observed the same male come out of **Subject Premises 16**, carrying a

22  package. The male got back into the Kia, departed, drove to 10409 56th Avenue South,

23  Seattle, Washington (**Subject Premises 30**, the known residence of Larry Collins as

24  discussed below), and went inside the residence at that location. Based on my training

25  and experience, I believe that Larry Collins met Stevie Allen at Stevie Allen's stash

26  house (**Subject Premises 16**) to buy marijuana that was stored at **Subject Premises 16**

27  from Stevie Allen.

28

AFFIDAVIT OF SHAWNA MCCANN -- 43
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     On July 13, 2020, at approximately 12:06 p.m., agents intercepted a call between Michael Walker using TT8 and Stevie Allen using TT7. (Session 188.) Michael Walker asked Stevie Allen: "what'd they say," and Stevie Allen replied: "it's all good. I'm just waiting for him to bring it." Stevie Allen said that he was just waiting for "him" to bring it and "as soon as he brings it, I'm gonna call you." Based on my training and experience, I believe that Michael Walker was trying to buy marijuana from Stevie Allen, but that Stevie Allen was waiting to get more marijuana from his supplier first. At approximately 1:38 p.m., agents intercepted a call between Michael Walker using TT8 and Stevie Allen using TT7. (Session 192.) Stevie Allen told Michael Walker that "4:00 p.m., it'll be all good." Michael Walker said, "Ok, yeah, what I'm gonna do...I'm going to sell her [customer] a couple of mine [marijuana supply] that I already got." Stevie Allen said that his supplier "was up in Eatonville, so you know, because they do the dispensary shit, so he has some deliveries and shit." At approximately 6:22 p.m., agents intercepted a call between Michael Walker using TT8 and Stevie Allen using TT7. (Session 211.) Stevie Allen told Michael Walker that "he [supplier] just text me. He's about to be pulling up." Michael Walker acknowledged and said he would meet Stevie Allen "up there at 9:30 [a.m. the next morning]." At approximately 6:56 p.m., via remote video surveillance, agents observed Stevie Allen, identified based on a comparison to his driver's license photograph, leave his residence (**Subject Premises 15**) driving **Subject Vehicle 20**. At approximately 7:17 p.m., agents intercepted two outgoing calls from TT7 to phone number (206) 963-5184 (TT9), known to be used by Aaron Wood (as discussed below), Stevie Allen's marijuana source of supply, as set forth below. (Sessions 216 and 217.) Both calls went unanswered. At approximately 7:27 p.m., agents observed via physical surveillance a dark colored 2015 Subaru Forester bearing Washington license plate AQR4300 registered to Aaron Wood (**Subject Vehicle 22**) parked on the street in front of **Subject Premises 16**. Agents then observed a male, identified as Aaron Wood based on a comparison to his driver's license photograph, exit from the area of **Subject Premises 16** and get into the driver's seat of the Forester. At approximately 7:33 p.m.,

AFFIDAVIT OF SHAWNA MCCANN –- 44
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Aaron Wood departed in the Forester and parked on a side road a couple of blocks away

2   from **Subject Premises 16**. At approximately 7:35 p.m., agents observed Stevie Allen

3   arrive at **Subject Premises 16** driving **Subject Vehicle 20**. Stevie Allen got out of

4   **Subject Vehicle 20** and went inside **Subject Premises 16**. At approximately 7:39 p.m.,

5   agents observed Aaron Wood start driving back towards **Subject Premises 16**. At

6   approximately 7:41 p.m., agents intercepted an outgoing call from Stevie Allen using

7   TT7 to Gregory Mason (identification discussed below) at phone number (206) 742-

8   2242;[29] as set forth below, Gregory Mason resides at Stevie Allen's stash house **Subject**

9   **Premises 16**. (Session 218.) Stevie Allen asked if Gregory Mason was "on the hill [at the

10  stash house **Subject Premises 16**]?" Gregory Mason told Stevie Allen that he was "on

11  my way up to the hill to meet Aaron [Wood]." Stevie Allen said he would be there in a

12  minute. At the time of this call, cell site location data for TT7 placed Stevie Allen in the

13  vicinity of **Subject Premises 16**. At approximately 7:41 p.m., agents intercepted an

14  outgoing call from Stevie Allen using TT7 to Aaron Wood using TT9. (Session 219.)

15  Aaron Wood told Stevie Allen that he was "just posted up on the hill waiting for Greg

16  [Mason]." Stevie Allen told Aaron Wood that "I just pulled up I'm here." Aaron Wood

17  told Stevie Allen that he would be right there. At approximately 7:49 p.m., agents

18  observed Aaron Wood park his Forester in front of **Subject Premises 16** and retrieve a

19  large plastic bin from the hatch area. Aaron Wood carried the bin to **Subject Premises 16**

20  with two hands, indicating the bin had items inside. At approximately 7:58 p.m., agents

21  observed Gregory Mason, identified based on a comparison to his driver's license

22  photograph, arrive at **Subject Premises 16** driving a black Range Rover. Agents

23  observed Gregory Mason get out of the Range Rover (**Subject Vehicle 21**) and walk into

24

25  ───────────────

26  [29] During a controlled purchase between Stevie Allen and CS3 at **Subject Premises 16** during which Gregory
    Mason was present, Gregory Mason provided his phone number to CS3 as "742-2242." Additionally, during

27  intercepted wire communications on TT7, Stevie Allen identified the user of (206) 742-2242 as "Greg," "Sauce,"
    and "Saucy." CS3 advised agents that Sauce and Saucy were well-known aliases for Gregory Mason. CS3 also

28  advised agents that Gregory Mason lived at Stevie Allen's stash house, **Subject Premises 16**, and helped Stevie
    Allen traffic marijuana.

AFFIDAVIT OF SHAWNA MCCANN –- 45
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   **Subject Premises 16**. At approximately 8:04 p.m., agents observed Aaron Wood exit

2   **Subject Premises 16** and walk back to his Forester while freely swinging the large

3   plastic bin with one hand, indicating the bin no longer had any items in it. Aaron Wood

4   put the plastic bin back inside his Forester and departed **Subject Premises 16**.

5         62.     On July 14, 2020, at approximately 8:47 a.m., Michael Walker called James

6   Lowe at TT5[30] and asked James Lowe to go with him to "Beacon Hill" (**Subject**

7   **Premises 16**) to "smoke a piece [sample of marijuana] and make sure [it's good quality].

8   I don't want to grab it [marijuana] and give a N* my money and then I give you a piece

9   and we don't like it [bad quality], I ain't doing that no more bro... because it be hard to

10  get your money back." (Session 538.) At approximately 9:09 a.m., Stevie Allen using

11  TT7 called Michael Walker at TT8. Michael Walker asked what time Stevie Allen would

12  be over there [**Subject Premises 16**], and Stevie Allen said that he was headed up there

13  right now. (Session 224.) At approximately 9:20 a.m., agents observed Stevie Allen

14  arrive at **Subject Premises 16** driving **Subject Vehicle 20**. At approximately 9:26 a.m.,

15  Michael Walker using TT8 called James Lowe at TT5 and asked, "how we looking?" and

16  James Lowe said, "we good"; Michael Walker said he was leaving from his house.

17  (Session 546.) At approximately 9:47 a.m., Michael Walker using TT8 called James

18  Lowe at TT5 and said that he was "outside" James Lowe's house in Skyway waiting for

19  Stevie Allen to call him back. James Lowe told Michael Walker to "come to the garage."

20  (Session 550.) At approximately 9:47 a.m., Stevie Allen using TT7 called Michael

21  Walker at TT8. Michael Walker asked if Stevie Allen "was up there" and Stevie Allen

22  said yes. Michael Walker said he was "in route" and would be there in "like 15

23  [minutes]." (Session 229.) At approximately 10:13 a.m., agents observed Michael Walker

24  arrive at **Subject Premises 16** driving the gold Honda Accord with a passenger in the

25

26  _____

27  [30] Agents obtained a search warrant for GPS location data and a pen register and trap and trace order for TT5 from
    April 2020 through August 2020 and identified James Lowe as the user of TT5 based on observing James Lowe in

28  the vicinity of GPS location data for TT5 at multiple different locations and times. James Lowe was identified based
    on a comparison to his driver's license photograph.

AFFIDAVIT OF SHAWNA MCCANN –- 46
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

front seat, identified as James Lowe based on a comparison to his driver's license photograph. Michael Walker exited his gold Honda Accord and walked into **Subject Premises 16**. At approximately 10:16 a.m., agents observed Michael Walker exit **Subject Premises 16**, jog back to the gold Honda Accord, and interact with James Lowe. At approximately 10:20 a.m., agents observed Michael Walker go back inside **Subject Premises 16**. At approximately 10:21 a.m., Michael Walker using TT8 called James Lowe at TT5. Michael Walker asked if James Lowe had "smoked none of that yet," and James Lowe said he was going to run across the street to the store. (Session 553.) At approximately 10:22 a.m., agents observed James Lowe exit the passenger side of the gold Honda Accord and walk to the Gull gas station across the street, returning to the gold Honda Accord at approximately 10:26 a.m. At approximately 10:30 a.m., agents observed Michael Walker exit **Subject Premises 16** carrying a large black trash bag in his hand that appeared to be weighted down. Michael Walker got into the driver's seat of the gold Honda Accord, with James Lowe in the front passenger seat, and drove off. At approximately 10:45 a.m., agents observed the gold Honda Accord parked at 11718 64th Lane South, Seattle, Washington. At approximately 11:06 a.m., Michael Walker received a call from an unknown male at phone number (206) 566-4342 (UM4342). UM4342 said he was "trying to get one." Michael Walker said he was at "his boy's [James Lowe's] right now in Skyway and that it's only five zips [five ounces of marijuana]."[31] Michael Walker and UM4342 discussed meeting in downtown Renton in 15 minutes. (Session 555.) Based on my training and experience, I believe that Michael Walker and James Lowe met Stevie Allen at Stevie Allen's stash house (**Subject Premises 16**) in order for James Lowe to try a sample of marijuana for Michael Walker and that Michael Walker

---

[31] Although Michael Walker told UM4342 he only had five ounces, the bag that he was holding when he left Stevie Allen's stash house appeared to contain a significantly larger amount than that. Michael Walker, however, may have been telling UM4342 that he only had five ounces available because of other planned sales.

1   ended up buying a large amount of marijuana[32] from Stevie Allen, which Michael Walker

2   carried out of **Subject Premises 16** in a large plastic bag. I know that drug traffickers

3   often transport, traffic, and distribute marijuana in plastic bag/trash bags. I also know,

4   based on intercepted calls and police reports, that Michael Walker was on pre-trial release

5   at this time for a local DUI charge and was subject to drug testing, and therefore would

6   have needed James Lowe to sample the marijuana for him.

7       63.     On July 22, 2020, at approximately 5:36 p.m., Stevie Allen using TT7

8   called Aaron Wood at TT9. (Session 576.) Stevie Allen said that "all the wedding stuff is

9   gone. I still have the other stuff but, so, you know." Aaron Wood said, "Nice. Gotcha

10  gotcha. So you got some Road Kill, and some White Winter, and some Face on Fire, or

11  Face Off [marijuana strains], I mean." Stevie Allen and Aaron Wood continued to discuss

12  different types of marijuana strains and agreed to try and meet later that evening. Aaron

13  Wood told Stevie Allen he was "at my shop [referencing his own marijuana processor

14  business, **Subject Premises 51**] about to leave and I'm probably going to hit your fish

15  and chips place on the way home and then head back to my place so you can call any

16  time and I'll come over."[33] At approximately 9:58 p.m., agents observed, via remote

17  video surveillance, Stevie Allen leaving his residence, **Subject Premises 15,** driving

18  **Subject Vehicle 20**. At approximately 10:10 p.m., agents observed Stevie Allen arrive at

19  and park in front of his stash house, **Subject Premises 16**. Stevie Allen exited **Subject**

20  **Vehicle 20** and walked into **Subject Premises 16**. At approximately 10:20 p.m., agents

21  observed a 2015 Subaru Forester bearing Washington state license plate number

22  AQR4300, known to be driven by Aaron Wood (**Subject Vehicle 22**), park in front

23

24

25  [32] Agents believe that Michael Walker purchased the "icing" strain of marijuana on this occasion. In intercepted
    calls between Stevie Allen and Aaron Wood a few days prior, including on July 11, 2020, Stevie Allen had arranged
26  to be resupplied with marijuana by Aaron Wood, and both had referenced "icing." (Session 113.) Agents understand
    "ices" and "icing" to be references to a marijuana strain based on numerous intercepted communications of Michael
27  Walker and Stevie Allen in which they discuss buying and selling icing at quantities and pricing consistent with the
    price of marijuana, and in the context of other well-known strains of marijuana that Michael Walker and Stevie
28  Allen were trafficking at that time, such as wedding cake, cookies, GG4, and coffee cake.
    [33] Stevie Allen is the owner and operator of a fish and chips restaurant, Emerald City Fish and Chips.

AFFIDAVIT OF SHAWNA MCCANN –- 48                    UNITED STATES ATTORNEY
USAO #2019R01083                                    700 STEWART STREET, SUITE 5220
                                                    SEATTLE, WASHINGTON 98101
                                                    (206) 553-7970

**Subject Premises 16**. Aaron Wood exited his vehicle, retrieved a large plastic case from the vehicle, and walked into **Subject Premises 16**. Based on my training and experience, I believe that Stevie Allen was supplied with marijuana by Aaron Wood at **Subject Premises 16**, that Stevie Allen used **Subject Vehicle 20** to drive to the stash house, and that Stevie Allen left from his residence (**Subject Premises 15**) and immediately drove to the stash house for the drug transaction.

64.     On July 24, 2020, at approximately 3:52 p.m., Larry Collins (identification discussed below) using TT16 called Stevie Allen at TT7. Stevie Allen said he was about to pull up on "the hill." Larry Collins asked if he could stop by Stevie Allen's "crib" to get "the one from last night" and "one of them weddings." Stevie Allen said, "I got you buddy" and that he would call Larry Collins in a minute. (Session 647.) Based on my training and experience, I believe Larry Collins was asking to buy marijuana from Stevie Allen and that he would stop by Stevie Allen's residence to pick it up. At approximately 6:34 p.m., Stevie Allen using TT7 called Larry Collins at TT16. Stevie Allen said he was at the house (**Subject Premises 15**), and Larry Collins said he would stop by. (Session 653.) At approximately 7:40 p.m., agents observed, via remote video surveillance, Larry Collins's known black Kia Sedona pull into the driveway of **Subject Premises 15**. At approximately 7:49 p.m., agents observed, via remote video surveillance, the black Kia Sedona pull out of the driveway and depart **Subject Premises 15**. Video surveillance was able to capture a partial license plate on the black Kia Sedona of 7873, and agents previously identified a black Kia Sedona registered to and driven by Larry Collins bearing Washington license plate BPV7873. Based on my training and experience, I believe that Larry Collins met Stevie Allen at Stevie Allen's residence (**Subject Premises 15**) to purchase marijuana, and accordingly that Stevie Allen keeps marijuana at both his residence (**Subject Premises 15**) and his stash house (**Subject Premises 16**).

65.     On September 9, 2020, at approximately 3:40 p.m., agents intercepted a call from Stevie Allen using TT7 to Jerrell Ingram (identification discussed below) at TT12. (Session 1506.) During this call, Stevie Allen asked for "a couple of soft ones" and said

that "Sauce [Greg Mason] told me to call you." Jerrell Ingram replied, "Just g's [grams]. I just got little little things." Stevie Allen said, "Yeah, yeah. Just a couple small ones [grams of cocaine]." Jerrell Ingram confirmed that Stevie Allen just wanted a couple of "g's" and said he "just do em for like 80 [$80 per gram]." Stevie Allen confirmed, and Jerrell Ingram said he was going "to go over and grab it [cocaine]" and then call Stevie Allen back. Based on my training and experience, I believe that Stevie Allen agreed to buy a couple of grams of cocaine from Jerrell Ingram for $80 per gram. I also know, based on my training and experience and interceptions during this investigation, that $80 per gram was consistent with the going rate for small amounts of powder (soft) cocaine in this region at that time.

66.     On November 6, 2020, a mail cover showed that Stevie Allen received mail at **Subject Premises 15**.

67.     On February 19, 2021, at approximately 1:00 p.m., agents observed Gregory Mason's known Range Rover (as discussed below) parked in front of **Subject Premises 16**. On March 3, 2021, at approximately 11:40 a.m., agents observed Gregory Mason's known Range Rover parked in front of **Subject Premises 16**. Agents observed Gregory Mason exit the apartment complex walkway for **Subject Premises 16**. Accordingly, agents believe that Gregory Mason still resides at **Subject Premises 16** and protects/helps to distribute Stevie Allen's drug stash at this location.

68.     On March 8, 2021, at approximately 12:45 a.m., surveillance was established at **Subject Premises 15**. This is the address listed on Stevie Allen's Washington state driver's license. Upon arrival, agents observed **Subject Vehicle 20** parked in the driveway, backed in up against the garage door. There was a light on in the room over the garage. Accordingly, I believe that Stevie Allen continues to reside at **Subject Premises 15** and use **Subject Vehicle 20**.

69.     On March 16, 2021, at approximately 8:00 p.m., agents observed **Subject Vehicle 20** parked at Stevie Allen's restaurant, Emerald City Fish and Chips, located at 3756 Rainier Avenue South, Seattle, Washington. At approximately 9:15 p.m., agents

observed Stevie Allen, identified based on a comparison to his driver's license photograph and agents' familiarity with him from prior surveillance, outside near **Subject Vehicle 20**. Agents then saw Stevie Allen go back into the restaurant. At approximately 9:58 p.m., agents observed Stevie Allen exit the restaurant, get into **Subject Vehicle 20** and depart, alone. At approximately 10:02 p.m., agents observed Stevie Allen arrive at his stash location, **Subject Premises 16**, and park **Subject Vehicle 20** on the street in front of **Subject Premises 16**. Agents observed Stevie Allen exit **Subject Vehicle 20** and walk directly into **Subject Premises 16**. This pattern of activity was similar to when agents were intercepting Stevie Allen using TT7 and receiving GPS location data for TT7, such that Stevie Allen would leave his restaurant business at closing and stop by his stash house to check on his drug trafficking business before going to his residence for the evening.

70.     On March 19, 2021, at approximately 9:53a.m., agents observed **Subject Vehicle 20** parked on the street outside **Subject Premises 16**. Stevie Allen, identified based on a comparison to his driver's license photograph, exited the driver's seat of **Subject Vehicle 20** and walked towards **Subject Premises 16**. Several seconds later Stevie Allen returned to **Subject Vehicle 20** and retrieved an unknown item from the front passenger seat. Stevie Allen then walked back towards **Subject Premises 16**. Accordingly, I believe that Stevie Allen continues to use **Subject Premises 16** as a drug stash location and **Subject Vehicle 20** as facilitation of his drug trafficking.

71.     Agents obtained updated toll records for TT7, which showed that from January 14, 2021, through March 14, 2021, Stevie Allen using TT7 exchanged 10 communications with Jerrell Ingram using TT12, indicating that Stevie Allen and Jerrell Ingram have continued their drug trafficking relationship. Additionally, from January 14, 2021, through March 14, 2021, Stevie Allen using TT7 exchanged 74 communications with Gregory Mason, indicating that Stevie Allen and Gregory Mason have continued their drug trafficking relationship.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

72.     I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Stevie Allen is a multi-kilogram marijuana trafficker who likely keeps his narcotics supply and proceeds in **Subject Premises 15** and **16** and uses **Subject Vehicle 20** to conduct drug transactions.

**D.     Gregory Mason's Vehicle**

73.     During this investigation, based on confidential source information, physical surveillance, remote video surveillance, and intercepted communications, agents identified Gregory Mason's residence as the same location as Stevie Allen's stash house (**Subject Premises 16**), and his vehicle as a black 2000 Range Rover bearing Washington license plate BHY1298 registered to Gregory Mason at 13016 14th Avenue S, Burien, Washington (**Subject Vehicle 21**). Agents deployed a drop car remote video surveillance in June and July 2020, aimed at the street in front of and door of **Subject Premises 16**, which showed that Gregory Mason stayed at **Subject Premises 16** overnight from June 2020 to July 2020. Agents intercepted communications in which Gregory Mason assisted and/or conducted drug transaction at **Subject Premises 16** with or on behalf of Stevie Allen. Agents observed Gregory Mason leaving from and coming back to **Subject Premises 16** driving **Subject Vehicle 21**. Some of these drug transactions and agents' observations are noted below for purposes of further supporting probable cause to search **Subject Premises 16** and establishing probable cause to search **Subject Vehicle 21**.

74.     As set forth above, on July 13, 2020, agents observed Gregory Mason arrive at **Subject Premises 16** driving **Subject Vehicle 21** during an ongoing drug transaction between Stevie Allen and Aaron Wood.

75.     On July 16, 2020, at approximately 9:10 p.m., Stevie Allen using TT7 called Gregory Mason. (Session 336.) Gregory Mason asked if there was "anything to get a zip out of." Stevie Allen replied, "I think there might be some in the closet. There's some in the closet I believe." Gregory Mason asked, "in that white box?" and Stevie Allen confirmed. Based on my training and experience, I believe that Gregory Mason called Stevie Allen to ask if he could sell one ounce (a "zip") of Stevie Allen's marijuana to a customer, and Stevie Allen told Gregory Mason to look in the closet in the stash house, **Subject Premises 16**.

76.     On July 17, 2020, agents again observed **Subject Vehicle 21** parked in front of **Subject Premises 16**.

77.     On July 24, 2020, at approximately 2:34 p.m., Michael Walker using TT8 called Stevie Allen at TT7. Michael Walker told Stevie Allen that he "was here [at the stash house, **Subject Premises 16**]." Stevie Allen agreed that Michael Walker could "just leave it with Sauce [Gregory Mason]" and that Michael Walker could "get the fire later." (Session 1868.) Based on my training and experience and earlier intercepted calls with Stevie Allen during which Michael Walker complained about getting bad marijuana, I believe that Michael Walker was returning some bad quality marijuana that Stevie Allen had previously sold him and that Stevie Allen told Michael Walker to leave the returned marijuana with Gregory Mason and that Michael Walker could pick up some better quality marijuana later. As set forth above, I know based on information provided by CS3 and physical and remote surveillance that "Sauce" and "Saucy" are nicknames for Gregory Mason and that Gregory Mason lives at Stevie Allen's stash house, **Subject Premises 16**, and protects Stevie Allen's drug supply and assists Stevie Allen with drug transactions.. I know that fire is a common term used by marijuana traffickers to refer to good quality marijuana. At approximately 2:35 p.m., agents observed Michael Walker exit **Subject Premises 16**, get into his gold Honda Accord, and drive off. At approximately 2:37 p.m., Stevie Allen using TT7 called Gregory Mason at phone number (206) 742-2242, and Gregory Mason confirmed that Michael Walker "just left" and that

AFFIDAVIT OF SHAWNA MCCANN –- 53
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Michael Walker "left that with [Gregory Mason]" at **Subject Premises 16**. Stevie Allen

2   told Gregory Mason to "weigh it up real quick." Gregory Mason said it weighed "144.3

3   [grams]." (Session 645.)

4          78.    On September 7, 2020, at approximately 4:15 p.m., Gregory Mason called

5   Jerrell Ingram at TT12 (identification discussed below). (Session 983.) Gregory Mason

6   said he was "headed up north to the white boy's house who bought this [cocaine] last

7   night" and that "he [white boy] said he didn't like it [bad quality]." Jerrell Ingram said, "I

8   told you it wasn't nothing to be cooked [into crack cocaine]" and that he "already got

9   hard [crack cocaine] and I got soft [powder cocaine]." Jerrell Ingram said that Gregory

10   Mason had asked for "$100 of seezoft [powder cocaine]." Based on my training and

11   experience, I believe that Gregory Mason bought about $100 worth of powder cocaine

12   from Jerrell Ingram and then sold some of that cocaine to a customer who tried to cook

13   the powder cocaine into crack cocaine and was not satisfied with the product.

14          79.    On February 19, 2021, at approximately 1:00 p.m., agents observed

15   Gregory Mason's known Range Rover parked in front of **Subject Premises 16**. On

16   March 3, 2021, at approximately 11:40 a.m., agents observed Gregory Mason's known

17   Range Rover parked in front of **Subject Premises 16**. Agents observed Gregory Mason

18   exit the apartment complex walkway for **Subject Premises 16**. Accordingly, agents

19   believe that Gregory Mason still uses **Subject Vehicle 21** and still resides at **Subject**

20   **Premises 16**.

21          80.    On March 15, 2021, agents were advised by an investigator with the

22   Washington State Liquor and Cannabis Board that Gregory Mason does not hold any

23   active marijuana producer, processor, or retailer license.

24          81.    I know based on my training and experience, that drug traffickers

25   frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

26   stash locations in order to protect their supply and to have the narcotics on hand for

27   transactions. I also know that drug traffickers maintain records and other trafficking-

28   related materials in their premises, including residences, for a long period of time,

AFFIDAVIT OF SHAWNA MCCANN –- 54
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Gregory Mason is a marijuana and cocaine redistributor working for Stevie Allen and Jerrell Ingram who likely keeps his narcotics supply and proceeds in and/or uses **Subject Premises 16** and **Subject Vehicle 21** to conduct drug transactions.

### E.   Aaron Wood's Residence, Vehicle, and Business

82.     Based on wire and electronic interceptions on Stevie Allen using TT7, agents identified Aaron Wood as an illegal source of supply of marijuana to Stevie Allen. Agents conducted open source research and identified a marijuana processor license held by Aaron Wood and a marijuana processor business, Emerald Peaks, affiliated with Aaron Wood. On March 15, 2021, agents consulted with investigators with the Washington State Liquor and Cannabis Board, who confirmed Aaron Wood has a valid marijuana processor license, that such license does not authorize Aaron Wood to sell marijuana but only to process, dry, cure, package, and label usable marijuana, marijuana concentrates, and marijuana-infused products for sale, and that any direct sales of marijuana by Aaron Wood to individuals unaffiliated with a validly licensed marijuana retail store is illegal. In Washington state, there is a separate license for growing marijuana and a separate license for selling marijuana at a retail store; Aaron Wood does not hold either of these licenses; he only has a processor license.

83.     During this investigation, based on physical surveillance, GPS location data, law enforcement database checks, and a mail cover, agents identified Aaron Wood's residence as 2405 E Helen Street, Apt. C, Seattle, Washington[34] (**Subject Premises 17**), his vehicle as a 2015 Subaru Forester bearing Washington state license plate number

---

[34] On March 14, 2021, agents conducted a check of CLEAR database which showed that **Subject Premises 17** was a residence associated with Aaron Wood, in addition to 410 E Denny Way, # 107, Seattle, Washington.

AFFIDAVIT OF SHAWNA MCCANN –- 55
USAO #2019R01083

AQR4300 registered to Aaron S. Wood at 410 E Denny Way, Seattle, Washington[35] (**Subject Vehicle 22**), and his business as Emerald Peaks, a marijuana processing business licensed with Washington state, located at 11463 Rainier Avenue S, Suite B, Seattle, Washington (**Subject Premises 51**). Agents obtained GPS location data on Aaron Wood's cell phone TT9 (identification discussed below) from July 28, 2020, to September 11, 2020, which showed that Aaron Wood remained at **Subject Premises 17** overnights during that time. Agents intercepted communications in which Aaron Wood discussed supplying Stevie Allen with marijuana, illegally. Agents observed Aaron Wood conducting these drug transactions at Stevie Allen's stash house, **Subject Premises 16**, arriving there driving **Subject Vehicle 22**, and then returning to his residence at **Subject Premises 17**. These communications indicate that Aaron Wood may have abused his marijuana processing license and business by acquiring marijuana through his business located at **Subject Premises 51** and selling it illegally. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 17**, **Subject Premises 51**, and **Subject Vehicle 22**.

84.     On July 11, 2020, at approximately 10:10 p.m., Aaron Wood using TT9 called Stevie Allen at TT7. (Session 113.) During this call, Aaron Wood asked, "did I miss you…I'm here with Greg [Mason]." Stevie Allen said, "Ok, ok." Aaron Wood asked, "You want me to leave it [sample of icing marijuana] with him [Greg Mason]?" Stevie Allen said, "Yeah, you got just that one right?" Aaron Wood replied, "Just that one, yeah." Stevie Allen asked, "And what's it [marijuana] called?" Aaron Wood said, "It's called icing, like I-C-I-N-G…and I can get the genetics and all the good stuff. I can't remember exactly but it's like the stuff everybody is always asking for. I'll actually find it out while I'm sitting here." Stevie Allen asked, "So this is available, like, if I call you

---

[35] Agents conducted physical surveillance at this location and identified it as a mail and postage business. I know, based on my training and experience, that drug traffickers frequently register their homes, vehicles, and other assets to family members or to PO boxes in order to evade law enforcement detection and seizure of their assets. Aaron Wood's driver's license address is listed as 410 E Denny Way, # 107, Seattle, Washington. Because this location corresponds to a mail and parcel business, agents believe this address is a PO box.

back, you can get it?" Aaron Wood replied, "Yes, I don't know if he [supplier] is going to answer tonight, but definitely tomorrow." Stevie Allen asked, "It's five more [units] of those [icing marijuana] or four more?" "I believe there are five more [units of icing marijuana]. I'll text him [supplier] right now." Based on my training and experience, I believe that Aaron Wood brought over a sample of icing marijuana to Stevie Allen at **Subject Premises 16**, but Stevie Allen was not there and told Aaron Wood to leave the marijuana sample with Gregory Mason. I believe that Aaron Wood said he had five more units of the icing marijuana to sell to Stevie Allen.

85.     As set forth above, on July 13, 2020, and July 22, 2020, Aaron Wood used **Subject Vehicle 22** to transport marijuana to Stevie Allen's stash house (**Subject Premises 16**) to illegally sell/supply Stevie Allen with marijuana. During the related intercepted communications, Aaron Wood used TT9 and Stevie Allen referred to him as "Aaron." The vehicle that Aaron Wood showed up in to sell Stevie Allen marijuana was registered to Aaron Wood, and TT9 was subscribed to Aaron Wood. On July 13, 2020, after conducting the marijuana transaction at Stevie Allen's stash house, at approximately 8:07 p.m., Aaron Wood, identified based on a comparison to his driver's license photograph, left Stevie Allen's stash house driving **Subject Vehicle 22**. Agents observed that Aaron Wood drove to Dick's Drive-In Restaurant located at 115 Broadway E, Seattle, Washington. Aaron Wood sat in **Subject Vehicle 22** for approximately 40 minutes and then got out to order food. At approximately 9:15 p.m., agents observed Aaron Wood depart the restaurant driving **Subject Vehicle 22**. Agents followed Aaron Wood to the area of 23rd Avenue and East Prospect Street. Agents observed Aaron Wood park **Subject Vehicle 22** on the street. This area is approximately one block from Aaron Wood's residence at **Subject Premises 17**.

86.     On July 15, 2020, at approximately 7:14 p.m., agents observed a white minivan pull up and park in front of Stevie Allen's stash house (**Subject Premises 16**). Aaron Wood exited the van and was observed carrying a large black plastic case. The case appeared to be the same as a case Aaron Wood brought to the same location on July

AFFIDAVIT OF SHAWNA MCCANN -- 57
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13, 2020. The license plate on the van was noted as Colorado license plate number JCQ456 registered to Enterprise Rentals. Agents also observed Stevie Allen's Audi (**Subject Vehicle 20**) parked directly behind the van. Agents later learned from Enterprise Rental that the renter of the van was Aaron Wood at 410 East Denny Way #107, Seattle, Washington (a mail and parcel business as discussed above). Agents observed Aaron Wood walk towards **Subject Premises 16** carrying the black plastic case before walking out of view.

87. On July 17, 2020, at approximately 7:05 p.m., Aaron Wood using TT9 called Stevie Allen at TT7. (Session 365.) During this call, Aaron Wood said, "I just opened up this possibility [drug deal] 'cause you know, you were texting me how many are around of the sunset [marijuana] and the wedding cake [marijuana], I think were those the two you were interested in?" Stevie Allen said, "Yeah." Aaron Wood said, "So basically, so, I don't know that I have any more wedding cake, but I probably could, how many, you got two cakes or um sunsets already [two pounds of the sunset marijuana]?" Stevie Allen confirmed. Aaron Wood said, "So there's probably three more on me [three more pound of sunset marijuana with Aaron Wood], but I have an opportunity right now if I committed 100%, I could get up to five more [pounds] sunsets [marijuana] and 13 more wedding cake triangles. And I could get some, I could probably get delatto, another pound or two of delatto [marijuana]. And I could get road kill skunk [marijuana], and I could get the wedding crasher [marijuana], another pound and a half which would make that an equal, a whole two pounds of wedding crasher. But I kinda have to make this commitment and he [supplier] will give us some time, but I'll explain all the reasons behind this but basically I kinda have to tell the guy if we're committed or not. Or he's gonna just take them." Stevie Allen said, "Right, right." Aaron Wood said, "And there's still more [marijuana] coming later, this is just like a today." Stevie Allen replied, "Ok, ok. Yeah I'll tell you what. I'm going to let them [Stevie Allen's associates] know so it's talking about five more [pounds of sunset marijuana] of those?" Aaron Wood said, "Well for sure there is three more [pounds of ] sunsets. You've got three for sure. But there's an

AFFIDAVIT OF SHAWNA MCCANN -- 58
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

additional five [pounds], so you could have eight…I don't just want to sell all the good stuff [good quality marijuana]…if I have to sell all the other stuff [bad quality marijuana] to someone else." Stevie Allen said, "Well let me talk to these guys [associates], but it sounds pretty promising." The parties agreed to talk later that day. Based on my training and experience, I believe that Aaron Wood offered to sell different types of marijuana strains to Stevie Allen by the pound, including sunset, wedding cake, road kill skunk, and wedding crasher, and that the parties agreed to discuss this potential drug transaction later that day.

88.     Later that same day, at approximately 10:57 p.m., Aaron Wood using TT9 called Stevie Allen at TT7. (Session 383.) During this call, Aaron Wood said, "if we come right now, he [supplier] can do a little switch-a-roo [with marijuana inventory], so I'm just calling to say, do you know which ones [marijuana] you could be pretty much 100% on and how many [pounds]?" Stevie Allen said, "Well I'm pretty sure on the wedding." Aaron Wood asked, "the wedding sunset or…." Stevie Allen said, "The wedding sunset for sure…I was trying to get the other one, hold on real quick." Aaron Wood asked, "What do you think of that wedding…not the wedding cake triangle but the half pound of the wedding crasher?" Stevie Allen said, "Really all the wedding stuff, I'm pretty sure I could get rid of [sell illegally]." Aaron Wood said, "So there's the wedding cake triangle…well ok so you for sure you want the five sunsets." Aaron Wood and Stevie Allen agreed to the five-pound wedding sunset marijuana deal, and Aaron Wood said, "this is just the beginning." Based on my training and experience, I believe that Aaron Wood was about to meet with his marijuana supplier and agreed to get at least five pounds of the wedding sunset marijuana to then sell, illegally, to Stevie Allen.

89.     On August 3, 2020, at approximately 12:51 p.m., Stevie Allen using TT7 called Aaron Wood at TT9. (Session 1104.) Aaron Wood said, "I'm just in front of your spot right now." Stevie Allen asked whether Aaron Wood was at "the fish spot [Emerald City Fish and Chips]," and Aaron Wood said, "No, I'm up on Beacon [stash house]" and that "Greg [Mason] said he'd be here in about ten minutes. So, I was just gonna kick until

he got here." Stevie Allen confirmed that Aaron Wood could "give it to Greg." Stevie
Allen asked, "where you headed right now?" and Aaron Wood replied, "to my shop
[marijuana processor business **Subject Premises 51**] in Renton." Aaron Wood asked if
he "can tell him [Aaron Wood's boss] that I'll have some money like in the next day or
something," and Stevie Allen said that he had "the turnover for those already." Aaron
Wood asked if Stevie Allen wanted "three more of those icings," and Stevie Allen said,
"yeah." Aaron Wood responded, "Ok. Awesome. unintelligible] I think I'm gonna get
those today. I'll leave these concentrates [a form of marijuana] with Greg [Mason] and
then I'll hit you up when I leave my shop [**Subject Premises 51**] later, like early
evening." Based on my training and experience, I believe that Aaron Wood arranged to
stop by Stevie Allen's stash house, **Subject Premises 16**, to resupply Stevie Allen with
marijuana that he would leave with Gregory Mason, and that they discussed when Stevie
Allen would pay for marijuana that Aaron Wood had previously fronted to Stevie Allen. I
believe that when Stevie Allen said that he had the "turnover" for those already, he was
telling Aaron Wood that he had already sold the prior marijuana and had the drug money
from those sales. I believe that Stevie Allen then agreed to buy three more units of the
icing marijuana strain from Aaron Wood, and that Aaron Wood said he would bring them
to Stevie Allen later, after he left his "shop," referencing his own marijuana processor
business, **Subject Premises 51**. GPS location data for TT9 showed that the device was in
the vicinity of **Subject Premises 17** immediately before and after Aaron Wood's call
with Stevie Allen, indicating that Aaron Wood left from **Subject Premises 17** to conduct
the drug deal and returned to **Subject Premises 17** after the drug deal; the data was
received too infrequently to confirm that TT9 traveled to **Subject Premises 16** in this
period, but given the frequency of location data provided, there was ample time for Aaron
Wood and TT9 to have done so.

90.     On September 25, 2020, the United States Postal Service confirmed that
mail addressed to Aaron Wood was sent to **Subject Premises 17**. Agents also conducted

AFFIDAVIT OF SHAWNA MCCANN –- 60
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  a check in the CLEAR database, which showed that **Subject Premises 17** was associated

2  with Aaron Wood.

3      91.    On March 5, 2021, at approximately 12:17 a.m., and on March 8, 2021, at

4  approximately 1:10 a.m., agents observed Aaron Wood's Subaru Forester (**Subject**

5  **Vehicle 22**) parked on the street in front of **Subject Premises 17**, indicating that he still

6  resides at this residence. On March 8, 2021, at approximately 10:40 a.m., agents observed

7  **Subject Vehicle 22** parked in front of the apartment building for **Subject Premises 17**.

8  At approximately 10:52 a.m. agents observed Aaron Wood, identified based on a

9  comparison to his driver's license photograph, exit the apartment building exterior door[36]

10 of **Subject Premises 17**, enter **Subject Vehicle 22** and drive away, indicating that he still

11 resides at this residence and drives this car.

12     92.    Agents obtained updated toll records for TT9, which showed that from

13 January 14, 2021, through March 9, 2021, Aaron Wood using TT9 exchanged 21 SMS

14 text messages and 15 calls with Stevie Allen using TT7, indicating that Aaron Wood and

15 Stevie Allen have continued their drug trafficking relationship.

16     93.    On March 15, 2021, agents received documentation from the Washington

17 State Liquor and Cannabis Board regarding Aaron Wood's marijuana processing

18 business, Emerald Peaks. These documents showed that a non-retail annual inspection

19 was conducted at Emerald Peaks, **Subject Location 51**, by a non-law enforcement

20 consultant on January 28, 2021. Present at that inspection of **Subject Location 51** was

21 the consultant and Aaron Wood who was listed as the manager/licensee with a contact

22 number of TT9. The inspection did not find any items out of compliance or anything

23 illegal. However, these inspections are not spontaneous; rather, the licensee has advanced

24 notice of the date and time the inspection will occur. Accordingly, a licensee such as

25

26 ───────────────

27 [36] As set forth in Attachment A11, **Subject Premises 17** is an apartment unit in a single building, multi-unit apartment complex with interior entry doors to each unit and a single exterior entry door used by all the units.

28 Accordingly, agents are unable to observe the front door to **Subject Premises 17** because it is inside the apartment building.

AFFIDAVIT OF SHAWNA MCCANN –- 61
USAO #2019R01083

1  Aaron Wood would have time to relocate any illegal marijuana from his business prior to
2  the inspection.

3         94.     Based on intercepted communications between Aaron Wood using TT9 and
4  Stevie Allen using TT7, agents believe that Aaron Wood may have been abusing his
5  marijuana processing license by acquiring marijuana from licensed marijuana growers
6  and selling some of the marijuana illegally to Stevie Allen and others. For example, on
7  July 11, 2020, Aaron Wood using TT9 called Stevie Allen at TT7. (Session 108.) During
8  this call, Aaron Wood discussed supplying Stevie Allen with new marijuana product and
9  mentioned that "the grower's mom died, so I gave him a week to just, yeah." Based on
10  my training and experience, I believe that Aaron Wood has connections to marijuana
11  growers through his marijuana processor license, one of whom he referred to as the
12  "grower." Additionally, in a later call on July 11, 2020, between Aaron Wood using TT9
13  and Stevie Allen using TT7, Aaron Wood stated that he could get the "genetic" of the
14  icing marijuana strain for Stevie Allen. (Session 113.) Based on my training and
15  experience, I know that professionally licensed marijuana growers provide genetics and
16  other scientific details regarding the strain and origins of their marijuana, unlike illegal,
17  non-professional marijuana grows. Additionally, as described above, on two separate
18  occasions Aaron Wood arranged to meet up with Stevie Allen to supply him with
19  marijuana after leaving his "shop," indicating that he stores both his regulated and illegal
20  marijuana at the same location, **Subject Premises 51**. Accordingly, there is probable
21  cause that **Subject Premises 51** contains evidence of Aaron Wood's illegal marijuana
22  trafficking, including illegal marijuana, illicit drug proceeds, documentation reflecting the
23  true amount of marijuana Aaron Wood has acquired from licensed marijuana growers but
24  has not accurately reflected on his processing logs due to illegal marijuana sales,

25
26
27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 identification and evidence of other illegal marijuana redistributors and associates, and
2 other common drug trafficking documentation such as pay-owe sheets.[37]

3       95.     I know based on my training and experience, that drug traffickers
4 frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and
5 stash locations in order to protect their supply and to have the narcotics on hand for
6 transactions. I also know that drug traffickers maintain records and other trafficking-
7 related materials in their premises, including residences, for a long period of time,
8 including current and prior cell phone devices that contain text messages and contact lists
9 of drug trafficking associates and pay-owe-sheets. Based on the above-referenced
10 intercepted communications, I believe that Aaron Wood is a multi-kilogram marijuana
11 trafficker who supplied Stevie Allen and who likely keeps his illegal marijuana supply
12 and proceeds in **Subject Premises 17** and **Subject Premises 51**, and uses **Subject**
13 **Vehicle 22** to conduct illegal marijuana transactions.

14      **F.**     **James Lowe's Two Residences and Vehicles**

15       96.     During this investigation, based on physical surveillance, GPS location
16 data, and mail covers, agents identified James Lowe's residence as 412 E Novak Lane,
17 Apt. H102, Kent, Washington (**Subject Premises 18**), his secondary residence as 11718
18 64th Lane S, Seattle, Washington (**Subject Premises 19**) and two of his vehicles as a
19 2010 Chevy Camero bearing Washington state license plate number BUE5594 registered
20 to Tammi M. June[38] and James D. Lowe at **Subject Premises 19** (**Subject Vehicle 46**),
21 and a white 2011 Jaguar XJL bearing Washington state license plate number BVZ2441
22 registered to James D. Lowe at **Subject Premises 19** (**Subject Vehicle 47**). Agents
23 obtained GPS location data on James Lowe's cell phone TT5 from April through August
24 2020, which showed that James Lowe frequented **Subject Premises 19** from April 2020

---

26 [37] Agents have arranged to have a Washington State Liquor and Cannabis Board investigator onsite at **Subject**
27 **Premises 51** during the search to advise on whether any marijuana and related documentation maintained in **Subject**
**Premises 51** is legal, illegal, or non-compliant with Aaron Wood's processing license and Washington state law.
28 [38] Based on social media postings on accounts associated with both Tammi June (which are in her own name) and
James Lowe, it appears that the two have a child or children in common.

to August 2020, including before and after suspected drug transactions, and was residing overnight at **Subject Premises 19** with a female whom agents believed was his girlfriend. Agents believe James Lowe was using **Subject Premises 19** as a drug trafficking stash house and secondary residence. Agents obtained renewed GPS location data for TT5 in March 2021, which showed that James Lowe continued to stay overnights at **Subject Premises 18** but also began alternating residences and also staying overnights at **Subject Premises 19**. **Subject Premises 19** is also currently listed as James Lowe's residence on his driver's license. Agents intercepted communications in which James Lowe discussed assisting Michael Walker with his marijuana trafficking, including sampling different types of marijuana for Michael Walker and advising which types were good quality. Agents observed James Lowe going to and from **Subject Premises 19** before and after drug transactions and conducting suspected drug transactions outside of **Subject Premises 18**. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 18** and **19** and **Subject Vehicles 46** and **47**.

97.     James Lowe has a criminal history which includes felony convictions for drug possession with intent to manufacture/deliver, drug possession with intent to manufacture/deliver a schedule 1 or 2 narcotic, and attempt to elude. On March 15, 2021, agents were advised by an investigator with the Washington State Liquor and Cannabis Board that James Lowe does not hold any active marijuana producer, processor, or retailer license.

98.     On March 27, 2020, agents were surveilling Michael Walker and observed him driving his gold Honda Accord (**Subject Vehicle 15**) to **Subject Premises 18**. Michael Walker parked his gold Honda Accord near **Subject Premises 18**. At approximately the same time of Michael Walker's arrival, the pen register for Michael

AFFIDAVIT OF SHAWNA MCCANN –- 64
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Walker's cell phone (TT2)[39] showed that Michael Walker called James Lowe at TT5.

2    Agents observed James Lowe, identified based on a comparison to his driver's license

3    photograph, exit **Subject Premises 18** within one minute of Michael Walker's arrival

4    carrying a white standard-size envelope in his hand. The envelope appeared to be full,

5    consistent with someone placing a large amount of money in an envelope for payment.

6    James Lowe got into the front passenger seat of the gold Honda Accord. James Lowe

7    exited Michael Walker's gold Honda Accord within one minute and appeared to put

8    something in his pocket as he walked back towards **Subject Premises 18**and went inside.

9    Michael Walker immediately left the area in the gold Honda Accord. Over the next hour,

10   agents saw three separate vehicles arrive outside of **Subject Premises 18** and contact

11   James Lowe, who walked outside the apartment unit to meet with the drivers of these

12   vehicles for short periods of time. Based on these observations and my training and

13   experience, I believe James Lowe was supplied drugs by Michael Walker outside of the

14   Kent apartment, and James Lowe then distributed those drugs to the other individuals

15   who met James Lowe outside of **Subject Premises 18**.

16          99.    On April 21, 2020, at approximately 1:00 p.m., agents observed James

17   Lowe and an unknown female, believed to be the girlfriend of James Lowe, exit **Subject

18   Premises 18**, both carrying a large black trash bag; they put the trash bag in the back of a

19   silver Lincoln Aviator and returned to the apartment. A few minutes later, agents

20   observed James Lowe, the female, and a small child exit **Subject Premises 18**. The

21   female got into the driver's seat, James Lowe got into the passenger seat, and the small

22   child was placed in a car seat in the back of the Lincoln Aviator. The Lincoln Aviator

23   drove a short distance to a trash bin in the apartment complex[40] and then drove to the

24   front of the apartment complex where the leasing office was located. Approximately

25   _____

26   [39] TT2 was a prior phone number used by Michael Walker for which agents obtained a search warrant for GPS
      location data and a Pen Register and Trap and Trace order.

27   [40] Agents were unable to observe any activities at the trash bin due to obstructed views; however, based on the
      circumstances, agents believe that James Lowe and the female likely disposed of the trash bags in the trash bin at

28   that time.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

three minutes later, agents observed the Lincoln Aviator return to **Subject Premises 18**; however, GPS location data for TT5 showed that James Lowe was not in the vicinity of **Subject Premises 18**. From prior surveillance, agents knew that James Lowe parked his vehicle at the entrance of the apartment complex and likely was dropped off near his vehicle at that time. At approximately 1:30 p.m., agents observed a Ford Windstar van, known to be driven by James Lowe based on prior physical surveillance, parked in the parking lot near Catfish Corner located at 11805 Renton Avenue S, Seattle, Washington. GPS location data for TT5 placed the device at this location around that same time. Agents observed James Lowe exit the Ford Windstar van and walk to Catfish Corner. A short time later, agents observed James Lowe return to the van and depart the parking lot. At approximately 1:32 p.m., agents observed James Lowe park the van at **Subject Premises 19**. GPS location data for TT5 placed the device at this location around this time. At approximately 1:50 p.m., agents observed James Lowe depart **Subject Premises 19** driving the van. At approximately 1:55 p.m., agents observed James Lowe use the walk-up ATM at the U.S. Bank located at 12610 76th Ave S, Seattle, Washington. At approximately 2:00 p.m., agents observed James Lowe depart the U.S. Bank driving the van and return to **Subject Premises 19**. At approximately 5:10 p.m., agents observed James Lowe depart **Subject Premises 19** driving the vanand park in the parking lot of Grocery Outlet Bargain Market located at 11656 68th Ave S, Seattle, Washington. At approximately 5:13 p.m., agents observed a male get into the front passenger seat of the van and meet with James Lowe. At approximately 5:16 p.m., agents observed the male exit the van and put something down his pants area. The male walked off towards the south end of the parking lot. At approximately 5:30 p.m., agents observed James Lowe exit the Grocery Outlet Bargain Market parking lot driving the van and park at **Subject Premises 19**.

100.   At approximately 5:45 p.m., GPS location data from TT5 showed that James Lowe was no longer in the vicinity of **Subject Premises 19**, but the Ford Windstar van had not left that residence. Agents drove to the area of the GPS location data for TT5,

AFFIDAVIT OF SHAWNA MCCANN –- 66
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and at approximately 6:25 p.m., agents observed James Lowe exit the passenger seat of a

2   GMC Envoy being driven by an unknown female. The GMC Envoy was parked in front

3   of a residence in Burien, Washington. At approximately 6:40 p.m., agents observed

4   James Lowe get into the passenger seat and the female get into the driver's seat of the

5   GMC Envoy and depart the Burien residence. At approximately 7:10 p.m., agents

6   observed the GMC Envoy pull into the drive-thru of the Church's Chicken located at

7   23839 Pacific Highway S, Des Moines, Washington and get food. At approximately 7:18

8   p.m., agents observed the GMC Envoy with James Lowe in the passenger seat and the

9   female in the driver's seat parked in the Rainier Continental Apartment complex near

10   building D, located at 28623 Military Rd S, Federal Way, Washington. Agents observed

11   Danavian Hunter, identified based on a comparison to social media photographs and

12   known to agents from a prior investigation,[41] carrying a white plastic bag walk to the

13   GMC Envoy and meet with James Lowe. A few minutes later, agents observed Danavian

14   Hunter walk away from the GMC Envoy without carrying any bags, and the GMC Envoy

15   with James Lowe and the unknown female departed the apartment complex. At

16   approximately 7:45 p.m., agents observed the GMC Envoy park at **Subject Premises 19**.

17   At approximately 7:47 p.m., agents observed James Lowe depart **Subject Premises 19**

18   driving the Ford Windstar van. At approximately 8:08 p.m., agents observed James Lowe

19   park the van near the front leasing office area of the apartment complex where **Subject**

20   **Premises 18** is located. James Lowe exited the van and walked towards and inside

21   **Subject Premises 18**. Based on my training and experience, I believe that James Lowe

22   went to and from **Subject Premises 19** before and after conducting a drug transaction at

23   the Grocery Outlet Bargain Market parking lot and then eventually returned to **Subject**

24   **Premises 18**. During this period of surveillance on April 21, 2020, GPS location data for

---

[41] Danavian Hunter is currently charged in U.S. District Court for the Western District of Washington with one count of Conspiracy to Distribute Marijuana and one count of Interstate Travel in Aid of Racketeering under cause number CR19-37 RAJ. Trial is scheduled for August 2, 2021. Danavian Hunter has been out of custody on an appearance bond since his arraignment in February 2019, and throughout the pendency of his case.

AFFIDAVIT OF SHAWNA MCCANN –- 67
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  TT5 indicated that the device was travelling with James Lowe, so investigators believe
2  that James Lowe travels with—and thus is the user of—TT5.

3       101.    On August 4, 2020, at approximately 1:22 p.m., Michael Walker using TT8
4  called James Lowe at TT5. (Session 3307.) James Lowe asked, "can we get more of that
5  ices [marijuana]?" Michael Walker replied, "what you want to grab?" James Lowe said,
6  "probably a half or something, an HP [half pound] or something." Michael Walker said,
7  "let me call and see if there is an HP around." Based on my training and experience, I
8  believe James Lowe asked to buy a half pound of the icing marijuana strain from Michael
9  Walker.

10      102.    On July 10, 2020, the United States Postal Service confirmed that mail
11 addressed to James Lowe was sent to both **Subject Premises 18** and **Subject Premises
12 19**. In late February 2021, agents observed a blue Camaro bearing Washington license
13 plate BUE5594 (**Subject Vehicle 46**) parked in the driveway of **Subject Premises 19**,
14 and a white Jaguar bearing Washington license plate BVZ2441 (**Subject Vehicle 47**)
15 parked on the street in front of **Subject Premises 19**, both registered to James Lowe at
16 **Subject Premises 19**, indicating that James Lowe is still frequenting **Subject Premises
17 19**. Agents also observed a social media post on the Facebook of James Lowe under the
18 username "James Lowe" of a picture of James Lowe standing next to **Subject Vehicle 46**
19 with the driver's door open while parked in the driveway of **Subject Premises 19**.

20      103.    Agents obtained reported earnings/wages for James Lowe from Washington
21 State Employment Security Department, which showed that James Lowe earned between
22 $8,000 and $10,400 in wages per quarter in 2019, which is about $2,600 to $3,500 per
23 month, from employment at Compass Housing Alliance. This amount of reported income
24 is inconsistent with his apparent lifestyle of owning two luxury vehicles and does not
25 appear to reflect his actual income, which may be acquired through drug trafficking based
26 on his association with the Michael Walker DTO and its members involved in drug
27 trafficking.

28

AFFIDAVIT OF SHAWNA MCCANN -- 68
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

104.    Based on my training and experience, I know that gang members and drug traffickers frequently boast about their criminal enterprises, including displaying photographs and videos of their narcotics, narcotics proceeds, or luxury cars, shoes, jewelry, and other goods purchased with narcotics proceeds as a status symbol. I know that such display of unexplained wealth in conjunction with the individual having no known or documented legitimate employment or legitimate source of income is an indication of drug trafficking, money laundering, and other criminal activities, frequently engaged in by gang members and associates. Accordingly, I believe that **Subject Vehicles 46-47** are evidence themselves of James Lowe's drug trafficking and items purchased with illicit drug proceeds.

105.    On March 19, 20201, at approximately 5:30 p.m., agents observed **Subject Vehicle 46** parked outside **Subject Premises 19**. At approximately 5:38 p.m., GPS location data for TT5 put James Lowe within range of **Subject Premises 19**. At approximately 11:45 p.m., GPS location data for TT5 showed that James Lowe had travelled to **Subject Premises 18**. Around that same time, agents observed **Subject Vehicle 46** parked outside of **Subject Premises 18**. GPS location data for TT5 showed that James Lowe stayed overnight at **Subject Premises 18**. GPS location data for TT5 showed that James Lowe stayed overnight at **Subject Premises 19** the following two nights, March 20-21, 2021, indicating that James Lowe is still frequenting, and staying overnight, at both residences.

106.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets.

AFFIDAVIT OF SHAWNA MCCANN -- 69
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

107.     Based on the above-referenced intercepted communications, I believe that James Lowe is a drug runner for Michael Walker who likely keeps his narcotics supply and proceeds in **Subject Premises 18** and **19** and uses/owns **Subject Vehicles 46** and **47** as luxury/status items purchased from suspected illicit drug proceeds.

### G.     Douglas Wrenn's Residence

108.     During this investigation, based on GPS location data and physical surveillance, agents identified Douglas Wrenn's residence as 18411 36th Avenue W, Apt. #B205, Lynnwood, Washington[42] (**Subject Premises 20**), and a vehicle he uses as a blue 2018 Hyundai Sonata bearing Washington state license plate number BWN7793 registered to Jaime A. Petrozzi at 4235 90th Way SE, Olympia, Washington (**Subject Vehicle 43**). Agents obtained GPS location data on Douglas Wrenn's cell phone, TT77, which showed that Douglas Wrenn remained at **Subject Premises 20** overnights from March 5, 2021, to the present. Agents intercepted communications indicating Douglas Wrenn conducted multiple marijuana transactions with Michael Walker on a weekly basis, including acting as the middleman between Michael Walker and an unknown marijuana supplier. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 20** and **Subject Vehicle 43**.

109.     On July 10, 2020, at approximately 9:14 a.m., Michael Walker using TT8 called Douglas Wrenn at phone number (206) 919-3965 (TT77).[43] (Session 44, 47.) During this call, Douglas Wrenn said, "I need some fire [good quality marijuana]," and

---

[42] Douglas Wrenn's listed address on his driver's license is 22818 100th Avenue SE, Kent, Washington. Based on my training and experience, I know that drug traffickers frequently list their residence, vehicles, and other assets in other people's names and at other locations in order to evade law enforcement detection. Agents have not observed Douglas Wrenn at his driver's license address on prior surveillance.

[43] Agents determined that Douglas Wrenn is the user of phone number (206) 919-3965 (TT77) based on intercepted communications in which Michael Walker refers to the user as "D.W." and "Earl." Douglas Wrenn's middle name is Earl. Additionally, on August 3, 2020, during session 3078 with TT8 used by Michael Walker, the user of **TT77** identified himself as "Douglas Wrenn." Agents also obtained GPS location data for TT77 and observed Douglas Wrenn, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS pings for TT77 at multiple locations and times.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Michael Walker asked, "what you want to grab?" Douglas Wrenn said, "probably a whipper [ounce], I need two of them, but I got money for one." Michael Walker asked if Douglas Wrenn wanted that "good fake sherbet" and then complained that the sherbet he bought through Douglas Wrenn's contact was not good quality. Douglas Wrenn said, "I got somebody else [marijuana supplier] I'm going to put you onto," and then complained that "he didn't get a fucking dime out of that shit [prior middleman deal]." Michael Walker said "he [supplier] charged me 22 [$2,200]" and that if he gives Douglas Wrenn "a zip [ounce] for 100 [$100], it only comes out to 1600 [$1,600 for the pound] and he loses 600 [$600 each pound] because he paid 2200 [$2,200 per pound]." Michael Walker said that if he sells "all the zips [ounces] for $150.00 and I broke them down and all that running around I got to do, I'd make 200 [$200 per pound of marijuana sold]. Man fuck no!" The call disconnected and Michael Walker called Douglas Wrenn back and said he "wants 200 [$200 for each ounce of marijuana] and is pressing a hard line" but that Douglas Wrenn is his "guy for 175 [$175 for each ounce of marijuana]." Based on my training and experience, I believe that Douglas Wrenn asked to buy marijuana from Michael Walker and Michael Walker agreed to sell two ounces of marijuana for $175 each to Douglas Wrenn. I also believe the parties discussed how Douglas Wrenn put Michael Walker in contact with a marijuana supplier who sold Michael Walker some bad quality sherbet marijuana (a marijuana strain), and Douglas Wrenn complained that he did not get any money for referring Michael Walker to the marijuana supplier.

110.    On July 15, 2020, at approximately 7:53 p.m., Michael Walker using TT8 called Douglas Wrenn at TT77. (Session 720.) During this call, Michael Walker asked what Douglas Wrenn "wanna grab," and Douglas Wrenn said, "I'll take two [ounces] of them but, I'm only paying you for one [ounce]." Michael Walker replied, "Ok why don't you pay me for one [ounce] then pay me the forty [$40]? Only for one." Douglas Wrenn said, "Deal, Let's do it like that. Deal, deal. What else you got, you said you got some other shit." Michael Walker replied, "Man that shits done. I only grabbed a P [pound], but that's gone." Douglas Wrenn asked, "you still have the glue and sherbet [two

1  different strains of marijuana] . . . I want both you gave me both sherbets last time."

2  Michael Walker replied, "No it was one and one." Based on my training and experience, I

3  believe Douglas Wrenn asked to buy two ounces of marijuana from Michael Walker and

4  the parties agreed to the transaction at a discount.

5  111.   On July 22, 2020, at approximately 10:52 a.m., Douglas Wrenn using TT77

6  called Michael Walker at TT8. (Session 1524.) During this call, Michael Walker asked

7  what Douglas Wrenn's "guy [supplier contact] got," and Douglas Wrenn said, "hold on

8  he's on the other line" and arranged for Michael Walker to talk directly with the supplier

9  on a three-way call. The supplier asked what Michael Walker was "looking for this go

10 around," and Michael Walker responded, "what you got." The supplier said, "we have

11 some glue, some more buffalo, sugar cookies [types of marijuana], stuff like that."

12 Michael Walker said, "yeah let me get the best kind because that shit that was supposed

13 to be sherbet wasn't sherb and it wasn't really what my people wanted." Michael Walker

14 asked the supplier to bring the "glue and sugar cookies." Michael Walker called out to

15 "D.W.," and Douglas Wrenn got on the phone and said that "he [supplier] would be ready

16 in an hour or so." Based on my training and experience, I believe that Douglas Wrenn put

17 Michael Walker in contact with the same marijuana supplier who sold Michael Walker

18 the bad quality sherbet, and Michael Walker and the supplier agreed to conduct another

19 marijuana transaction for the glue [GG4 or gorilla glue 4] and sugar cookie marijuana

20 types.

21 112.   From March 5, 2021 to the present, GPS location data for TT77 showed

22 that Douglas Wrenn has primarily remained, including overnights, at **Subject**

23 **Premises 20**.

24 113.   On March 8, 2021, at approximately 10:28 p.m., GPS location data for

25 TT77 showed that Douglas Wrenn was in the vicinity of Michael Walker's residence in

26 Renton, Washington (**Subject Premises 30**). Douglas Wrenn remained in this vicinity for

27 about thirty minutes. GPS location data for TT77 then showed that Douglas Wrenn had

28

AFFIDAVIT OF SHAWNA MCCANN -- 72
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   departed the vicinity and was headed north in the direction of his residence (**Subject**

2   **Premises 20**) at approximately 10:57 p.m.

3        114.   On March 15, 2021, GPS location data for TT77 showed the device was in

4   the vicinity of **Subject Premises 20** and had not moved overnight. At approximately

5   12:00 p.m., a uniformed officer with Lynnwood Police Department knocked on the door

6   of **Subject Premises 20** and provided a ruse that there had been a 911 hang up call from

7   this residence. A male voice from inside **Subject Premises 20** shouted to the officer that

8   there had been no 911 call and the male refused to answer the door.

9        115.   On March 15, 2021, agents were advised by an investigator with the

10  Washington State Liquor and Cannabis Board that Douglas Wrenn does not hold any

11  active marijuana producer, processor, or retailer license.

12       116.   On March 16, 2021, at approximately 11:27 a.m., GPS location data for

13  TT77 showed the device was in the vicinity of **Subject Premises 20** and had not moved

14  overnight. At approximately 11:42 a.m., GPS location data for TT77 indicated that

15  Douglas Wrenn had left **Subject Premises 20**. GPS location data for TT77 showed that

16  Douglas Wrenn made a quick trip to the Issaquah area and then began to drive back to

17  **Subject Premises 20**. At approximately 12:49 p.m., agents observed **Subject Vehicle 43**

18  arrive at the apartment complex driven by Jamie Petrozzi, identified based on her driver's

19  license photograph and photographs on her publicly available Facebook account. Jamie

20  Petrozzi and Douglas Wrenn, identified based on his driver's license photograph and

21  photographs on his Facebook account under the user name "Douglas Earl Wrenn-El,"

22  exited **Subject Vehicle 43** and walked towards **Subject Premises 20**. At approximately

23  12:50 p.m. agents observed Douglas Wrenn and Jamie Petrozzi approach **Subject**

24  **Premises 20**. Jamie Petrozzi used a key to unlock the door, and she and Douglas Wrenn

25  went inside **Subject Premises 20**. Around 12:59 p.m., GPS location data for TT77

26  indicated Douglas Wrenn was at **Subject Premises 20**.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

117.   On a prior surveillance, on May 13, 2020, agents observed Douglas Wrenn driving a 2019 Hyundai Elantra bearing Washington license plate BQH6745,[44] registered to Jamie Petrozzi at 4235 90th Way SE, Olympia, Washington, park across the street from Michael Walker's residence and walk to and inside Michael Walker's residence. Accordingly, Douglas Wrenn has a history of using vehicles registered to Jamie Petrozzi, including **Subject Vehicle 43**.

118.   I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Douglas Wrenn is a marijuana trafficker and middleman for Michael Walker who likely keeps his narcotics supply and proceeds in **Subject Premises 20** and **Subject Vehicle 43**.

### H.    Kevin Gipson's Residence and Vehicle

119.   Investigators reviewed law enforcement and public databases, which showed that a phone number used by Kevin Gipson is (206) 393-7387 (TT6). Investigators subpoenaed subscriber information and toll records for TT6, which was in fact subscribed to Kevin Gipson with a subscriber address of 4727 Beacon Avenue S, Apt. 9, Seattle, Washington (**Subject Premises 21**). In April 2020, at the instruction of and under the supervision of investigators, a confidential source, CS3, conducted a controlled purchase of approximately 1.3 grams of powder cocaine from Kevin Gipson. For this controlled purchase, CS3 stopped by unannounced at Kevin Gipson's residence

---

[44] Agents have not seen this vehicle since approximately the autumn of 2020, and registration records indicate that insurance declared this vehicle a total loss in October 2020 and the registration or insurance was canceled in January 2021.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    at **Subject Premises 21**. During this controlled purchase, Kevin Gipson gave CS3 his

2    phone number of (206) 393-7387 (TT6). Kevin Gipson told CS3 that Michael Walker

3    was working with Jamaal Davis and Maghan Stenson to traffic drugs, but that Michael

4    Walker and Maghan Stenson recently had a falling out. After the controlled buy, CS3

5    said that the person who provided him with the cocaine was Kevin Gipson, whom he had

6    previously identified based on his driver's license photo.

7        120.    Accordingly, during this investigation, based on physical surveillance, GPS

8    location data for Kevin Gipson's cell phone (TT6), and confidential source information,

9    agents identified Kevin Gipson's residence as 4727 Beacon Avenue S, #9, Seattle,

10   Washington (**Subject Premises 21**), and his vehicle as a red 2003 Ford Explorer bearing

11   Washington state license plate number BGK5297 registered to Bee K Gibson at 4727

12   Beacon Avenue S, Seattle, Washington[45] (**Subject Vehicle 24**). Agents obtained GPS

13   location data on Kevin Gipson's cell phone TT6 from May through August 2020, which

14   showed that Kevin Gipson remained at **Subject Premises 21** overnights from May 2020

15   to August 2020.[46] Agents conducted two controlled purchases of cocaine from Kevin

16   Gipson in the spring of 2020 utilizing a confidential source who contacted Kevin Gipson

17   at TT6; based on these controlled purchases, physical and video surveillance, toll

18   analysis, and other investigative techniques, agents obtained a court-authorized wire and

19   electronic communications interception on TT6 used by Kevin Gipson. During this

20   investigation, and specifically the period of wire and electronic communications

21   interception, agents observed Kevin Gipson conducting multiple cocaine transactions on

22   a daily to weekly basis. Agents observed Kevin Gipson conducting cocaine transactions

23   at his residence (**Subject Premises 21**), and agents observed Kevin Gipson driving

24   **Subject Vehicle 24** to and from drug transactions conducted elsewhere. Some of these

25

26   _____

27   [45] The vehicle registration with Washington State Department of Licensing did not list a specific apartment unit with this address.

28   [46] During the period of GPS location data for TT6, agents observed Kevin Gipson, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS pings for TT6 at multiple different locations and times.

AFFIDAVIT OF SHAWNA MCCANN –- 75
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  drug transactions and agents' observations are noted below for purposes of establishing

2  probable cause to search **Subject Premises 21** and **Subject Vehicle 24**.

3       121.    On July 14, 2020, Jimmy Carter using TT13[47] had been intercepted talking

4  with Kevin Gipson on TT6 about supplying Kevin Gipson with cocaine and Kevin

5  Gipson not being satisfied with the cocaine because the baggies of cocaine did not

6  contain a gram of cocaine each. (Sessions 913, 954.) On these calls, Kevin Gipson stated

7  that "these don't even weigh a gram with the bag dawg." Jimmy Carter replied, "Well

8  don't touch none of them then. I gotta come see that, I'll be back up there." On July 16,

9  2020, at approximately 9:59 a.m., agents intercepted an incoming call to Kevin Gipson

10  on TT6 from Jimmy Carter at TT13. (Session 1078.) During this call, Jimmy Carter told

11  Kevin Gipson that he was at Kevin Gipson's door (**Subject Premises 21**). Agents

12  reviewed video surveillance from outside **Subject Premises 21** from July 16, 2020,

13  around 9:59 a.m. and observed a male matching the description of Jimmy Carter walking

14  up to **Subject Premises 21** while talking on the phone. At approximately 10:13 a.m.,

15  video surveillance showed the male matching Jimmy Carter's description leaving the area

16  of **Subject Premises 21** and walking towards the center median of Beacon Avenue S

17  where there is general parking. Based on my training and experience, I believe that

18  Jimmy Carter was at **Subject Premises 21** to address the problem Kevin Gipson

19  described with the prior supply of cocaine.

20       122.    On July 27, 2020, at approximately 12:46 p.m., agents intercepted a

21  phone conversation between Kevin Gipson using TT6 and an unknown male using phone

22  number (206) 258-1246 (referred to as UM1246). (Session 2815.) During the call,

23  UM1246 said, "I need three man." Kevin Gipson told UM1246 to "sit out by my truck

24  and I'll come out." At approximately 12:48 p.m., agents observed an Oldsmobile Alero

25  pull up and park near Kevin Gipson's vehicle (**Subject Vehicle 24**). At approximately

26

27

---

28  [47] The identification of Jimmy Carter as the user of TT13 is discussed in more detail below, in the section on Jimmy Carter.

AFFIDAVIT OF SHAWNA MCCANN –- 76
USAO #2019R01083

12:50 p.m., agents observed Kevin Gipson, identified based on a comparison to his driver's license photo, exit **Subject Premises 21**, go up to the window of the Alero, and briefly contact the driver of the Alero. The Alero then drove out of the area. Kevin Gipson got into **Subject Vehicle 24** and drove away. At approximately 12:27 p.m., agents intercepted a call between Kevin Gipson using TT6 and an unknown male using phone number (206) 231-1610 (referred to as UM1610). (Session 2808.) During this call, UM1610 asked Kevin Gipson to "bring me 30." At approximately 12:56 p.m., agents intercepted a call between Kevin Gipson using TT6 and UM1610. (Session 2819.) During the call, Kevin Gipson told UM1610 that he would be pulling up in about three minutes. Based off prior surveillance and phone conversations, agents believed Kevin Gipson was going to meet UM1610 to sell him $30 worth of cocaine at/near South Charlestown Street from 34th Avenue South in Seattle. (Session 2808.) At approximately 1:02 p.m., agents observed Kevin Gipson driving **Subject Vehicle 24** in the area of South Charlestown Street from 34th Avenue South in Seattle. Around that same time, cell-site location data for TT6 indicated that the phone was travelling with Kevin Gipson. At approximately 1:30 p.m., agents observed Kevin Gipson driving **Subject Vehicle 24** return to and go inside of **Subject Premises 21**. At approximately 1:31 p.m., agents intercepted a phone conversation between Kevin Gipson using TT6 and an unknown male using phone number (206) 591-5015 (referred to as UM5015). (Session 2829.) During the call, UM5015 told Kevin Gipson he wanted to get "three." UM5015 then told Kevin Gipson he would call when he got "outside." At approximately 1:47 p.m., agents intercepted a phone conversation between Kevin Gipson using TT6 and UM5015. (Session 2834.) During the call, UM5015 told Kevin Gipson he was "about to pull up." At approximately 1:49 p.m., agents observed a white 2005 Acura TL pull up and park in front of **Subject Premises 21**. An unknown male in his 50's got out of the vehicle and walked towards **Subject Premises 21**. At approximately 1:50 p.m., the same male exited **Subject Premises 21,** came back to the Acura, got into the front passenger seat, and the Acura drove away. Based on my training and experience, I believe that Kevin Gipson sold three

1  grams of cocaine to UM1246 outside of **Subject Premises 21**, then drove to sell $30

2  worth of cocaine to UM1610 using **Subject Vehicle 24**, then returned to **Subject**

3  **Premises 21** and sold three units or $30 worth of cocaine to UM5015 at **Subject**

4  **Premises 21**.

5       123.    On July 24, 2020, at approximately 11:55 a.m., Kevin Gipson using TT6

6  called Jamar Howard at TT14.[48] (Session 2362.) Kevin Gipson asked Jamar Howard to

7  bring the "halftime hard," and Jamar Howard agreed. Kevin Gipson using TT6 called

8  Jamar Howard at TT14 again at approximately 12:08 p.m. (Session 2366.) Kevin Gipson

9  asked for the "quarter of soft too," and Jamar Howard said he had a "beezy seezy." Kevin

10  Gipson asked for that and then said he understood that to be a half a quarter. Kevin

11  Gipson said he would "take it" and wanted the other "beezy hard." Jamar Howard agreed.

12  At approximately 12:15 p.m., Kevin Gipson using TT6 called Jamar Howard at TT14.

13  (Session 2368.) Kevin Gipson asked if Jamar Howard had "left yet"; Jamar Howard said

14  no and that he was "about to leave right now." Kevin Gipson asked Jamar Howard to

15  throw another "half hard" in there. At approximately 12:41 p.m., agents observed Kevin

16  Gipson walk down the stairs from **Subject Premises 21**, interact with two males, and

17  then go back upstairs. At approximately 12:43 p.m., agents observed a male, later

18  identified as Jamar Howard based on a comparison to his driver's license photograph and

19  social media photographs, walk up the stairs to **Subject Premises 21**. At approximately

20  12:46 p.m., agents observed Jamar Howard and Kevin Gipson both walk down the stairs

21  from **Subject Premises 21**. Agents, via remote video surveillance, observed Kevin

22  Gipson hand an item that appeared to be a flat paper envelope to Jamar Howard. Kevin

23  Gipson then got into **Subject Vehicle 24** and drove off. At approximately 1:18 p.m.,

24  agents observed Kevin Gipson return to **Subject Premises 21** driving **Subject Vehicle**

25

26  _____

27  [48] Based on interceptions of Kevin Gipson using TT6, agents identified Jamar Howard as one of Kevin Gipson's cocaine suppliers. Agents obtained a search warrant for GPS location data for TT14 and confirmed that Jamar

28  Howard was the user of TT14 based on physical surveillance seeing Jamar Howard, identified based on a comparison to his driver's license photograph, in the same locations as the GPS location data for TT14 at multiple locations and different times.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **24**. At approximately 2:40 p.m., agents observed Kevin Gipson come down the stairs at

2  **Subject Premises 21** and get into **Subject Vehicle 24**. A gold Jeep Liberty bearing

3  Washington license plate BTB8411 pulled up near Kevin Gipson in **Subject Vehicle 24**.

4  Agents observed the driver of the gold Jeep reach out of the driver's window with a

5  closed fist towards Kevin Gipson. The gold Jeep then departed, and Kevin Gipson drove

6  off in **Subject Vehicle 24**. At approximately 3:49 p.m., agents observed a newer black

7  BMW with no license plate park in front of **Subject Premises 21**. An unknown male

8  exited the BMW and walked up to **Subject Premises 21**. At approximately 3:52 p.m.,

9  agents observed Kevin Gipson return to **Subject Premises 21** driving **Subject Vehicle**

10  **24**. Kevin Gipson walked up the stairs to **Subject Premises 21** and met with the

11  unknown male who came from the newer BMW. At approximately 3:57 p.m., agents

12  observed the BMW driver come down the stairs from **Subject Premises 21** carrying a

13  baggie in his hand, get into the BMW, and drive off. Based on my training and

14  experience, I believe that Jamar Howard supplied Kevin Gipson with about an ounce of

15  crack cocaine ("hard") and an eighth of an ounce of powder cocaine ("soft") at **Subject**

16  **Premises 21**, then Kevin Gipson conducted a drug transaction with the driver of the gold

17  Jeep Liberty outside of **Subject Premises 21** from **Subject Vehicle 24**, and conducted a

18  drug transaction with the driver of the newer BMW in **Subject Premises 21**.

19        124.    On August 4, 2020, at approximately 5:21 p.m., investigators intercepted a

20  phone conversation between Kevin Gipson using TT6 and Jerrell Ingram using TT12.[49]

21  During the call, Jerrell Ingram discussed selling Kevin Gipson a "half" and that he was

22  "pulling up in back." (Session 3998.) Agents believed Jerrell Ingram had just pulled up in

23  the alley behind **Subject Premises 21**. At approximately 5:25 p.m., agents observed a

24  white 2020 Ford Fusion bearing California state license plate number 8MEU299,

25  registered to Enterprise Rental and rented by Cecilia Turner, in the alley directly behind

26

27  _____

28  [49] Agents obtained a search warrant for GPS location data for TT12, and observed Jerrell Ingram, identified based on a comparison to his driver's license photograph, in the vicinity of the GPS pings for TT12 at multiple different locations and times.

AFFIDAVIT OF SHAWNA MCCANN –- 79
USAO #2019R01083

1    **Subject Premises 21**. As discussed below, agents had observed Jerrell Ingram driving

2    the same vehicle on prior physical surveillance on August 1, 2020. GPS location data for

3    TT12 put Jerrell Ingram in range of **Subject Premises 21**. On August 4, 2020, at

4    approximately 7:56 p.m., and again on August 6, 2020, at approximately 2:05 p.m.,

5    agents intercepted calls between Kevin Gipson using TT6 and Jerrell Ingram using TT12

6    during which Kevin Gipson told Jerrell Ingram that people were complaining about the

7    quality of the drugs Jerrell Ingram previously sold to Kevin Gipson. (Sessions 4033,

8    4198.) Jerrell Ingram told Kevin Gipson that he "got some the other way right now and

9    then I'm waiting on something that supposed to come in today." Based on my training

10   and experience, I believe that Jerrell Ingram supplied Kevin Gipson with a half-ounce of

11   cocaine, but the cocaine was not good quality, and Kevin Gipson's customers complained

12   about the quality; Jerrell Ingram told Kevin Gipson that he only had crack cocaine left at

13   that time but was expecting to get more powder cocaine later that day.

14         125.    On November 6, 2020, at approximately 8:03 p.m., Kevin Gipson using

15   TT6 called David Kelley at TT19.[50] (Session 3740.) During this call, Kevin Gipson asked

16   David Kelley, "you going to be able to make it?" David Kelley confirmed. Kevin Gipson

17   asked for "a ball of soft and a quarter hard." David Kelley said, "yep." Based on my

18   training and experience, I believe that Kevin Gipson asked to buy an eightball/eighth of

19   an ounce of powder cocaine and a quarter of an ounce of crack cocaine from David

20   Kelley. Based on this investigation and intercepted communications, I know that David

21   Kelley is a cocaine supplier to several Michael Walker DTO members, including Kevin

22   Gipson and Jerrell Ingram. On November 9, 2020, agents conducted a search of David

23   Kelley's residence and vehicle, based on federal search warrants, and seized more than a

24   kilogram of cocaine, digital scales, over $55,000 in cash, six firearms, a suspected pay-

25   owe sheet, and a money counter. After the search of David Kelley's residence, Kevin

26

27   _____

28   [50] Agents obtained a search warrant for GPS location data and identified David Kelley as the user of TT19 based on physical surveillance observing David Kelley, identified based on a comparison to his driver's license photograph, in the same location as TT19 at multiple different locations and times.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Gipson continued to call David Kelley at TT19 from November 10, 2020, to November

2 14, 2020; however, David Kelley did not answer.

3   126. On February 19, 2021, at approximately 1:00 p.m., agents observed

4 **Subject Vehicle 24** parked in front of **Subject Premises 21**. Again, on March 3, 2021, at

5 approximately 11:40 a.m., agents observed **Subject Vehicle 24** parked in front of

6 **Subject Premises 21**. On March 7, 2021, at approximately 1:30 p.m., agents observed

7 Kevin Gipson exit **Subject Premises 21** and walk down the stairs to Beacon Avenue

8 South. Agents also observed **Subject Vehicle 24** parked in the center median parking lot

9 on Beacon Avenue South in front of **Subject Premises 21**, indicating that Kevin Gipson

10 still resides at **Subject Premises 21** and uses **Subject Vehicle 24**. I know based on my

11 training and experience, that drug traffickers frequently keep their narcotics and narcotics

12 proceeds in their residences, vehicles, and stash locations in order to protect their supply

13 and to have the narcotics on hand for transactions. I also know that drug traffickers

14 maintain records and other trafficking-related materials in their premises, including

15 residences, for a long period of time, including current and prior cell phone devices that

16 contain text messages and contact lists of drug trafficking associates and pay-owe sheets.

17 Based on the above-referenced intercepted communications, I believe that Kevin Gipson

18 is a multi-ounce cocaine redistributor who likely keeps his narcotics supply and proceeds

19 in **Subject Premises 21** and uses **Subject Vehicle 24** to conduct narcotics transactions.

20  **I.** **Jimmy Carter's Residence, Secondary Residence, Apartment Unit,**
21    **Storage Unit, and Vehicle**

22   127. During this investigation, based on physical and remote video surveillance,

23 a mail cover, and GPS location data for Jimmy Carter's cell phones (TT13 and TT20),[51]

24 agents identified Jimmy Carter's residence and location of his narcotics money as 19301

25

26

27 [51] Agents obtained search warrants with an integrated pen register/trap and trace order to track TT13 and TT20 and
confirmed the user of both devices is Jimmy Carter based on physical surveillance observing Jimmy Carter,

28 identified based on a comparison to his driver's license photograph, in the same location as GPS location data for
TT13 and TT20 at different locations and times.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5th Avenue East, Spanaway, Washington (**Subject Premises 23**),[52] his secondary residence as 12805 Occidental Avenue South, Burien, Washington (**Subject Premises 24**), an apartment complex that he frequents as 12902 SE 312th Street, Apt. K207, Auburn, Washington (**Subject Premises 33**), his storage locker as Glacier West Self Storage, 1407 Central Avenue South, Kent, Washington, Unit 176 (**Subject Premises 25**), and his vehicles as a gray 2009 Chevrolet Silverado bearing Washington state license plate number C32244G registered to Jimmy J. Carter at **Subject Premises 23** (**Subject Vehicle 25**), and a 2013 Audi Q7 bearing Washington license plate BWK4351 registered to Byron Hunter and Jimmy J. Carter at **Subject Premises 23** (**Subject Vehicle 49**). Agents obtained GPS location data on Jimmy Carter's cell phones, TT13 and TT20, from July through September 2020, which showed that Jimmy Carter remained at **Subject Premises 23** during the days and was primarily at **Subject Premises 24** overnights from July 2020 to September 2020. Additionally, agents installed a pole camera capturing the driveway of **Subject Premises 23** and **24**, which showed the same pattern from August 2020 to November 2020; the cameras are currently still installed and showed Jimmy Carter still frequenting these residences. Agents intercepted communications and/or observed Jimmy Carter conducting multiple cocaine transactions on a weekly basis. Agents observed Jimmy Carter coming and going from **Subject Premises 23** and **24** immediately before and after drug transactions driving **Subject Vehicle 25** and accessing **Subject Premises 25** after an intercepted call in which he said he was getting firearms. More recently, from late November 2020 to the present, agents observed Jimmy Carter frequenting **Subject Premises 33** in a pattern that is indicative of this location being used as a narcotics stash location. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 23** through **25**, **Subject Premises 33**, **Subject Vehicle 25,** and **Subject Vehicle 49**.

---

[52] Jimmy Carter's address currently on file with the Department of Licensing is **Subject Premises 23**.

128.    Jimmy Carter has a criminal history which includes three felony convictions for drug distribution and possession, including one felony for which he was sentenced to 36 months in prison, making him ineligible under federal law to possess a firearm. Jimmy Carter has fourteen gross misdemeanor and misdemeanor convictions for attempted possession of controlled substances, obstructing law enforcement, attempted possession of stolen property, driving violations, interfering with reporting of a domestic violence incident, and assault.

129.    On August 6, 2020, at approximately 10:20 a.m., agents observed **Subject Vehicle 25** parked in the backyard of **Subject Premises 23**. Around that same time, GPS location data for TT13 put Jimmy Carter at **Subject Premises 23**. On September 3, 2020, the United States Postal Service confirmed that mail addressed to Jimmy Carter was sent to **Subject Premises 23**.

130.    On September 9, 2020, at approximately 10:48 a.m., agents intercepted a phone call between Jimmy Carter using TT20 and Kefentse Olabisi using TT30 (identification discussed below). (Session 716.) During the call, Jimmy Carter asked, "You ain't talk to your boy boy [supplier] yet?" and Kefentse Olabisi replied, "I'm about to go see him [supplier] in a second." Jimmy Carter said, "Oh man, you should have stopped by and got a little bread [money for narcotics]." Kefentse Olabisi replied, "Come out and bring it [money for narcotics]." Jimmy Carter said, "It's 10:50 a.m. Yep, I can meet you somewhere real quick and give it [money] to you. Did you even see what he was gonna let us do or no [price and quantity for narcotics]?" Kefentse Olabisi replied, "Uhuh. I ain't talk about it [details of narcotics deal] on the phone. I had sent some money already just to tell him [supplier] that I needed on [to buy narcotics], needed something. I'm going to holler at him [supplier] when I see him." Based on my training and experience, I believe that Jimmy Carter contacted Kefentse Olabisi to discuss combining money to conduct a narcotics deal with Kefentse Olabisi's unknown supplier whom Kefentse Olabisi said he was going to meet soon. Around the time of this call,

AFFIDAVIT OF SHAWNA MCCANN -- 83
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Jimmy Carter was in the vicinity of **Subject Premises 23** based on cell-site location data

2  for TT20.

3      131.    Later that same day, at approximately 11:55 a.m., agents intercepted a

4  phone call between Jimmy Carter using TT20 and Kefentse Olabisi using TT30. (Session

5  725.) During the call, Jimmy Carter said, "I'm on the road right now. Why don't you

6  meet me at that, uh, Emerald Queen, the one right there…in Fife…so I can give you this

7  change [money for narcotics]." Kefentse Olabisi asked, "how long." Jimmy Carter

8  replied, "I should be there in like the next, probably like fifteen minutes…I'm just going

9  to drop the [unintelligible] and I got to take him [Jimmy Carter's father] to the thing

10  [appointment] and I'll just come back later on." Around the time of this call, cell-site

11  location data for TT20 indicated that Jimmy Carter was leaving from the vicinity of

12  **Subject Premises 23**. Based on my training and experience and the intercepted call

13  discussed above, I believe Jimmy Carter and Kefentse Olabisi agreed to meet at the

14  Emerald Queen Casino in Fife for Jimmy Carter to give Kefentse Olabisi money so that

15  Kefentse Olabisi could purchase narcotics from his supplier for himself and Jimmy

16  Carter, and that Jimmy Carter retrieved the money that he was going to give to Kefentse

17  Olabisi for the purpose of acquiring narcotics from **Subject Premises 23**. At

18  approximately 12:32 p.m., GPS location data for TT20 put Jimmy Carter within range of

19  the Emerald Queen Casino. Agents observed Jimmy Carter's gray 2009 Chevrolet

20  Silverado (**Subject Vehicle 25**) in the parking lot. **Subject Vehicle 25** was parked next to

21  a blue 2007 Chevrolet Impala bearing Washington state license plate number BOJ4787

22  registered to Kefentse Lumumba-Olabisi (**Subject Vehicle 26**). Shortly thereafter, both

23  vehicles drove out of the parking lot.

24      132.    Later that same day at approximately 12:34 p.m., shortly after Jimmy

25  Carter was observed meeting with the vehicle registered to Kefentse Olabisi, **Subject**

26  **Vehicle 26**, Kefentse Olabisi using TT30 called Jimmy Carter at TT20. (Session 746.)

27  During this call, Kefentse Olabisi said, "What'd you say this is [how much money]?"

28  Jimmy Carter replied, "Nine [$9,000]." Kefentse Olabisi said, "I was making sure it

AFFIDAVIT OF SHAWNA MCCANN –- 84
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   wasn't supposed to be ten [$10,000]." Jimmy Carter replied, "Nah, this is nine. Just give

2   me whatever [amount of cocaine] you can get with all that. And whatever on the other, if

3   you can from the last, what you got from the last time . . . .You say you gonna see what

4   he [supplier] talking about?" Kefentse Olabisi said, "Yeah, yeah. I see how many [ounces

5   of cocaine] I can get [with the money Jimmy Carter gave to Kefentse Olabisi]." Based on

6   my training and experience, I believe that Jimmy Carter met with Kefentse Olabisi and

7   gave Kefentse Olabisi $9,000 to purchase cocaine from Kefentse Olabisi's supplier, and

8   that Kefentse Olabisi called Jimmy Carter to confirm that Jimmy Carter only gave him

9   $9,000. At approximately 7:48 p.m., Kefentse Olabisi using TT30 called Jimmy Carter at

10  TT20. (Session 816.) During this call, Jimmy Carter said he "was going down by the

11  spot." Kefentse Olabisi asked, "to yours?" Jimmy Carter said, "yep," and Kefentse

12  Olabisi said, "alright." Based on physical and remote video surveillance, and prior

13  intercepted calls, agents knew that Jimmy Carter's spot was **Subject Premises 24**. At

14  approximately 11:23 p.m., Kefentse Olabisi using TT30 sent a text message to Jimmy

15  Carter at TT20 that read: "I'll be there in 20." (Session 864.) Approximately one hour

16  later, GPS location data for TT20 and TT13 put Jimmy Carter within range of **Subject

17  Premises 24**. Based on subsequent intercepted communications, agents believe that

18  Kefentse Olabisi ended up not going to **Subject Premises 24** that night because he said

19  he got a flat tire. (Session 932.)

20      133.    On September 10, 2020, at approximately 7:40 p.m., agents intercepted a

21  phone call between Jimmy Carter using TT20 and Kefentse Olabisi using TT30. (Session

22  1004.) During the call, Kefentse Olabisi said, "I just talked to him [supplier]. He's

23  watching the game. But I can pull up on him." Jimmy Carter replied, "Yeah, I am about

24  to strike out [not get any narcotics that day]. I'm about to go down that way and try it

25  again [try to find narcotics to buy], man, shit. I trying to get in the kitchen tonight [buy

26  cocaine and cook it up into crack cocaine]." Kefentse Olabisi said, "I guarantee you. I got

27  you. I got you." Jimmy Carter replied, "Alright, let me know. If not, I could have went

28  and seen my other guy [other supplier]. He for sho put us on [sell narcotics], man. You

AFFIDAVIT OF SHAWNA MCCANN –- 85
USAO #2019R01083

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

ain't even call me. Damn . . . I'll be down that way." Based on my training and experience, I believe this is a continuation of the prior conversation between Jimmy Carter and Kefentse Olabisi in which the parties discussed pooling their money together and Kefentse Olabisi going to his supplier to purchase several ounces of cocaine. Jimmy Carter expressed that he needed to get cocaine and could call his other cocaine supplier to get cocaine if Kefentse Olabisi did not come through with the narcotics deal. GPS location data for TT20 and TT13 put Jimmy Carter within range of his residence at **Subject Premises 23**. During this call, Kefentse Olabisi asked, "you going to your spot right? Or your coming out here?" Jimmy Carter said, "I was going to stop there." Agents believed that the "spot" referenced by Jimmy Carter and Kefentse Olabisi indicated that they planned to meet at **Subject Premises 24** later that day. At approximately 9:44 p.m., GPS location data for TT20 and TT13 showed that Jimmy Carter had left **Subject Premises 23**. At approximately 10:35 p.m., agents observed Jimmy Carter's Chevy Silverado (**Subject Vehicle 25**) arrive at **Subject Premises 24**. GPS location data for TT20 and TT13 put Jimmy Carter within range of **Subject Premises 24**. At approximately 11:38 p.m., agents intercepted a phone call from Kefentse Olabisi using TT30 to Jimmy Carter at TT20. (Session 1060.) During this call, Kefentse Olabisi told Jimmy Carter that he "was about to pull up on you." At approximately 11:50 p.m., agents intercepted a phone call from Kefentse Olabisi using TT30 to Jimmy Carter at TT20. (Session 1061.) During this call, Kefentse Olabisi asked Jimmy Carter to "open the door." At approximately 11:51 p.m., agents drove by **Subject Premises 24** and observed a dark colored Chevrolet Impala parked in front of the residence, which matched the vehicle investigators had seen Kefentse Olabisi drive on prior physical surveillance, **Subject Vehicle 26**. Agents believed that Kefentse Olabisi was meeting with Jimmy Carter at **Subject Premises 24** to deliver narcotics that Kefentse Olabisi had purchased with their pooled money.

134.    On September 11, 2020, at approximately 8:45 p.m., Jimmy Carter using TT20 called Kefentse Olabisi at TT30. (Session 1184.) During this call, Kefentse Olabisi

AFFIDAVIT OF SHAWNA MCCANN –- 86
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  asked where Jimmy Carter was at, and Jimmy Carter said, "going my way" and that he

2  would be there "within the hour." Jimmy Carter also said that he was "going to see my

3  other guy [supplier]." Kefentse Olabisi replied, "I'll see you when I see you." Based on

4  intercepted calls in this investigation, agents believed that Jimmy Carter was headed to

5  **Subject Premises 24**. At approximately 10:11 p.m., Kefentse Olabisi using TT30 called

6  Jimmy Carter at TT20. (Session 1193.) During this call, Kefentse Olabisi asked, "Did

7  you already make the do the do [cook the powder cocaine into crack cocaine]?" Jimmy

8  Carter replied, "Nope." Kefentse Olabisi said, "cause I was just about to, but I can't do it

9  right here [can't cook the powder cocaine into crack cocaine at Kefentse Olabisi's

10  location]. Do one for me uh, do one for me uh my way [asking Jimmy Carter to cook the

11  powder cocaine into crack cocaine for him]." Jimmy Carter replied, "Ok, your way?"

12  Kefentse Olabisi said, "Yeah and I'm about to drop you off your other two [two ounces

13  of cocaine]. I got your one right now, but I'm about to bring you two, so if you cook one

14  for me, I'm about to drop you off another two basically, so you'll still have yours . . . I'll

15  be to you in about 30 minutes." Jimmy Carter said, "Well then come on man. Bring uh,

16  my change too man [narcotics money left over from when Jimmy Carter gave Kefentse

17  Olabisi money on September 9, 2020, to purchase several ounces of cocaine for them

18  both]." Based on my training and experience, I believe that Kefentse Olabisi was able to

19  buy cocaine for himself and Jimmy Carter and was asking Jimmy Carter to cut and cook

20  up the powder cocaine into crack cocaine for Kefentse Olabisi. Jimmy Carter asked

21  Kefentse Olabisi to bring any money left over from the cocaine transaction from when

22  Jimmy Carter gave money to Kefentse Olabisi at the Emerald Queen Casino previously

23  for the transaction.

24       135.   On September 14, 2020, at approximately 8:49 p.m., agents intercepted a

25  phone call between Jimmy Carter using TT13 and an unknown male using phone number

26  (206) 915-6980 (referred to as UM6980). (Session 159.) During this call, Jimmy Carter

27  explained, "I'm on these weird hours man. I leave about 6 in the morning [from **Subject**

28  **Premises 24**] and go back to uh, out south [**Subject Premises 23**]. So I come down now,

AFFIDAVIT OF SHAWNA MCCANN –- 87
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

all up until, now until like 6. I'd be down my way." Based on GPS location data for TT13 and TT20, agents knew that during this call, Jimmy Carter was explaining how he spends his time at both **Subject Premises 23** and **24** for part of each day, specifically **Subject Premises 23** during the day and **Subject Premises 24** overnight. On September 15, 2020, at approximately 8:55 p.m., agents intercepted a phone call between Jimmy Carter using TT13 and an unknown male using phone number (206) 915-6980. (Session 174.) During the call, Jimmy Carter told UM6980 to "come to my house in 30 minutes . . . in Burien [**Subject Premises 24**]." UM6980 asked, "what's the ticket [price for cocaine]," and Jimmy Carter replied, "I'll give it to you for 21 [an ounce of cocaine for $2,100]." UM6980 indicated that the price was too high. GPS location data for TT13 and TT20 put Jimmy Carter within range of his residence (**Subject Premises 23**). At approximately 9:42 p.m., agents intercepted a phone call between Jimmy Carter using TT13 and an unknown male using phone number (425) 961-5191 (referred to as UM5191). (Session 178.) During the call, UM5191 agreed to come by and see Jimmy Carter. At approximately 9:53 p.m., agents observed Jimmy Carter's gray 2009 Chevrolet Silverado (**Subject Vehicle 25**) parked in the driveway of **Subject Premises 24**. GPS location data for TT13 and TT20 put Jimmy Carter within range of **Subject Premises 24**. At approximately 10:01 p.m., agents intercepted a phone call between Jimmy Carter using TT13 and UM5191. (Session 179.) During the call, Jimmy Carter asked if UM5191 was "at the door (**Subject Premises 24**)," and UM5191 said he was at "the gas station" (near **Subject Premises 24**) because he had someone with him and asked for the "same as last time [same type and quantity of narcotics as a prior transaction]." Jimmy Carter said he was "about to pull up over there [gas station]." At approximately 10:03 p.m. agents observed Jimmy Carter exit **Subject Premises 24** and get into **Subject Vehicle 25** alone. Jimmy Carter drove straight to the 76 Gas Station located at 12660 1st Avenue South, Burien, Washington. Cell site location data for TT13 indicated that Jimmy Carter was in the area of the 76 Gas Station. Jimmy Carter parked near the gas pumps next to a beige 2001 GMC Yukon. Jimmy Carter remained in **Subject Vehicle 25**. At approximately

AFFIDAVIT OF SHAWNA MCCANN –- 88
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10:12 p.m., agents observed an unknown individual get out of the passenger seat of **Subject Vehicle 25**, get into the GMC Yukon, and drive off; agents did not see the unknown individual get into **Subject Vehicle 25**.

136.    On September 30, 2020, at approximately 10:46 p.m., agents intercepted a call between Jimmy Carter using TT20 and Larry Collins using phone number (206) 619-6341 (TT57) (identification discussed below in the section on Larry Collins). (Session 3539.) During this call, Larry Collins told Jimmy Carter that he had to get a new phone.[53] Jimmy Carter said he wanted "one of them [one ounce of cocaine]" from Larry Collins to "pay a couple of little bills." Larry Collins agreed and said it would be "the 1-6 [$1,600]." Larry Collins said he "didn't have it [cocaine] on me," and Jimmy Carter said that he was at "the house [**Subject Premises 24**]." The parties agree to talk at midnight to arrange the narcotics transaction. At approximately 11:44 p.m., agents intercepted a call between Jimmy Carter using TT20 and Larry Collins using phone number (TT57). (Session 3552.) During this call, Larry Collins told Jimmy Carter that he would "be there" in 30 minutes [**Subject Premises 24**]. At approximately 11:44 p.m., agents observed, via remote video surveillance, Jimmy Carter, identified based on GPS location data of TT13 and TT20, the vehicle driven, and physical description matching Jimmy Carter, arrive at **Subject Premises 24** driving **Subject Vehicle 25**. At approximately 12:17 a.m., agents observed, via remote video surveillance, Larry Collins, identified based on GPS location data of TT16, the vehicle driven, and physical description matching Larry Collins, arrive at **Subject Premises 24**; Larry Collins went into **Subject Premises 24** and then left at approximately 1:00 a.m.

137.    On November 20, 2020, at approximately 1:11 p.m., agents intercepted an incoming call to Kefentse Olabisi at TT30 from Jimmy Carter using TT20 (Session

---

[53] About an hour earlier, agents conducted a traffic stop on Jonathan Harrington as he was leaving Larry Collins's house and conducted a probable cause search, based on interceptions of Jonathan Harrington arranging a cocaine transaction with Larry Collins using TT16. Agents seized cocaine and a firearm from Jonathan Harrington during this traffic stop.

AFFIDAVIT OF SHAWNA MCCANN –- 89
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   4954.) Jimmy Carter asked Kefentse Olabisi if he had heard about Drako getting killed.

2   Agents were able to determine that the parties were talking about Drako Jimerson, a man

3   known to Seattle gang detectives as originally from Seattle and affiliated with the Deuce

4   8 gang who was victim of a homicide in Kentucky the previous day. Jimmy Carter said,

5   "I'm not playin no more . . . people trying to get you for things from a long time ago."

6   Jimmy Carter and Kefentse Olabisi continued to discuss how Jimerson might have been

7   killed because it was a rumor in the Seattle area that Jimerson had killed Lorenzo Marr in

8   Seattle. According to Jimmy Carter and Kefentse Olabisi, Marr was suspected of killing

9   Charles Justice, a close friend of Drako Jimerson. Agents were able to determine that

10  Marr was a victim of a homicide in Seattle on May 8, 2018. Charles Justice was a victim

11  of a homicide on April 29, 2018. Jimmy Carter said, "I ain't playin no more, I'm rollin a

12  certain kind of way. I want somebody to shoot at me, I swear to God I'm goin all out."

13  Jimmy Carter continued, "I ain't goin down skinning and grinnin, I'm goin down shootin.

14  I'm goin to get my motherfuckin stuff right now . . . now until New Year's that's how

15  I'm movin. I'd rather get caught with than without it." Jimmy Carter could then be heard

16  conducting a separate street-level cocaine deal in the background while on the line with

17  Kefentse Olabisi. Jimmy Carter got back on the phone with Kefentse Olabisi and said,

18  "It's on, I feel some kind of way about that." A little later in the conversation, Jimmy

19  Carter continued by saying, "I've come too far man, I've come too far to let a N*** get

20  up on me dog. I've come too far my N***. I don't give a fuck if they listenin or not my

21  N***. I don't give a fuck, they better come get me now then." Jimmy Carter then told

22  Kefentse Olabisi that he had another call coming in and would call him back. At

23  approximately 1:24 p.m., agents intercepted another incoming call to Kefentse Olabisi at

24  TT30 from Jimmy Carter using TT20. (Session 4955 on TT30.) During this call, the

25  parties continued to talk about how dangerous it was and trying not to get robbed in the

26  drug business. Jimmy Carter said, "I'm bout to . . . go get my heaviest shit out just in case

27  they try me." Shortly after this call, at approximately 2:20 p.m., GPS location data for

28  TT20 indicated Jimmy Carter was in the vicinity of Glacier West Self Storage, 1407

1  Central Avenue South, Kent, Washington. Based on the conversations with Kefentse

2  Olabisi, agents believed Jimmy Carter went to the storage facility to retrieve firearms he

3  had stored there. On January 13, 2021, at approximately 11:15 a.m., agents went to

4  Glacier West Self Storage and spoke with the property manager who confirmed that

5  Jimmy Carter rented Unit 176 (**Subject Premises 25**) at that location.

6  138.  On March 1, 2021, agents went to Glacier West Self Storage and again

7  spoke with the property manager who confirmed that Jimmy Carter still was renting Unit

8  176 (**Subject Premises 25**) at that location and had last accessed the unit on February 20,

9  2021. Agents obtained Chase bank account records for the account name "Jimmy Carter

10  dba JBS All Purpose Services" for the period from January 3, 2017, to January 29, 2021.

11  The bank records show routine payments from Jimmy Carter's bank account to Glacier

12  Self-Storage, with the last payment shown in the records being made on December 30,

13  2020.

14  139.  On February 19, 2021, at approximately 1:11 p.m., agents observed, via

15  remote video surveillance, **Subject Vehicle 25** pull into the driveway at **Subject**

16  **Premises 24** and a male matching the physical description of Jimmy Carter exit **Subject**

17  **Vehicle 25** and go into **Subject Premises 24**.

18  140.  On August 26, 2020, August 31, 2020, and September 3, 2020, a mail cover

19  return showed that Jimmy Carter received mail at **Subject Premises 23**. On March 2,

20  2021, agents conducted law enforcement database checks, including in CLEAR, and

21  Washington Department of Licensing records checks, which showed that Jimmy Carter

22  still lists **Subject Premises 23** as his primary residence, still has **Subject Vehicle 25**

23  registered to this address, and is still associated with the utilities at **Subject Premises 23**.

24  On March 4, 2021, at approximately 10:51 a.m., agents observed, via remote video

25  surveillance, a grey Chevy truck matching **Subject Vehicle 25**[54] pull into the driveway of

26  _____

27  [54] The remote video surveillance was unable to make out the license plate on this vehicle in order for agents to

28  definitively state that the vehicle was **Subject Vehicle 25**; however, agents are familiar with **Subject Vehicle 25**

AFFIDAVIT OF SHAWNA MCCANN –- 91
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Subject Premises 23**. At approximately 3:31 p.m., agents observed this same grey Chevy truck matching **Subject Vehicle 25** backout of the driveway and depart **Subject Premises 23** and return a short time later at approximately 4:32 p.m. At approximately 8:12 p.m., agents observed a truck matching **Subject Vehicle 25** back out and depart the area of **Subject Premises 23**, indicating that Jimmy Carter still is frequenting **Subject Premises 23**.

141.    From approximately November 14, 2020, to December 11, 2020,[55] agents observed that Jimmy Carter's cell phone, TT20, placed him at the Promenade apartments located at **Subject Premises 33** routinely every day to every other day for several hours a day, and some days the GPS location data for TT20 showed that Jimmy Carter made more than one visit to **Subject Premises 33**. This pattern of activity is consistent with **Subject Premises 33** being a stash location for Jimmy Carter's narcotics. Additionally, agents noted that Jimmy Carter seemed to start frequenting **Subject Premises 33** after agents conducted several search warrant executions and vehicle stops on Michael Walker DTO associates, including Jonathan Harrington and Randolph Brown. Agents believe based on the law enforcement activity, which agents know Jimmy Carter was aware of because he discussed it with others including Larry Collins and Kefentse Olabisi, that Jimmy Carter may have changed up his pattern and relocated some of his narcotics trafficking activities to **Subject Premises 33** to avoid law enforcement detection. Additionally, during intercepted communications of Kefentse Olabisi using TT30, Kefentse Olabisi texted an unknown male at phone number (206) 676-2235 (referred to as UM2235): "Meet me behind the promenade in 20 min." (Session 1228.) Based on other intercepted communications between Kefentse Olabisi and UM2235, specifically discussing meetings, getting four and giving $60, I believe this text message pertained to

---

based on seeing the vehicle during prior physical surveillance, and believe that the truck observed on March 4, 2021, is **Subject Vehicle 25** known to be driven by Jimmy Carter.
[55] Agents obtained a warrant for location information for TT20 on October 23, 2020, that lasted for 45 days, expiring on December 12, 2020.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    a drug deal that was taking place near **Subject Premises 33**. Based on this investigation

2    and intercepted communications between Kefentse Olabisi using TT30 and Jimmy Carter

3    using TT20, I know that Jimmy Carter and Kefentse Olabisi are drug trafficking

4    associates who assist one another with cocaine supply, cooking powder cocaine into

5    crack cocaine, and cocaine redistribution at both their respective residences and stash

6    locations. Agents believe that Jimmy Carter is staying at **Subject Premises 33** with a

7    girlfriend and that evidence of Jimmy Carter's drug trafficking, including his cell phones,

8    will be located at **Subject Premises 33**.

9        142.     On February 24, 2021, at approximately 5:59 a.m., agents went to **Subject**

10    **Premises 33** and observed **Subject Vehicle 25** parked in front of building K. There was

11    also a white 2013 Audi Q7 bearing Washington license plate BWK4351 (**Subject**

12    **Vehicle 49**) parked next to **Subject Vehicle 25**. **Subject Vehicle 49** is registered to

13    Jimmy Carter at **Subject Premises 23**. On February 25, 2021, at approximately 9:25

14    a.m., agents went to **Subject Premises 33** and observed Jimmy Carter walking away

15    from **Subject Vehicle 25** as the lights blinked, indicating he had just locked the vehicle.

16    Agents observed Jimmy Carter walk to Apartment K207 and go inside **Subject Premises**

17    **33**.

18        143.     Agents obtained reported earnings/wages for Jimmy Carter from

19    Washington State Employment Security Department, which showed that he had no

20    reported wages from January 1, 2018, through December 31, 2020, and only $1,535.80

21    earned in 2017. This amount of reported income is inconsistent with his apparent lifestyle

22    of owning multiple properties and a luxury vehicle (**Subject Vehicle 49**) and does not

23    appear to reflect his actual income, acquired through drug trafficking based on his

24    association with the Michael Walker DTO and its members involved in drug trafficking.

25    Accordingly, I believe that **Subject Vehicle 49** is itself evidence of Jimmy Carter's drug

26    trafficking and purchased with illicit drug proceeds.

27    Agents obtained updated toll records for TT13, which showed that from January 14,

28    2021, through March 14, 2021, Jimmy Carter using TT13 exchanged 7 SMS text

AFFIDAVIT OF SHAWNA MCCANN –- 93
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  messages and 111 calls with Kefentse Olabisi using TT30, and 2 SMS text messages and

2  64 calls with Kevin Gipson using TT6, indicating that Jimmy Carter is continuing his

3  drug trafficking relationship with both Kevin Gipson and Kefentse Olabisi.

4        144.   I know based on my training and experience, that drug traffickers

5  frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

6  stash locations in order to protect their supply and to have the narcotics on hand for

7  transactions. I also know that drug traffickers maintain records and other trafficking-

8  related materials in their premises, including residences, for a long period of time,

9  including current and prior cell phone devices that contain text messages and contact lists

10  of drug trafficking associates and pay-owe sheets. Based on the above-referenced

11  intercepted communications, I believe that Jimmy Carter is a multi-kilogram cocaine

12  trafficker who likely keeps his narcotics supply and/or proceeds in **Subject Premises 23**

13  through **25** and **33** and uses **Subject Vehicle 25** to conduct narcotics transactions and

14  owns **Subject Vehicle 49** through suspected drug proceeds.

15        **J.**    **Kenneth Lee's Residence.**

16        145.   During this investigation, based on physical surveillance and GPS location

17  data for Kenneth Lee's cell phone (TT29), agents identified Kenneth Lee's residence as

18  3584 Portland Avenue East, Tacoma, Washington (**Subject Premises 26**). Agents

19  obtained GPS location data in September and October 2020 for Kenneth Lee's cell

20  phone, TT29, which showed that Kenneth Lee remained at **Subject Premises 26**

21  overnights from September 2020 to October 2020. Agents intercepted communications

22  regarding Kenneth Lee conducting cocaine transactions with Jimmy Carter. Some of

23  these drug transactions and agents' observations are noted below for purposes of

24  establishing probable cause to search **Subject Premises 26**.

25        146.   Kenneth Lee has prior felony convictions for unlawful possession of a

26  firearm, drug possession, drug possession with intent to manufacture/deliver, robbery,

27  burglary, and vehicle theft.

28

AFFIDAVIT OF SHAWNA MCCANN -- 94
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

147.    On September 9, 2020, at approximately 11:57 a.m., Jimmy Carter using TT20 called Kenneth Lee at TT29 (identification discussed below). (Session 726.) During this call, Kenneth Lee said, "I got hold of [him] but he at 19 a piece [$1,900 per ounce of powder cocaine]." Jimmy Carter thought that price was too high and replied, "I've been holding off this long. I'll just wait." Kenneth Lee said, "yeah, not unless he go down the way. And we get them for 15 [$1,500 per ounce of powder cocaine]." Jimmy Carter responded, "He said he got some for 15, but he ain't never come up [followed through with the narcotics deal]. You know that talk." Based on my training and experience, I believe that Jimmy Carter contacted Kenneth Lee to see how much Kenneth Lee was selling cocaine at per ounce, and that Jimmy Carter declined to buy powder cocaine from Kenneth Lee because $1,900 per ounce was too high, but both Kenneth Lee and Jimmy Carter were waiting to hear from a supplier about a narcotics deal of $1,500 per ounce of powder cocaine. I know that "piece" is a common term used by drug traffickers to refer to an ounce of narcotics.

148.    On September 11, 2020, at approximately 2:02 p.m., Jimmy Carter using TT20 called Kenneth Lee at TT29. (Session 1116.) During this call, Kenneth Lee said, "I had a cat [supplier] who has two [ounces of cocaine] of them for 18 [$1,800 per ounce]. I didn't know if you were interested [in buying those narcotics], but you didn't pick up [answer the phone]." Jimmy Carter replied, "Um, did you try it out [check the quality of the cocaine]? You know it's for sure straight [good quality]?" Kenneth Lee said, "Oh yeah yeah yeah. It was good [quality] . . . so I didn't know if you were ready. That's why I didn't grab them. I was like naw, I don't know if the number [price], you know. I don't wanna spend nobody else's money." Jimmy Carter replied, "If you said it's powder [good quality] man, shit I'll snatch it. Fuck it. I ain't doing nothing. I'm here in Pierce County [likely referring to **Subject Premises 23**]. I was just laying down and shit." The parties then agreed to talk later to arrange the cocaine transaction. Later, on September 11, 2020, at approximately 3:52 p.m., Jimmy Carter using TT20 called Kenneth Lee at TT29. (Session 1153.) During this call, Kenneth Lee said, "it done went up back to 2 [$2,000

AFFIDAVIT OF SHAWNA MCCANN –- 95
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

per ounce of cocaine]." Jimmy Carter replied, "We should have did it for the 19 [bought the two ounces of cocaine for $1,900 a piece]." Kenneth Lee said, "you know, cause it ain't in the budget [$2,000 per ounce is too high]." Jimmy Carter said, "nah, it ain't [in the budget]. I can't do nothin' with it [make a profit off of it], not unless you can uh do, do you know how to um for me [cut the powder cocaine with a cutting agent and cook the powder cocaine into crack cocaine]?" Kenneth Lee said, "uh, yeah, you know, like I usually do [how Kenneth Lee cuts and cooks his cocaine]? You probably put about 21 [amount of cutting agent]. 21 or something like that." Jimmy Carter replied, "if you do, do it, can you uh you know, do it for me [Kenneth Lee cut and cook up the cocaine that Jimmy Carter buys]?" Kenneth Lee said, "yeah, I can put the 21 [cutting agent] on there, [unintelligible] about 21, yeah? . . . I mean but, you know, yours, but your people [Jimmy Carter's customers] a little different than mine [Kenneth Lee's customers], so I you know, I can't make that call for you [how to cut and cook the cocaine], you know. I know 14 [cutting agent] is [unintelligible], you know what I'm sayin." Jimmy Carter replied, "I'll snatch them for the 19 [$1,900 per ounce of cocaine] . . . So what I was gonna tell you is, ok, snatch them [buy the 2 ounces of cocaine], take a beezy out of both of em [take 1/8 of an ounce out of each ounce of cocaine], and then just do em, and just hit the rest [cut and cook the remaining cocaine]." Kenneth Lee agreed. Based on my training and experience, I believed Jimmy Carter told Kenneth Lee to buy two ounces of powder cocaine from Kenneth Lee's supplier on behalf of Jimmy Carter and then to cut and cook most of the powder cocaine into crack cocaine for Jimmy Carter.

149.    Later on September 11, 2020, at approximately 5:44 p.m., Kenneth Lee using TT29 called Jimmy Carter at TT20. (Session 1161.) During this call, Kenneth Lee told Jimmy Carter that he was headed to his house and would call Jimmy Carter when he got there. Later that same day, at approximately 6:44 p.m., Kenneth Lee using TT29 called Jimmy Carter at TT20. (Session 1165.) During this call, Kenneth Lee said, "I'll be at the house, so you just stop by before you go down the freeway." Jimmy Carter said alright and asked if Kenneth Lee had already, but before Jimmy Carter could finish his

AFFIDAVIT OF SHAWNA MCCANN –- 96
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sentence Kenneth Lee interrupted and said, "no, I have that done though [cut and cooked into crack cocaine] by then." Based on my training and experience, I believe this call was a continuation of the cocaine transaction that Jimmy Carter and Kenneth Lee discussed earlier that day and that Kenneth Lee was telling Jimmy Carter to come by his house, **Subject Premises 26**, later that evening to conduct the cocaine transaction and that Kenneth Lee would have the cocaine cut and cooked into crack cocaine by the time Jimmy Carter arrived.

150.    On September 22, 2020, at approximately 5:14 p.m., GPS location data for TT29 put the device within range of 3584 Portland Avenue East, Tacoma, Washington (**Subject Premises 26**). At approximately 6:24 p.m., agents observed a red 1994 Chevrolet truck bearing Washington state license plate number C76740L parked in the driveway. A records check revealed the vehicle was registered to K & L Auto Lease and Rebuild at 11725 Military Road South, Seattle, Washington. Open source research of K & L Auto Lease and Rebuild showed this business was owned by Kenneth Lee. On the front of **Subject Premises 26** there was a sign that read: K & L Transport and the phone number (206) 353-1714 (TT29). Agents observed a male in the front yard of **Subject Premises 26** who was identified as Kenneth Lee based on a comparison to his driver's license photograph. At approximately 7:43 p.m., agents observed Kenneth Lee and another male come out of the residence. Kenneth Lee got into the red Chevrolet truck and backed it up further in the driveway. Kenneth Lee and the other male then went back inside the residence. GPS location data for TT29 put the device within range of the residence.

151.    On September 23, 2020, at approximately 12:08 p.m., Kenneth Lee using TT29 called Jimmy Carter at TT20. (Session 2628.) During this call, Jimmy Carter said, "my boy, my one guy, told me 47 [$47,000]." Kenneth Lee asked, "47 for what? The whole thing [kilogram of cocaine]?" Jimmy Carter confirmed. Kenneth Lee asked, "what's it looking like," and Jimmy Carter said, "I gotta go, we gotta go, a two hour ride to go get it… Eastern Washington." Kenneth Lee said, "that 47 [$47,000] sound good

1    though," and Jimmy Carter replied, "hell yeah. It's all good. Cause that only 13 [$1,300
2    per ounce]." Kenneth Lee said, "if he had a 4-5 [$45,000 per kilogram], then yeah…But,
3    I mean as a matter a fact, because, you know, I could get the bread [money] for about 5 of
4    them [5 kilograms]. You know." Based upon my training and experience, I believe that
5    Jimmy Carter had access to a source of supply in Eastern Washington and could obtain
6    cocaine for $47,000 per kilogram, and that Kenneth Lee was willing to purchase 5
7    kilograms of cocaine if he could negotiate the price down to $45,000 per kilogram.

8    152.    On September 24, 2020, at approximately 3:37 p.m., agents observed
9    Kenneth Lee arrive at **Subject Premises 26** driving his red 1994 Chevrolet truck bearing
10   Washington State license plate C76740L. Kenneth Lee retrieved unknown items out of
11   the truck and went inside the residence. At approximately 3:39 p.m., GPS location data
12   placed TT29 at **Subject Premises 26** with Kenneth Lee.

13   153.    On February 25, 2021, at approximately 7:00 a.m., agents observed a black
14   Accord parked in the driveway of **Subject Premises 26**. The black Accord was registered
15   to Shanika Mayes at 4322 Southwest 321st Street, Federal Way, Washington. Agents
16   observed an unknown female in her thirties get out of the driver's seat of the black
17   Accord and knock on the front door to **Subject Premises 26**. Agents observed Kenneth
18   Lee exit **Subject Premises 26** and lock the door with keys. The female and Kenneth Lee
19   left in the black Accord with Kenneth Lee as the front passenger. Accordingly, agents
20   believe that Kenneth Lee still resides at **Subject Premises 26**.

21   154.    Agents obtained updated toll records for TT29, which showed that from
22   January 14, 2021, through March 14, 2021, Kenneth Lee using TT29 exchanged 36
23   communications with Jimmy Carter using TT20, indicating that Kenneth Lee and Jimmy
24   Carter have continued their drug trafficking relationship. I know based on my training
25   and experience, that drug traffickers frequently keep their narcotics and narcotics
26   proceeds in their residences, vehicles, and stash locations in order to protect their supply
27   and to have the narcotics on hand for transactions. I also know that drug traffickers
28   maintain records and other trafficking-related materials in their premises, including

AFFIDAVIT OF SHAWNA MCCANN –- 98
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  residences, for a long period of time, including current and prior cell phone devices that

2  contain text messages and contact lists of drug trafficking associates and pay-owe-sheets.

3  Based on the above-referenced intercepted communications, I believe that Kenneth Lee is

4  a multi-kilogram cocaine trafficker who likely keeps his narcotics supply and proceeds in

5  **Subject Premises 26**.

6      **K.**    **Kefentse Olabisi's Residence and Vehicle**

7      155.    During this investigation, based on physical surveillance, GPS location data

8  for Kefentse Olabisi's cell phone (TT30),[56] and remote video surveillance, agents

9  identified Kefentse Olabisi's residence as 2542 55th Avenue NE, Tacoma, Washington[57]

10  (**Subject Premises 27**) and one of his vehicles as a blue 2007 Chevrolet Impala bearing

11  Washington license plate number BOJ4787 registered to Kefentse Lumumba-Olabisi at

12  2904 East Republican Street, Seattle, Washington (**Subject Vehicle 26**). Agents obtained

13  GPS location data on Kefentse Olabisi's cell phone, TT30, in September and October

14  2020, which showed that Kefentse Olabisi remained at **Subject Premises 27** overnights

15  from September 2020 to October 2020. Additionally, agents installed a pole camera

16  facing the driveway of **Subject Premises 27**, which showed Kefentse Olabisi staying

17  overnights at **Subject Premises 27** from October 2020 to January 2021,[58] and which is

18  still currently installed and shows that other Michael Walker DTO members, including

19  Edward Coleman (discussed below), continue to frequent **Subject Premises 27**. Based on

20  intercepted communications on TT20 used by Jimmy Carter and TT16 used by Larry

21  Collins, agents obtained a court-authorized wire and electronic communications

22

23  ────────────

[56] Agents obtained a search warrant for GPS location data for TT30 and identified the user as Kefentse Olabisi based

24  on physical surveillance observing Kefentse Olabisi, identified based on a comparison to his driver's license photograph, in the same area of the GPS location data for TT30 at different locations and times.

25  [57] Kefentse Olabisi has a different address listed on his driver's license of 2904 E Republican Street, Seattle, Washington. Agents have not observed Kefentse Olabisi at this location during prior physical surveillance.

26  [58] Agents noted that Kefentse Olabisi intermittently was not present overnight at **Subject Premises 27** for several weeks. During interceptions on TT30, Kefentse Olabisi referenced frequently travelling to Atlanta, where he has

27  family, and staying for longer period of time. Agents believe that Kefentse Olabisi may be staying in Atlanta during the period where agents did not observe him overnights at **Subject Premises 27**. Additionally, Kefentse Olabisi

28  frequently wears hoods over his face and head, making it difficult to positively identify him from pole camera footage.

1   interception on TT30 used by Kefentse Olabisi. During this investigation, and

2   specifically the period of wire and electronic communications interception, agents

3   intercepted communications and observed Kefentse Olabisi conducting multiple cocaine

4   and other narcotics transactions on a daily to weekly basis. Agents observed Kefentse

5   Olabisi coming and going from **Subject Premises 27** immediately before and after drug

6   transactions driving **Subject Vehicle 26**. Some of these drug transactions and agents'

7   observations are noted below for purposes of establishing probable cause to search

8   **Subject Premises 27** and **Subject Vehicle 26**.

9          156.    Kefentse Olabisi has felony convictions for drug possession with intent to

10  manufacture/distribute, unlawful possession of a firearm, and drug possession.

11         157.    On October 24, 2020, at approximately 10:37 a.m., Kefentse Olabisi using

12  TT30 called an unknown male, referred to as Kerry during the call, using phone number

13  (206) 429-1617. (Session 102.) During this call, Kefentse Olabisi said he was "just

14  checking in with you," and Kerry said he was "doing good." Kefentse Olabisi asked if

15  Kerry "got the address," and Kerry replied, "yes . . . 2542 55th Avenue NE, Tacoma

16  (**Subject Premises 27**)." Kefentse Olabisi confirmed the address. Kerry said he would

17  "go over there in about an hour" and asked if Kefentse Olabisi had some "good goods."

18  Kefentse Olabisi relied, "yeah real good, real good." Kerry confirmed that he would

19  come to Kefentse Olabisi's house later and said "I wanna get a half from you." Kefentse

20  Olabisi replied, "yep, I got you." Based on my training and experience, I believe Kefentse

21  Olabisi gave Kerry his home address (**Subject Premises 27**) for Kerry to come over later

22  and conduct a half-unit of narcotics drug transaction at **Subject Premises 27**.

23         158.    On September 11, 2020, at approximately 7:40 p.m., Kefentse Olabisi using

24  TT30 called Larry Collins at TT16. (Session 264.) During this call, Kefentse Olabisi said

25  he was "movin' and grooving [making narcotics deals]. Anything ever change with the

26  weather [asking if Larry Collins was able to get narcotics]?" Larry Collins replied, "yeah,

27  but it's been like a hit or miss type thing." Kefentse Olabisi said, "I was just letting you

28  know that we alright, we good over here [Kefentse Olabisi has narcotics right now]."

AFFIDAVIT OF SHAWNA MCCANN –- 100
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Larry Collins replied, "Oh really? What be the ticket [price]?" Kefentse Olabisi said, "I

2  paid 19 [$1,900 per ounce], so you know I want 2 [$2,000 per ounce]." Larry Collins

3  indicated that the price was high and said, "if you want me to do that for me, just let me

4  know, I mean for you, just let me know [cook the powder cocaine into crack cocaine]."

5  Kefentse Olabisi said, "I do," and Larry Collins said, "Ok, we do it first thing in the

6  morning." Based on my training and experience, I believe that Kefentse Olabisi advised

7  Larry Collins that Kefentse Olabisi had cocaine to sell and that Kefentse Olabisi bought

8  the cocaine at $1,900 per ounce and wanted to sell it at $2,000 per ounce to make a profit.

9      159.    As set forth above, Kefentse Olabisi had several conversations with Jimmy

10  Carter on September 11, 2020, discussing a cocaine transaction. Olabisi met with Jimmy

11  Carter that day in the Emerald Queen Casino parking lot to pick up money from Jimmy

12  Carter to buy cocaine and split the cocaine with Jimmy Carter; Kefentse Olabisi drove

13  **Subject Vehicle 26** to that meeting.

14      160.    On September 12, 2020, at approximately 6:28 p.m., Jimmy Carter using

15  TT20 called Kefentse Olabisi at TT30. (Session 1270.) During the conversation, Jimmy

16  Carter agreed to meet Kefentse Olabisi at Kefentse Olabisi's residence later that night to

17  smoke some weed. At approximately 8:37 p.m., Kefentse Olabisi using TT30 called

18  Jimmy Carter at TT20. (Session 1282.) During the call, Kefentse Olabisi said he was at

19  home, and Jimmy Carter said he was going to come see Kefentse Olabisi and would "be

20  pulling up in a second." Jimmy Carter then complained that "you might have it in your

21  hand [cocaine], but ain't nobody got no money man. And I ain't borrowing, lending or

22  anything so . . . The drought hit now I'm piecing them off [selling cocaine in smaller

23  quantities]." At approximately 10:18 p.m., Jimmy Carter using TT20 called Kefentse

24  Olabisi at TT30 and told Kefentse Olabisi that he was at the door. A short time later, GPS

25  location data for TT20 and TT13 put Jimmy Carter in the vicinity of **Subject Premises**

26  **27**. Based on my training and experience, I believe Jimmy Carter went to Kefentse

27  Olabisi's residence at **Subject Premises 27** to smoke marijuana and that Jimmy Carter

28

AFFIDAVIT OF SHAWNA MCCANN --- 101
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   was complaining that no one had money to buy the cocaine that Jimmy Carter had on

2   hand and that he was not willing to front the cocaine to anyone.

3        161.   On September 13, 2020, at approximately 2:33 p.m., agents observed

4   **Subject Vehicle 26** parked in the driveway of **Subject Premises 27**.

5        162.   On September 24, 2020, at approximately 8:27 a.m., Kefentse Olabisi using

6   TT30 called Jimmy Carter at TT20. (Session 2682.) During this call, Jimmy Carter said,

7   "the price got everybody, ran everybody down. You got to get two bands [$2,000] to

8   play" and that "I do have stuff [cocaine] put together [ready to sell]. I'm ready." Kefentse

9   Olabisi said, "I'm trying to get rid of mine still." Kefentse Olabisi talked about having an

10  unknown female who was buying "balls" for "three dollars [$300]" from him. Jimmy

11  Carter said, "I need to get this shit [cocaine] over there to you so you can take care, take

12  care of that [sell the cocaine]." Jimmy Carter said he would come see Kefentse Olabisi in

13  a couple of hours. Based on my training and experience, I believe that Jimmy Carter told

14  Kefentse Olabisi that he still had cocaine to sell and that he was having a hard time

15  selling it because no one had money, and Kefentse Olabisi told Jimmy Carter about an

16  unknown female who was buying an eighth of an ounce of cocaine from him at $300 per

17  "ball" (an eighth of an ounce, often called an eightball); Jimmy Carter said he was going

18  to bring his cocaine to Kefentse Olabisi for Kefentse Olabisi to sell to the female on

19  Jimmy Carter's behalf. At approximately 12:46 p.m., Kefentse Olabisi using TT30 called

20  Jimmy Carter at TT20. (Session 2708.) Jimmy Carter said he "hit the freeway already,"

21  and Kefentse Olabisi said "come to the house." At approximately 1:43 p.m., GPS

22  location data placed TT20, used by Jimmy Carter, at Kefentse Olabisi's residence,

23  **Subject Premises 27**. At approximately 1:57 p.m., agents observed Jimmy Carter's

24  Chevy Silverado bearing Washington State license plate C32244G (**Subject Vehicle 25**)

25  parked in the driveway of **Subject Premises 27**. The garage door was partially open and

26  there appeared to be people in the garage. At approximately 2:00 p.m., agents observed

27  the garage door close. At approximately 2:12 p.m., agents observed the garage door open

28  and a male who was identified as Jimmy Carter, based off a comparison to his driver's

AFFIDAVIT OF SHAWNA MCCANN –- 102
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   license photograph, walk out to his Silverado. Jimmy Carter retrieved an unknown object
2   from the back seat area of the truck and then walked back into the garage and the garage
3   door closed again. At approximately 2:20 p.m., agents observed the garage door open and
4   a male who was identified as Kefentse Olabisi, based off a comparison to his driver's
5   license photograph, exit **Subject Premises 27** and access the trunk of **Subject Vehicle**
6   **26**. Kefentse Olabisi retrieved an unknown object out of the trunk and went back inside
7   the garage. The garage door closed again. At approximately 2:45 p.m., agents observed
8   Jimmy Carter exit the garage, get into his Silverado, and drive away.

9          163.    On October 27, 2020, at approximately 10:37 a.m., agents intercepted a call
10   between Kefentse Olabisi using TT30 and Edward Coleman (identification discussed
11   below) using phone number (206) 602-8457 (TT67). (Session 712.) During this call,
12   Edward Coleman said, "I'm kinda short too man. I got one little piece left, and I ain't
13   even put it on the scale yet." The parties agreed to talk later. At approximately 1:22 p.m.,
14   agents intercepted a call between Kefentse Olabisi using TT30 and Edward Coleman
15   using phone number (206) 602-8457. (Session 733.) Edward Coleman said, "I need to see
16   you man. I got, what I got left is 15 on the scale." Kefentse Olabisi said he was at the
17   house, and Edward Coleman told Kefentse Olabisi that he was "on the way to meet
18   Chase" and then would be headed over to Kefentse Olabisi's house. At approximately
19   2:14 p.m., Edward Coleman called Kefentse Olabisi at TT30 and told Kefentse Olabisi
20   that "I'm at you." At that same time, agents observed Kefentse Olabisi and Edward
21   Coleman, identified based on a comparison to their driver's license photographs, outside
22   of **Subject Premises 27**. They got into **Subject Vehicle 26** and drove off. Based on my
23   training and experience, I believe Edward Coleman met Kefentse Olabisi at **Subject**
24   **Premises 27** to get supplied more narcotics.

25          164.    During the evening of that same day, agents intercepted a call between
26   Kefentse Olabisi using TT30 and Edward Coleman using TT67. (Session 791.) During
27   the call, Kefentse Olabisi explained that he gave Edward Coleman "too much [narcotics]"
28   and directed Edward Coleman to "look in the trunk" to check for "something extra in

there." Edward Coleman stated that he currently had "it [narcotics] on me," but could not "weigh it out right now." Edward Coleman later stated that he had given "Brian" whatever Kefentse Olabisi had given him to give to Brian and that he did not check to see what he gave Brian. Based on my training and experience, I believe Kefentse Olabisi met with Edward Coleman and that they had conducted a drug transaction in which Kefentse Olabisi provided more narcotics than intended and that the narcotics was in the trunk of the vehicle utilized by Edward Coleman.

165.    Also on October 27, 2020, at approximately 4:25 p.m., agents intercepted an incoming call to Kefentse Olabisi at TT30 from an unknown male using phone number (206) 460-8032 (referred to as UM8032). (Session 754.) UM8032 asked Kefentse Olabisi if he was in the south end and asked if they could meet. Based on the call, agents believed they were meeting for a narcotics transaction. At approximately 5:09 p.m., agents intercepted an incoming call to Kefentse Olabisi TT30 from UM8032. (Session 774.) UM8032 told Kefentse Olabisi that he was at "the Arco station," and Kefentse Olabisi told UM8032 he just "sent him the location" to meet him at. At approximately 5:11 p.m., agents observed Kefentse Olabisi arrive at the Black Bear Diner, 32065 Pacific Highway South, Federal Way. Kefentse Olabisi was a passenger in a 2011 Chrysler Town & Country, Washington license BHR6393. Kefentse Olabisi, two unknown adult females and a child went into the restaurant. At approximately 5:18 p.m., agents intercepted an incoming call to Kefentse Olabisi at TT30 from UM8032. (Session 777.) UM8032 told Kefentse Olabisi he was "outside." At that same time, agents observed a black 2007 BMW 328 bearing Washington license BUZ1082 pull into the restaurant parking lot and park. Agents observed Kefentse Olabisi come out of the restaurant and get into the passenger seat of the black BMW. Kefentse Olabisi got out of the black BMW within a minute and went back into the restaurant. The black BMW left the area. Agents believe Kefentse Olabisi conducted a drug transaction with UM8032 during this brief interaction.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

166.    On January 19, 2021, agents observed, via remote video surveillance, a male believed to be Kefentse Olabisi[59] exit a dark blue colored sedan parked in the driveway of **Subject Premises 27**, open the garage door, and walk inside **Subject Premises 27**.

167.    On February 23, 2021, at approximately 7:29 a.m., agents observed **Subject Vehicle 26** parked directly behind Edward Coleman's residence (**Subject Premises 28**). At approximately 8:35 a.m., agents observed Edward Coleman, identified based on a comparison to his driver's license photograph, exit **Subject Premises 28**, get into **Subject Vehicle 26**, and depart. Agents followed Edward Coleman directly to Kefentse Olabisi's residence, **Subject Premises 27**, arriving at approximately 9:05 a.m. Agents observed Edward Coleman exit **Subject Vehicle 26**, open the garage door to **Subject Premises 27** using a code on the keypad, and go inside the residence. At approximately 9:23 a.m., agents observed Edward Coleman exit the garage and close the garage door to **Subject Premises 27** using the keypad; then Edward Coleman left in **Subject Vehicle 26**. As set forth in the intercepted call between Kefentse Olabisi and Edward Coleman above, agents know that Kefentse Olabisi lends **Subject Vehicle 26** to Edward Coleman to drive and conduct drug deals in. Accordingly, I believe that Kefentse Olabisi is still working with Edward Coleman to traffic narcotics using **Subject Vehicle 26** and **Subject Premises 27**.

168.    I know based on my training and experience, that drug traffickers frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. Based on the above-referenced intercepted communications, I believe that Kefentse Olabisi is a multi-kilogram cocaine trafficker who likely keeps his narcotics supply and proceeds in **Subject Premises 27** and uses, or lets Edward Coleman use, **Subject Vehicle 26** to facilitate drug transactions.

---

[59] Due to the male wearing a hood, agents were unable to definitively identify the male as Kefentse Olabisi.

L.    **Edward Coleman's Residence**

169.    During this investigation, based on physical surveillance and intercepted communications, agents identified Edward Coleman's residence as 5008 East Q Street, Tacoma, Washington (**Subject Premises 28**).[60] Beginning in early March 2021, agents obtained GPS location data on Edward Coleman's cell phone, TT67, which showed that Edward Coleman remained at **Subject Premises 28** overnights from March 5, 2021, to the present. TT67 is subscribed to Edward N Coleman at 5008 E Q Street, Tacoma, Washington (**Subject Premises 28**). Agents intercepted communications regarding Edward Coleman conducting cocaine transactions as a runner for Kefentse Olabisi. Some of these drug transactions and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 28**.

170.    Edward Coleman has three felony convictions for theft and residential burglary.

171.    On October 24, 2020, at approximately 7:27 p.m., Edward Coleman using phone number (206) 602-8457 (TT67) called Kefentse Olabisi at TT30. (Session 196.) During this call, Edward Coleman said, "old boy in Auburn [customer] called me man, he trying do something…he used to get the balls [eightballs/eighths of an ounce] of the soft [powder cocaine]." Kefentse Olabisi replied, "what he [customer] want?" Edward Coleman said, "I think that's what he want, for sho, I told him, you know, how prices was though man." Kefentse Olabisi said, "yea, tell him it's gonna be 3-350 [$300 to $350]." Edward Coleman replied, "ok, I'll let him know." About two minutes later, Edward Coleman called Kefentse Olabisi back at TT30 and asked "can you do it [eighth of an ounce of cocaine] for the 3 [$300]," and Kefentse Olabisi agreed and said he would "bring it" to Edward Coleman or come let Edward Coleman get the car and "bust a couple other juugs [drug deals] if you want to." Edward Coleman said, "just head this

---

[60] Edward Coleman has a different address listed on his driver's license of 2215 1st Avenue, Apt. 1505, Seattle, Washington. Agents have not observed Edward Coleman at this address during prior physical surveillance.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    way man and give it to me, or whatever, you know, because a couple of people

2    [customer] done called me, but I don't know if they still wanted some." Kefentse Olabisi

3    asked, "you ain't got nothing?" Edward Coleman said, "Yeah, I got some on me, I'm

4    saying I don't know if they still want some or not." Kefentse Olabisi said, "I'm fixing to

5    come get you, pick you up, and bring you this car." (Session 199.)

6         172.    Based on my training and experience, I believe that Edward Coleman had a

7    cocaine customer who wanted to buy an eighth of an ounce of cocaine, and Edward

8    Coleman, as the cocaine runner/distributor for Kefentse Olabisi, called Kefentse Olabisi

9    to determine if Kefentse Olabisi agreed to the drug transaction and to get the price to sell

10   the cocaine to his customer of $300. I know, based on my training and experience and

11   intercepted communications during this investigation, that the price for an eighth of an

12   ounce of cocaine at that time in this region was about $300 to $350. I believe that Edward

13   Coleman confirmed that he had cocaine on him at that time but did not have enough

14   cocaine for the customers who had called him, and that Kefentse Olabisi agreed to come

15   get Edward Coleman, bring him more cocaine, and let Edward Coleman use one of his

16   cars to make drug deals. Later that same day at approximately 8:13 p.m., Kefentse

17   Olabisi using TT30 called Edward Coleman at TT67 and said, "I'm outside." (Session

18   216.) At the time of this call, cell site location data for TT30 showed that Kefentse

19   Olabisi was in the vicinity of Edward Coleman's residence at **Subject Premises 28**.

20        173.    As set forth above, on October 27, 2020, Edward Coleman was intercepted

21   communicating with Kefentse Olabisi at TT30 regarding picking up more narcotics from

22   Kefentse Olabisi to sell and eventually was observed meeting Kefentse Olabisi at

23   Kefentse Olabisi's residence (**Subject Premises 27**). Agents identified Edward Coleman

24   as the user of TT67 on this date after observing, via remote video surveillance, Edward

25   Coleman, identified based on a comparison to his driver's license photograph, arrive at

26   Kefentse Olabisi's residence following this intercepted call. Additionally, TT67 is

27   subscribed to Edward Coleman, and during intercepted calls, Kefentse Olabisi referred to

28   the user of TT67 as "Ed."

AFFIDAVIT OF SHAWNA MCCANN –- 107
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

174.    On October 31, 2020, at approximately 1:32 p.m., Edward Coleman using TT67 texted Kefentse Olabisi at TT30: "Got a couple bones [money] for you.im in Tacoma." (Session 1679.) Kefentse Olabisi replied, "ok." (Session 1692.) Later that same day at approximately 4:47 p.m., Edward Coleman using TT67 texted Kefentse Olabisi at TT30: "Little less than a half left." (Session 1752.) Kefentse Olabisi replied, "ok." (Session 1765.) At approximately 7:48 p.m., Edward Coleman using TT67 texted Kefentse Olabisi at TT30: "Little over a dub left." (Session 1824.) At approximately 9:47 p.m., Kefentse Olabisi using TT30 called Edward Coleman at TT67 and asked Edward Coleman to "send him the address" because Kefentse Olabisi was "coming a different route"; Edward Coleman agreed. (Session 1867.) At approximately 9:48 p.m., Edward Coleman texted his address to Kefentse Olabisi as: "5008 east Q street [**Subject Premises 28**]." (Session 1868.) At approximately 9:59 p.m., Kefentse Olabisi using TT30 called Edward Coleman at TT67 and told Edward Coleman to "come out." At the time of this call, cell site location data for TT30 showed that Kefentse Olabisi was in the vicinity of Edward Coleman's residence at **Subject Premises 28**. Based on my training and experience, I believe that Edward Coleman told Kefentse Olabisi that he had some narcotics proceeds to give to Kefentse Olabisi from cocaine sales and that he was running low on cocaine. Edward Coleman then texted his home address to Kefentse Olabisi who stopped by **Subject Premises 28** to pick up the narcotics proceeds and drop off more cocaine with Edward Coleman for him to distribute, indicating that Edward Coleman keeps both narcotics proceeds and narcotics in **Subject Premises 28**.

175.    On November 3, 2020, at approximately 4:04 p.m., Edward Coleman using TT67 called Kefentse Olabisi at TT30. (Session 2387.) During this call, Kefentse Olabisi instructed Edward Coleman to "meet him [customer] at the gas station . . . he gonna be in a black BMW." Kefentse Olabisi also told Edward Coleman, not to "forget that the one in a small bag is for him [customer in the black BMW] and the one in a big bag is for her [unknown female customer]" and that "he [customer in black BMW] should be there in about ten minutes." Based on my training and experience, I believe Kefentse Olabisi sent

AFFIDAVIT OF SHAWNA MCCANN -- 108
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his runner, Edward Coleman, to conduct two drug deals on his behalf, including to meet with an unknown male customer at a gas station who was driving a black BMW.

176.    On November 8, 2020, at approximately 6:32 p.m., Kefentse Olabisi using TT30 called Edward Coleman at TT67. (Session 3507.) During this call, Kefentse Olabisi said he was going to come pick Edward Coleman up and discussed meeting with "Brian." At approximately 6:47 p.m., Kefentse Olabisi using TT30 called Edward Coleman and said, "send me your address again." (Session 3509.) About one minute later, Edward Coleman texted his address to Kefentse Olabisi as: "5008 east Q street [**Subject Premises 28**]." (Session 3510.) Based on my training and experience, I believe Kefentse Olabisi said he was going to pick Edward Coleman up at **Subject Premises 28** to conduct drug trafficking activities that day, including meeting with "Brian," whom agents know based on other intercepted communications is Mohammed Safaiezeab, another drug runner/distributor for Kefentse Olabisi, as discussed below.

177.    As set forth above, on February 23, 2021, agents observed Edward Coleman exit **Subject Premises 28** and drive **Subject Vehicle 26** directly to Kefentse Olabisi's residence and use a garage key code to access Kefentse Olabisi's residence. Agents also observed **Subject Vehicle 26** at **Subject Premises 28** on February 25, 2021, at approximately 8:00 a.m. On February 26, 2021, at approximately 8:00 a.m., agents observed **Subject Vehicle 26** parked at **Subject Premises 28**. At approximately 11:20 a.m., agents observed Edward Coleman exit **Subject Premises 28** and say goodbye to an unknown adult female inside the residence. Edward Coleman then left in **Subject Vehicle 26**. And agents obtained GPS location data on Edward Coleman's cell phone, TT67, which showed that Edward Coleman remained at **Subject Premises 28** overnights from March 5, 2021, to the present.

178.    Agents obtained updated toll records for TT67, which showed that from January 14, 2021, through March 14, 2021, Edward Coleman using TT67 exchanged 203 communications with Kefentse Olabisi using TT30 and 595 communications with

AFFIDAVIT OF SHAWNA MCCANN -- 109
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Mohammed Safaiezeab aka Brian, indicating that Edward Coleman, Kefentse Olabisi,
2  and Mohammed Safaiezeab have continued their drug trafficking relationship.

3        179.    I know based on my training and experience, that drug traffickers
4  frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and
5  stash locations in order to protect their supply and to have the narcotics on hand for
6  transactions. Based on the above-referenced intercepted communications, I believe that
7  Edward Coleman is a narcotics redistributor who works for Kefentse Olabisi and who
8  likely keeps his narcotics supply and proceeds in **Subject Premises 28** and uses **Subject**
9  **Vehicle 26** to conduct drug transactions.

10        **M.**    **Mohammad Safaiezeab aka Brian's Residence and Vehicle**

11        180.    During this investigation, based on physical surveillance and intercepted
12  communications, agents identified Mohammad Safaiezeab's residence as 14518 22nd
13  Place West, Lynnwood, Washington (**Subject Premises 29**), and his vehicle as a black
14  2003 Honda Accord coupe bearing Washington state license plate number AGS9353
15  registered to Mohammad Safaiezeab at **Subject Premises 29** (**Subject Vehicle 27**).
16  Agents intercepted communications regarding Mohammad Safaiezeab aka Brian
17  conducting cocaine transactions as a customer of and runner for Kefentse Olabisi. Some
18  of these drug transactions and agents' observations are noted below for purposes of
19  establishing probable cause to search **Subject Premises 29** and **Subject Vehicle 27**.[61]

20        181.    On October 27, 2020, at approximately 7:33 p.m., Kefentse Olabisi using
21  TT30 called Edward Coleman at TT67. (Session 791.) During this call, Kefentse Olabisi
22  told Edward Coleman to "look and see what [how much narcotics] I gave you again. I
23  think I might have gave you too much [narcotics]…look in that trunk again and see what
24  I gave you. I think I put something extra in there." Edward Coleman asked, "what's it

25

---

26  [61] On March 4, 2021, agents obtained a search warrant with integrated pen register/trap and trace to obtain location
27  data for TT72, used by Mohammad Safaiezeab. Throughout the period of time that agents have been receiving data
   in response to this warrant, the location data has shown that TT72 is in Atlanta, Georgia. However, **Subject Vehicle**
28  **27** has remained parked at **Subject Premises 29**, at least as recently as March 21, 2021, the last ime that agents
   checked this location.

AFFIDAVIT OF SHAWNA MCCANN –- 110
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  supposed to be [how much narcotics was it supposed to be]?" and said he could not
2  weigh it out right now. Kefentse Olabisi said, "no no, you'll already see it if it's too
3  much. It'll be, uh, you should have some more [narcotics] for Brian [Mohammad
4  Safaiezeab] and uh something else in there. If not, I'm trying to see where I put that other
5  thing." Edward Coleman said, "what you gave me for Brian, I just gave him the whole
6  thang [whole unit of narcotics]." Kefentse Olabisi asked, "Did you look at it and see what
7  you gave him?" Edward Coleman said, "Nope I didn't man. I just gave it [narcotics] to
8  him [Brian aka Mohammad Safaiezeab]." Kefentse Olabisi said, "Alright, ok. Is that all I
9  gave you? And the stuff [narcotics] for you." Edward Coleman confirmed. Based on my
10  training and experience, I believe that Kefentse Olabisi gave narcotics to Edward
11  Coleman for Edward Coleman to redistribute and for Edward Coleman to give to
12  Mohammad Safaiezeab to redistribute, but that Kefentse Olabisi thought he gave too
13  large of an amount of narcotics to Edward Coleman to give to Mohammad Safaiezeab.
14  Edward Coleman said that he gave the whole unit of narcotics to Mohammad Safaiezeab
15  without checking the quantity. Based on the context of this conversation, I believe that
16  amount of narcotics discussed are ounce-level narcotics amounts to be redistributed by
17  Edward Coleman and Mohammad Safaiezeab as opposed to personal use amounts of
18  narcotics, because Kefentse Olabisi referenced how it would be obvious to Edward
19  Coleman if Kefentse Olabisi gave him too much narcotics, indicating that the parties are
20  trafficking amounts larger than personal use amounts of narcotics.

21        182.    On November 4, 2020, at approximately 4:41 p.m., agents intercepted a call
22  between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using phone number
23  (404) 840-6997 (TT72) (identification discussed below). (Session 2539.) Mohammad
24  Safaiezeab stated that an unnamed man had been using "Zelle [a common money-transfer
25  app] . . . for longer than me." Mohammad Safaiezeab asked if the reason for the limit [on
26  money that could be transferred] is because the unnamed man "was sending it [money] to
27  [Kefentse Olabisi] for the first time or because [the unnamed man] was using [Zelle] for
28  the first time." Kefentse Olabisi said it was because the unnamed man was "sending it

AFFIDAVIT OF SHAWNA MCCANN -- 111
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   [money] to [Kefentse Olabisi] for the first time." Mohammad Safaiezeab concluded that

2   the unnamed man "can send 500 today, 2500 tomorrow and then another 2500 after that,"

3   and that he wanted to "do it this way so there is no record on this side" because "too

4   many transactions too soon, it's going to draw some attention" from his wife.

5   Mohammad Safaiezeab also pointed out that he just withdrew "5000 [$5,000] a couple of

6   weeks ago." Based on my training and experience, and the conversations discussed

7   further below, I believe that Mohammad Safaiezeab works as Kefentse Olabisi's

8   runner/associate and that Kefentse Olabisi supplies drugs to Mohammad Safaiezeab to

9   further distribute. I further believe that, in the conversation discussed above, Mohammad

10  Safaiezeab was discussing with Kefentse Olabisi that he had found an unnamed man to

11  launder drug proceeds from Mohammad Safaiezeab's drug sales and route them back to

12  Kefentse Olabisi, his supplier. Based on the amount of money discussed during this call, I

13  believe that Mohammad Safaiezeab is a multi-ounce drug re-distributor working with

14  Kefentse Olabisi rather than solely a drug user because the amount of money discussed is

15  equivalent to ounce-levels of narcotics, specifically cocaine, as opposed to user amounts

16  of narcotics.

17         183.   On November 8, 2020, at approximately 6:31 p.m., agents intercepted a

18  phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using

19  TT72. (Session 3505.) Mohammad Safaiezeab asked if "you think you will be able to

20  deliver or . . ." and Kefentse Olabisi said, "I'll try if not I'll have Ed [Edward Coleman]

21  come over there. I'll have him drop it off or something." Based on my training and

22  experience, I believe that Mohammad Safaiezeab asked Kefentse Olabisi to get more

23  narcotics, and Kefentse Olabisi agreed and said that Edward Coleman, Kefentse Olabisi's

24  other runner, would deliver the drugs.

25         184.   On November 15, 2020, at approximately 2:42 p.m., agents intercepted a

26  call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using TT72.

27  (Session 4297.) Mohammad Safaiezeab asked Kefentse Olabisi to come by the house

28  (**Subject Premises 29**) sometime today, and Kefentse Olabisi agreed. Mohammad

AFFIDAVIT OF SHAWNA MCCANN –- 112
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Safaiezeab advised that he "may not be home so just text me, but I'll leave the car door

2   open." At approximately 4:30 p.m., agents drove by **Subject Premises 29** and observed

3   **Subject Vehicle 27** parked unoccupied in the driveway. At approximately 6:02 p.m.,

4   Mohammad Safaiezeab called Kefentse Olabisi at TT30 and asked, "are we happening or

5   . . ." and Kefentse Olabisi responded that "he was coming after the football game."

6   (Session 4317.) At approximately 8:11 p.m., Kefentse Olabisi using TT30 called

7   Mohammad Safaiezeab to let him know that Kefentse Olabisi was on the way and "will

8   be there in about 20 minutes." Mohammad Safaiezeab said that he "will make sure the

9   door is unlocked." (Session 4333.) At approximately 8:45 p.m., Mohammad Safaiezeab

10  called Kefentse Olabisi at TT30 and asked if he "dropped it." Kefentse Olabisi replied,

11  "yeah it's in there." (Session 4336.) At about 8:34 p.m., GPS location data for TT30

12  placed Kefentse Olabisi in the vicinity of **Subject Premises 29**. Based on my training

13  and experience, I believe that Kefentse Olabisi went to Mohammad Safaiezeab's

14  residence at **Subject Premises 29** and left drugs in **Subject Vehicle 27**, and Mohammad

15  Safaiezeab had left the door to the vehicle unlocked for Kefentse Olabisi to access

16  because he was not at home.

17        185.    On November 17, 2020, at approximately 12:27 p.m., agents intercepted a

18  phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using

19  TT72. (Session 4521.) Mohammad Safaiezeab asked if he can "deposit it [money] like

20  last time." Kefentse Olabisi asked, "when you thinking? I'd rather you give me the cash."

21  Mohammad Safaiezeab said he would "like to deposit it into the account. I'd like to try

22  and do it today; if not tomorrow morning." Based on my training and experience, I

23  believe that Mohammad Safaiezeab was laundering drug proceeds from his drug sales

24  back to Kefentse Olabisi who supplied the drugs to Mohammad Safaiezeab.

25        186.    On November 19, 2020, at approximately 6:46 p.m., agents intercepted a

26  phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using

27  TT72. (Session 4860.) During the call, Kefentse Olabisi addressed Mohammad

28  Safaiezeab as "Brian." Mohammad Safaiezeab said he was "at home (**Subject Premises**

AFFIDAVIT OF SHAWNA MCCANN –- 113
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**29**),” and Kefentse Olabisi agreed to meet him at the smoothie spot in Burien. At approximately 7:06 p.m., agents intercepted a phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab. (Session 4863.) During the conversation, Mohammad Safaiezeab told Kefentse Olabisi that he would "be at the smoothie in 25 minutes" and would contact Kefentse Olabisi when he was "10 minutes out." At approximately 7:20 p.m., agents intercepted a phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab. (Session 4866.) During the call, Mohammad Safaiezeab told Kefentse Olabisi that he would "be there in ten minutes." At approximately 7:30 p.m., agents observed **Subject Vehicle 27** park in front of the Emerald City Smoothie in Burien with a lone male in the driver's seat, identified as Mohammad Safaiezeab aka Brian asked on a comparison to his driver's license photograph. At approximately 7:31 p.m., Mohammad Safaiezeab got out of the vehicle and stood in front of Emerald City Smoothie. At approximately 7:33 p.m., agents intercepted a phone call between Kefentse Olabisi using TT30 and Mohammad Safaiezeab using TT72. (Session 4875.) During the call, Kefentse Olabisi told Mohammad Safaiezeab that he was "at the light Brian . . . go to the pizza place because the smoothie thing ain't even open." At approximately 7:34 p.m., Mohammad Safaiezeab got back into **Subject Vehicle 27** and moved across the parking lot to Pizza Palace located at 116 Southwest 148th Street, Burien, Washington. At approximately 7:35 p.m., Kefentse Olabisi, identified based on a comparison to his driver's license photograph, driving **Subject Vehicle 26,** pulled into the lot and parked near **Subject Vehicle 27**. Mohammad Safaiezeab got out of **Subject Vehicle 27** and went over to the driver side of **Subject Vehicle 26** and met with Kefentse Olabisi. GPS location data for TT30 put Kefentse Olabisi within range of Pizza Palace. Agents observed Mohammad Safaiezeab lean in towards Kefentse Olabisi for a few seconds, and then walk back to **Subject Vehicle 27** as Kefentse Olabisi drove off in **Subject Vehicle 26**. Mohammad Safaiezeab drove **Subject Vehicle 27** to a different part of the lot and parked. At approximately 7:39 p.m., agents observed Mohammad Safaiezeab bent over and snorting something into his nose from a straw while seated in the driver's seat of

AFFIDAVIT OF SHAWNA MCCANN –- 114
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    **Subject Vehicle 27**. At approximately 7:41 p.m., agents observed Mohammad

2    Safaiezeab lick the straw. At approximately 7:42 p.m., Mohammad Safaiezeab departed

3    the parking lot driving **Subject Vehicle 27** and then stopped at a nearby parking lot of

4    Big 5 Sporting Goods located at 125 Southwest 148 Street, Burien, Washington. At

5    approximately 7:45 p.m., agents again observed Mohammad Safaiezeab snorting

6    something into his nose from a straw while seated in **Subject Vehicle 27**. At

7    approximately 7:51 p.m., agents observed Mohammad Safaiezeab pull out of the parking

8    lot and then park **Subject Vehicle 27** behind the Denny's restaurant located at 14821 1st

9    Avenue South, Burien, Washington. At approximately 8:02 p.m., Mohammad Safaiezeab

10   drove out of the Denny's lot in **Subject Vehicle 27** and got onto Interstate 5 traveling

11   northbound. At approximately 8:21 p.m., Mohammad Safaiezeab exited Interstate 5 at

12   Northgate Way in Seattle, drove into the Northgate Mall parking lot, and parked in front

13   of Gene Juarez Salon and Spa located at 401 Northeast Northgate Way, Seattle,

14   Washington. At approximately 8:25 p.m., agents observed Mohammad Safaiezeab

15   snorting something into his nose through a straw while seated in **Subject Vehicle 27**. At

16   approximately 8:37 p.m., **Subject Vehicle 27** drove out of the lot and got back onto

17   northbound Interstate 5. At approximately 8:55 p.m., agents observed Mohammad

18   Safaiezeab driving **Subject Vehicle 27** arrive at his registered Washington Department of

19   Licensing address of 14518 22nd Place West, Lynnwood, Washington (**Subject**

20   **Premises 29**).

21       187.    On November 21, 2020, at approximately 2:12 p.m., Mohammad

22   Safaiezeab using TT72 called Kefentse Olabisi at TT30. (Session 5116.) During this call,

23   Mohammad Safaiezeab asked if Kefentse Olabisi was "in town or already left." Kefentse

24   Olabisi said he "already left." Mohammad Safaiezeab said, "so I should contact Ed

25   [Edward Coleman]?" Kefentse Olabisi replied, "he [Edward Coleman] said he already

26   met you yesterday." Mohammad Safaiezeab confirmed and asked if "he [Edward

27   Coleman] can meet me today." Kefentse Olabisi said ok, and Mohammad Safaiezeab said

28   he would "give him [Edward Coleman] a call." Based on my training and experience, I

AFFIDAVIT OF SHAWNA MCCANN –- 115
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  believe that Mohammad Safaiezeab called Kefentse Olabisi to get resupplied with

2  cocaine, but Kefentse Olabisi was out of town, so Mohammad Safaiezeab said he would

3  call Edward Coleman whom he met with the previous day. I believe that Edward

4  Coleman manages Kefentse Olabisi's drug trafficking business while Kefentse Olabisi is

5  travelling and that Mohammad Safaiezeab is another redistributor of Kefentse Olabisi's

6  who gets resupplied on nearly a daily basis by Kefentse Olabisi and/or Edward Coleman

7  acting on behalf of Kefentse Olabisi.

8       188.   On March 1, 2021, at approximately 5:18 p.m., agents observed **Subject**

9  **Vehicle 27** parked in the driveway of **Subject Premises 29**, indicating that Mohammad

10  Safaiezeab still resides at this address. Additionally, **Subject Premises 29** is still listed as

11  his current residence in Washington Department of Licensing records.

12       189.   Agents obtained updated toll records for TT72, which showed that from

13  January 14, 2021, through March 14, 2021, Mohammed Safaiezeab using TT72

14  exchanged 75 communications with Kefentse Olabisi using TT30 and 595

15  communications with Edward Coleman, indicating that Mohammed Safaiezeab has

16  continued his drug trafficking relationship with Kefentse Olabisi and Edward Coleman.

17       190.   I know based on my training and experience, that drug traffickers

18  frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

19  stash locations in order to protect their supply and to have the narcotics on hand for

20  transactions. Based on the above-referenced intercepted communications, I believe that

21  Mohammad Safaiezeab is a narcotics redistributor working for Kefentse Olabisi who

22  likely keeps his narcotics supply and proceeds in **Subject Premises 29** and uses **Subject**

23  **Vehicle 27** to conduct drug transactions.

24       **N.   Larry Collins's Residence and Two Vehicles**

25       191.   During this investigation, based on physical surveillance, a mail cover, GPS

26  location data for Larry Collins's cell phone (TT16), and remote video surveillance, agents

27  identified Larry Collins's residence as 10409 56th Avenue South, Seattle, Washington

28  (**Subject Premises 30**), and his vehicles as a black 2006 Kia Sedona bearing Washington

AFFIDAVIT OF SHAWNA MCCANN –- 116
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  license plate BPV7873 registered to Larry W. Collins at **Subject Premises 30** (**Subject**

2  **Vehicle 28**), and a 2020 Acura MDX bearing Washington state license plate number

3  BQW9453 registered to Marriah Collins, the wife of Larry Collins,[62] at **Subject**

4  **Premises 30** (**Subject Vehicle 29**). **Subject Premises 30** is the listed residence of Larry

5  Collins on his driver's license. In August and September, 2020, and again from February

6  through early March 2021, agents obtained GPS location data on Larry Collins's cell

7  phone, TT16,[63] which showed that Larry Collins remained at **Subject Premises 30**

8  overnights during those periods. Additionally, agents installed a pole camera in August

9  2020 capturing the driveway of **Subject Premises 30**, which showed that Larry Collins

10  stayed overnights at **Subject Premises 30** from August 2020 to the present. Based on

11  intercepted communications on TT7 used by Stevie Allen, agents obtained a court-

12  authorized wire and electronic communications interception on TT16 used by Larry

13  Collins. During this investigation, and specifically the periods of wire and electronic

14  communications interception, agents intercepted communications and/or observed Larry

15  Collins conducting multiple cocaine and marijuana transactions on a weekly basis.

16  Agents observed Larry Collins coming and going from **Subject Premises 30**

17  immediately before and after drug transactions driving **Subject Vehicles 28** and **29**.

18  Some of these drug transactions and agents' observations are noted below for purposes of

19  establishing probable cause to search **Subject Premises 30** and **Subject Vehicles 28** and

20  **29**.

21        192.    Larry Collins has a criminal history which includes a felony for drug

22  possession.

23        193.    As set forth above, on July 23, 2020, agents intercepted a call between

24  Larry Collins using TT16 and Stevie Allen using TT7 during which they discussed

25

26  _____

[62] Agents identified Marriah Collins as the wife of Larry Collins based on physical surveillance and CLEAR
27  database checks identifying her as Larry Collin's wife.
[63] Agents obtained a search warrant for GPS location data for TT16 and confirmed that Larry Collins was the user of
28  TT16, based on physical surveillance observing Larry Collins, identified based on a comparison to his driver's
license photograph, in the same area of GPS location data for TT16 at different locations and times.

AFFIDAVIT OF SHAWNA MCCANN –- 117
USAO #2019R01083

meeting to conduct a marijuana transaction. At approximately 8:39 p.m., agents observed **Subject Vehicle 28** pull up and park in front of Stevie Allen's stash house. A male, believed to be Larry Collins based on physical features matching his driver's license photograph, got out of the driver's seat and went towards Stevie Allen's stash house and walked out about ten minutes later carrying a package. The male got back into **Subject Vehicle 28**, departed, drove to **Subject Premises 30** (the known residence of Larry Collins), and went inside the residence at that location. Based on my training and experience, I believe that Larry Collins drove to Stevie Allen's stash house to buy marijuana using **Subject Vehicle 28** and immediately after the drug transaction drove to his residence at **Subject Premises 30**.

194.    As set forth above, on July 24, 2020, agents intercepted a call between Larry Collins using TT16 and Stevie Allen using TT7 during which they discussed Larry Collins driving to Stevie Allen's residence to conduct a marijuana transaction. At approximately 7:40 p.m., agents observed, via remote video surveillance, **Subject Vehicle 28** pull into Stevie Allen's residence driveway. At approximately 7:49 p.m., agents observed, via remote video surveillance, **Subject Vehicle 28** depart Stevie Allen's residence.

195.    On August 13, 2020, at approximately 7:50 p.m., agents went to the GPS location area of TT16 and observed Larry Collins get into **Subject Vehicle 28** and depart a parking lot. Around that same time, the pen register for TT16 indicated Larry Collins was communicating with (206) 422-3300 (TT32), known to be used by Jamaal Davis, the owner of City Teriyaki, 5400 Rainier Avenue South, Seattle, Washington.[64] Agents followed Larry Collins, identified based on a comparison to his driver's license photograph, driving **Subject Vehicle 28** directly to City Teriyaki. At approximately 8:08 p.m., Larry Collins parked in the parking lot and got out of **Subject Vehicle 28**. Agents

---

[64] Agents know that TT32 is used by Jamaal Davis based on physical surveillance, intercepted calls identifying the user as "Sac" and "J-Sac," and CS8 information.

AFFIDAVIT OF SHAWNA MCCANN –- 118
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

observed Larry Collins on the phone; at that time the pen register for TT16 indicated Larry Collins was talking with Jamaal Davis. Agents observed Larry Collins use a code on the front passenger door of Jamaal Davis's white 2013 Ford F150 bearing Washington license C47763S. Larry Collins then opened the back passenger door of the white F150 and removed what appeared to be two large takeout type food containers from the back seat area of the white F150. Larry Collins then got back into **Subject Vehicle 28** with the food containers and drove to his residence at **Subject Premises 30**.

196.    On September 11, 2020, at approximately 10:46 a.m., agents intercepted a phone call between Larry Collins using TT16 and Randolph Brown using phone number (206) 259-1461 (TT24).[65] (Session 228.) During the call, Randolph Brown said, "the Mexican boy [supplier] just called me, right, talking about he got some good news and bad news. I'm like, give me the bad news first. So he said motherfucker got 9 of them [nine ounces of cocaine] for me, but it's better [better quality] but he want 1600 [$1,600 per ounce of cocaine]. I told him absolutely not . . . Motherfucker, that bullshit. That's your price. You trying to bump that shit up. Motherfucker, hell naw." Larry Collins replied, "yeah, you should said, hey what's dude's number [supplier's boss's number]?" Randolph Brown said, "matter fact, yeah. Matter fact, I'm about to call him [supplier] back and tell him let me get his [boss's] number. Cause he said something the last time about either dude [boss] wanting my number or give me his number or some shit. But um, um. What was I fixin' to say, oh yeah, he said the reason why it is so high [price] because he had to pay somebody to bring it [load of cocaine] up from California. Well, motherfucker that ain't my problem." At approximately 10:48 a.m., agents intercepted a phone call between Larry Collins using TT16 and Randolph Brown using TT24. (Session 229.) During the call, Randolph Brown said, "right when I got off the phone with you, I seen a text. He [supplier] talking about I [supplier] called my friend [boss], 1550 [$1,550

[65] Agents conducted physical surveillance in conjunction with GPS location data on TT24 in several locations at different times and identified Randolph Brown as the user of TT24, based on a comparison to Randolph Brown's driver's license photograph.

AFFIDAVIT OF SHAWNA MCCANN –- 119
USAO #2019R01083

1  per ounce of cocaine]. Motherfucker, I'm finna call you [supplier] right now, and I want
2  to talk to the Mexican [boss]." Based on my training and experience, I believe that
3  Randolph Brown was telling Larry Collins that his supplier offered nine ounces of
4  cocaine for $1,600 per ounce, and that Randolph Brown was complaining about the high
5  price, so Randolph Brown wanted to talk to his supplier's boss about the price, but before
6  Randolph Brown called his supplier back, he received a text message from the supplier
7  saying the price per ounce of cocaine was lowered to $1,550 per ounce.

8        197.   That same day, at approximately 11:01 a.m., agents intercepted a phone call
9  between Larry Collins using TT16 and Randolph Brown using TT24. (Session 231.)
10 During the call, they further discussed the prices of the narcotics. Larry Collins told
11 Randolph Brown that he would call him when he finished getting his haircut. At
12 approximately 2:01 p.m., agents intercepted a phone call between Larry Collins using
13 TT16 and Randolph Brown using TT24. (Session 235.) During the call, Randolph Brown
14 told Larry Collins that "he [the supplier] would be there in five minutes." Larry Collins
15 told Randolph Brown that he was on the way. From law enforcement database checks,
16 including CLEAR, agents believed Randolph Brown lived at 2532 South 286th Place #A,
17 Federal Way, Washington. At approximately 1:43 p.m., agents intercepted a phone call
18 between Larry Collins using TT16 and Randolph Brown using TT24. (Session 236.)
19 During the call, Larry Collins asked where he could park. At the time of this call, cell site
20 location data for TT16 showed that Larry Collins was in the vicinity of Randolph
21 Brown's residence in Federal Way. At approximately 2:01 p.m., agents observed a 2019
22 Acura MDX bearing Washington state license plate number BQW9453 (**Subject Vehicle
23 29**) parked in front of Randolph Brown's residence. At approximately 3:35 p.m., agents
24 observed a male, identified as Larry Collins based on a comparison to his driver's license
25 photograph, exit the exterior gate leading to Randolph Brown's residence, get into
26 **Subject Vehicle 29** and drive off.

27       198.   On September 13, 2020, Randolph Brown using TT24 sent the following
28 text message to Larry Collins at TT16: "L call me back." (Session 332.) About an hour

AFFIDAVIT OF SHAWNA MCCANN –- 120
USAO #2019R01083

and a half later, Randolph Brown using TT24 called Larry Collins at TT16. (Session 335.) During this call Randolph Brown said that "the boy [Mexican middle man], he just, he called me this morning and he just hit me back again talking, at first, about 14-75 [$1,475 per ounce of cocaine] . . . but now he just called me and said 14-50 [$1,450 per ounce] and we can get 10 [ounces] because he's leaving out of town for two weeks." Larry Collins replied, "I need to put some more money together Ran. I don't have enough money yet." Randolph Brown said, "Me neither. I guess I got about, I don't know, about 8 [$8,000] or 9 [$9,000]." Larry Collins replied, "I'm not quite there either." Randolph Brown said, "let me see what I can do." Larry Collins asked, "How's it [cocaine] look [quality], is it harder or is it still soft?" Randolph Brown said, "I ain't even looked at it, why is yours still soft." Larry Collins replied, "yeah I had somebody [customer] bring one [cocaine unit] back." Randolph Brown said, "I don't know, I'm gonna have to go look at it [cocaine]," and Larry Collins said, "ok look at it and call me." Based on my training and experience, I believe that Randolph Brown told Larry Collins that his Mexican source of supply was offering ten ounces of cocaine at $1,450 per ounce; Larry Collins said he did not have enough money yet to buy more cocaine and asked about the quality of the cocaine. Randolph Brown said he would go look at the cocaine and call Larry Collins back.

199.    On October 7, 2020, and December 2, 2020, the United States Postal Service confirmed that mail addressed to Larry Collins was sent to **Subject Premises 30**.

200.    As set forth in more detail below in the section on Jonathan Harrington, on September 30, 2020, agents intercepted a call between Larry Collins using TT16 and Jonathan Harrington discussing a cocaine transaction, and Larry Collins told Jonathan Harrington to come by **Subject Premises 30** to conduct the cocaine deal. Agents observed a male, later identified as Jonathan Harrington, go to **Subject Premises 30** briefly and depart. Agents conducted a traffic stop on Jonathan Harrington shortly after he left **Subject Premises 30** and seized cocaine and a firearm from his person.

AFFIDAVIT OF SHAWNA MCCANN –- 121
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Accordingly, agents believe Larry Collins sold Jonathan Harrington cocaine out of

2  **Subject Premises 30**.

3      201.   On November 17, 2020, investigators executed a federal search warrant on

4  Randolph Brown's primary residence located at 2532 S 286th Place, #A, Federal Way,

5  Washington. In this residence, investigators located and seized suspected heroin, powder

6  and crack cocaine, and marijuana; four firearms; four digital scales in a backpack; several

7  cell phone devices; and $4,000 in U.S. currency. During the interview of Randolph

8  Brown, he admitted to having a drug trafficking partner but refused to provide the name

9  of his partner. Based on the intercepted communications described above, agents believe

10 that Larry Collins is Randolph Brown's drug trafficking partner.

11     202.   On February 17, 2021, agents intercepted phone calls between Larry

12 Collins using TT16 and Eugene McGee using TT23 (identification discussed below in the

13 section about Eugene McGee). (Session 1853, 1859.) During these calls, Larry Collins

14 said that "Randy called" him, but Larry Collins said he would call Randy back. Eugene

15 McGee asked if Larry Collins had "talked to him [Randy] lately," and Larry Collins said

16 he did not think Randy was going to "tell the truth." Larry Collins said he is going to get

17 a "fresh one [cell phone]" and get rid of all his "old ones too [cell phones]" and that he

18 had about "eight old ones [cell phones] sitting around" that he has been going back and

19 forth on. Eugene McGee asked an unknown male in the background if he had "seen

20 Randy lately." Based on my training and experience, I believe Larry Collins and Eugene

21 McGee were talking about Randolph Brown, whose residence had been searched as set

22 forth above, and that Larry Collins said he was getting all new cell phones and getting rid

23 of his old cell phones after agents searched Randolph Brown's residence, showing that

24 Larry Collins was trying to evade law enforcement detection by getting new cell phones.

25     203.   During the wire interceptions of Larry Collins using TT16 from February 9,

26 2021, through March 1, 2021, agents intercepted almost daily conversations between

27 Anson Thomas using phone number (206) 712-9769 and Larry Collins having short

28 discussions arranging to meet each other. From interceptions of calls between Kevin

1  Gipson using TT6 and Anson Thomas using (206) 712-9769, agents know that Anson

2  Thomas is a cocaine user and street dealer. The majority of the communications

3  intercepted between Kevin Gipson using TT6 and Anson Thomas were drug-related,

4  specifically Anson Thomas calling and texting Kevin Gipson to arrange to buy cocaine

5  from Kevin Gipson. For example, on July 20, 2020, at approximately 1:05 p.m., phone

6  number (206) 712-9769 subscribed to Anson Thomas called Kevin Gipson at TT6

7  (Session 1766). During this call, Anson Thomas said he was outside and wanted to get

8  "150." Kevin Gipson said "ok." On July 24, 2020, at approximately 3:29 p.m., Kevin

9  Gipson using TT6 called phone number (206) 712-9769 subscribed to Anson Thomas

10  (Session 2411). During this call, the following discussion took place:

11      Thomas: Man, I ain't doin, man….[unintelligible]….I want some powder

12      [cocaine] that's straight. I don't need no pills, man, what you cuttin' that shit with?

13      NoDoz?

14      TT6: You said cuttin' it with what?

15      Thomas: NoDoz!

16      TT6: What is that?

17      Thomas: I don't know. What kind of pill you puttin' in this shit?

18      TT6: Man, I ain't even doing that.

19      Thomas: Man, shit.

20      TT6: Man.

21      Thomas: People [narcotics customers] keep cussin' me out and bringin' it back.

22      Talkin' about, see this the pill in it right here. I just pulled this pill out the damn

23      shit.

24      TT6: What?

25      Thomas: Yeah man. You gotta tell me if you gonna do it like that…[unintelligible]

26      TT6: [laughs]

27

28

AFFIDAVIT OF SHAWNA MCCANN -- 123
USAO #2019R01083

1    Thomas: I ain't cut it with baking soda. I could've cut it with baking soda, but I

2    cut it with nyzotol. I gotta tell them something man. You can't just send me out

3    there to walk the plank.

4    204.   Later on July 24, 2020, at approximately 4:50 p.m., phone number (206)

5  712-9769 subscribed to Anson Thomas called Kevin Gipson at TT6 (Session 2432).

6  During this call the following discussion took place:

7    Thomas: I'm back out here. I need 300 [$300 worth of cocaine].

8    TT6: You just left, you you just left though.

9    Thomas: Ay man. I ain't make it down the hill. I had three people [narcotics

10    customers] down at the Boys and Girls Club waiting, and this shit gone. I need

11    300, and I need it like yesterday….. I'm right here pullin' in the parking lot now.

12    TT6: What you trying to get?

13    Thomas: 300.

14    TT6: Okay. Alright.

15    205.   On August 4, 2020, at approximately 7:23 p.m., phone number (206) 712-

16  9769 subscribed to Anson Thomas called Kevin Gipson at TT6 (Session 4029). During

17  this call the following discussion took place:

18    TT6: Hello?

19    Thomas: Hey man. I just pulled up in here man [outside of Kevin Gipson's

20    apartment]. I need 5.

21    TT6: What now?

22    Thomas: 5…hundred [$500 worth of cocaine].

23    TT6: Uhhhh. Uh, come on up.

24    Thomas: Aright.

25    206.   Based on my training and experience, I believe that phone number (206)

26  712-9769 subscribed to Anson Thomas contacted Kevin Gipson frequently to arrange

27  cocaine transactions ranging from $150 to $500 worth, and that Anson Thomas then re-

28  distributed the cocaine to other narcotics customers.

207.   The recent pattern and frequency of the communications between Larry Collins and Anson Thomas mirrors the pattern and frequency of the communications between Kevin Gipson and Anson Thomas, namely multiple communications in a day, and multiple communications day after day. Additionally, Larry Collins and Anson Thomas mostly spoke to arrange meetings. The fact that they did not discuss the purpose of the meetings, and that they were meeting so frequently, also leads me to believe that Anson Thomas and Larry Collins were arranging to meet to conduct a drug transaction. Accordingly, investigators believe that the short communications exchanged between Anson Thomas and Larry Collins arranging to meet likely pertained to drug trafficking.

208.   On February 23, 2021, agents observed, via remote video surveillance, Larry Collins exit **Subject Premises 30**, get into **Subject Vehicle 28**, and drive off, indicating that Larry Collins is still residing at **Subject Premises 30**. On March 10, 2021, at approximately 10:55 a.m., agents observed, via remote video surveillance, **Subject Vehicle 29** back out of the driveway and depart **Subject Premises 30**. On March 11, 2021, at approximately 10:48 a.m., agents observed, via remote video surveillance, Larry Collins take the trash out and set it in front of **Subject Premises 30**. Later on March 11, 2021, at approximately 5:18 p.m., agents observed, via remote video surveillance, Larry Collins exit **Subject Premises 30**, get into **Subject Vehicle 28**, and drive off.

209.   On March 3, 2021, at approximately 11:32 a.m., Eugene McGee using TT23 spoke on the phone with Larry Collins using TT16. (Session 5218.) Eugene McGee asked if Larry Collins was at home. Larry Collins affirmed, and Eugene McGee said he was going to pull up on Larry Collins. At approximately 11:48 a.m., Eugene McGee using TT23 called Larry Collins at TT16. (Session 5224.) Eugene McGee told Larry Collins that he was outside. At approximately 11:54 a.m., video surveillance showed Eugene McGee in a white truck (**Subject Vehicle 31**) pull up in front of Larry Collins residence, **Subject Premises 30**. Agents observed Larry Collins come out of the house and walk to the passenger side window of **Subject Vehicle 31** and talk to Eugene McGee through the passenger side window. At approximately 12:07 p.m., video surveillance

AFFIDAVIT OF SHAWNA MCCANN -- 125
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   showed Larry Collins back away from **Subject Vehicle 31** as it started to move forward.

2   The passenger side door was cracked open. Larry Collins and Eugene McGee then

3   resumed talking out in front of **Subject Premises 30**. At approximately 12:19 p.m., video

4   surveillance showed Eugene McGee drive away alone in **Subject Vehicle 31**, and Larry

5   Collins went back inside **Subject Premises 30**. I know based on my training and

6   experience and prior surveillance during this investigation that Eugene McGee and Larry

7   Collins often meet in person to discuss criminal enterprise activities in order to evade law

8   enforcement detection, particularly after the recent law enforcement activity in this

9   investigation that caused Larry Collins to get a new cell phone, in addition to TT16, and

10  suspect a wiretap investigation. Based on my training and experience and this

11  investigation, I know that it is common for drug traffickers, particularly amongst this

12  DTO, to have a long-term cell phone used predominately for family and other innocent

13  conversation and also to have one or multiple other cell phones for their drug trafficking

14  communications, which they also frequently change to avoid law enforcement detection.

15  After the law enforcement activity affecting Larry Collins, as discussed herein, I believe

16  that Larry Collins used this method and transitioned TT16 to use predominately as his

17  family/innocent phone and acquired at least one other cell phone to contact Randolph

18  Brown and other drug trafficking associates, particularly since during the most recent

19  wiretap on TT16, Larry Collins indicated to Eugene McGee that he had talked to

20  Randolph Brown but agents did not intercept such a call over TT16.

21      210.    I know based on my training and experience, that drug traffickers

22  frequently keep their narcotics and narcotics proceeds in their residences, vehicles, and

23  stash locations in order to protect their supply and to have the narcotics on hand for

24  transactions. I also know that drug traffickers maintain records and other trafficking-

25  related materials in their premises, including residences, for a long period of time,

26  including current and prior cell phone devices that contain text messages and contact lists

27  of drug trafficking associates and pay-owe sheets. Based on the above-referenced

28  intercepted communications, I believe that Larry Collins is a multi-ounce cocaine

AFFIDAVIT OF SHAWNA MCCANN -- 126
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  trafficker who likely keeps his narcotics supply and proceeds in **Subject Premises 30** and

2  uses **Subject Vehicles 28** and **29** to conduct drug transactions.

3         **O.**    **Jonathan Harrington's Residence and Vehicle**

4        211.    During this investigation, based on physical surveillance and intercepted

5  communications, agents identified Jonathan Harrington's residence as 212 24th Avenue,

6  Seattle, Washington[66] (**Subject Premises 31**) and his vehicle as a blue 2002 Buick Park

7  Avenue bearing Washington license plate AAN7807 registered to Jonathan F. Harrington

8  at 5717 33rd Avenue S, Seattle, Washington (**Subject Vehicle 30**). Agents obtained GPS

9  location data on Jonathan Harrington's cell phone, TT68, beginning on March 4 or 5,

10  2021, which showed that Jonathan Harrington remained at **Subject Premises 31**

11  overnights from March 5, 2021, to the present. Agents intercepted communications

12  regarding Jonathan Harrington conducting a cocaine transaction with Larry Collins as

13  noted below to establish probable cause to search **Subject Premises 31** and **Subject**

14  **Vehicle 30**.

15        212.    On September 29, 2020, at 3:30 p.m., Larry Collins using TT16 called

16  Jonathan Harrington at phone number (206) 291-5768 (TT68). (Session 844.) During this

17  call Jonathan Harrington asked, "Yeah, well you ready [have cocaine]? . . . what's the

18  price?" Larry Collins confirmed and said, "I can get you a babe [4.5 ounces of cocaine]

19  for the 65 [$6,500]." Jonathan Harrington asked, "what's about 65 [$6,500], that's 17

20  [$1,700 per ounce]?" Larry Collins said, "Naw, that's like . . . uh, maybe like . . . a little

21  over like . . . hold on let me see . . . .That's like 1445 [$1,445 per ounce] or some shit . . .

22  .Like 1445 [$1,445 per ounce for the 4.5 ounces of cocaine], that's it." Jonathan

23  Harrington replied, "Ok, ok L. Let me see what I can do man, and I'll call you." Based on

24  my training and experience, I believe that Larry Collins offered to sell Jonathan

25  Harrington 4.5 ounces of cocaine for a total of $6,500, which breaks down to about

26

27  ─────────────────────────

28  [66] Jonathan Harrington has a different residence listed on his driver's license of 5717 33rd Avenue S, Seattle, Washington. Agents believe, based on intercepted calls, that this residence is the residence of Jonathan Harrington's girlfriend.

AFFIDAVIT OF SHAWNA MCCANN –- 127
USAO #2019R01083

1   $1,445 per ounce of cocaine. I know from this and an earlier, related investigation that

2   the terms "babe" and "baby" are commonly used by drug traffickers, and specifically

3   members of the Michael Walker DTO, to refer to 4.5 ounces of cocaine, which is half of

4   a "nino"/"nina," (child) meaning nine ounces of cocaine. I am also aware, based on my

5   training and experience and this investigation, that (because of volume discounts) $1,445

6   per ounce is consistent with the going rate of powder cocaine in this region at this time.

7       213.   On September 30, 2020, at approximately 10:18 a.m., Larry Collins using

8   TT16 called Jonathan Harrington at TT68. (Session 881.) During this call, Jonathan

9   Harrington told Larry Collins, "but I could get one [ounce of cocaine] though, you know

10   what I'm saying, and Bug want to get one [ounce of cocaine]." Jonathan Harrington also

11   told Larry Collins, "But he [Bug] got somebody who want to get the two and a half [2.5

12   ounces of cocaine], so when he call me back, I was going to call you and tell you I was

13   going to come get the four and a half [4.5 ounces of cocaine]." Larry Collins said, "I got

14   some super real good [quality cocaine], some super, I didn't do nothing to it, some uh,

15   [unintelligible]. I could shoot you one [ounce of cocaine] that I've been having for a

16   minute for a super deal or something, if you just wanted to do that." Jonathan Harrington

17   responded, "what just the one [ounce of cocaine]?" and Larry Collins replied, "yeah but

18   it's already did [cooked into crack cocaine], but it's super good [quality]." Jonathan

19   Harrington asked, "What you want for that [one ounce of cocaine]?" and Larry Collins

20   replied, "Oh, I could probably get it to you, since you helped me out that one time, I'll

21   give it to you for like, uh, 11 [$1,100] or something." Jonathan Harrington said, "Damn,

22   that's a deal man" and Larry Collins responded, "Yeah I ain't touched it or nothing [did

23   not add any cutting agents]." Jonathan Harrington said, "Man, I need to come get that"

24   and Larry Collins responded, "Yep, I'll call you as soon as I get back." Jonathan

25   Harrington replied, "Alright." Based on my training and experience, I believe that

26   Jonathan Harrington was unable to find enough money and/or customers to buy the

27   "babe" (4.5 ounces of cocaine) at that time, but that Larry Collins agreed to sell Jonathan

28   Harrington one ounce of crack cocaine for $1,100, providing a substantial discount

AFFIDAVIT OF SHAWNA MCCANN -- 128
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  because of some favor or assistance Jonathan Harrington had provided to Larry Collins in
2  the past.

3      214.    On September 30, 2020, at approximately 1:58 p.m., Larry Collins using
4  TT16 called Jonathan Harrington at TT68. (Session 899.) During this call, Larry Collins
5  told Jonathan Harrington that, "you can come grab that one [ounce of cocaine] if you
6  want." Jonathan Harrington said, "yep I'm about to be on my way." At approximately
7  3:07 p.m., agents observed, via remote video surveillance, **Subject Vehicle 30** arrive at
8  Larry Collins's residence (**Subject Premises 30**). A male, later identified as Jonathan
9  Harrington, got out of the driver's seat of **Subject Vehicle 30** and met Larry Collins, who
10 was standing on the sidewalk in front of his residence (**Subject Premises 30**). They both
11 walked to Larry Collins's residence. At approximately 3:42 p.m., agents observed
12 Jonathan Harrington leave Larry Collins's residence driving **Subject Vehicle 30**. Agents
13 followed Jonathan Harrington from the area and conducted a vehicle stop before Jonathan
14 Harrington made any other stops or met with any other individuals. Agents confirmed the
15 identity of Jonathan Harrington based on his driver's license and conducted a probable
16 cause search of Jonathan Harrington, which resulted in the seizure of approximately 59.7
17 grams (total package weight) of crack cocaine from Jonathan Harrington's pants pocket.
18 Agents also recovered a Glock .40 caliber pistol from his hip, which Jonathan Harrington
19 claimed he could legally carry and provided a concealed pistol license in his name.
20 Agents did not seize Jonathan Harrington's phone. Later that day, during a call from
21 Jonathan Harrington using TT68 to Larry Collins at TT16, Jonathan Harrington stated
22 that he "just got blowed over" [stopped by law enforcement]. Jonathan Harrington further
23 explained that "they [law enforcement] found the work [narcotics] on me and everything
24 bro." After going into more detail about what happened, Jonathan Harrington stated that
25 "they took my gun and the work [cocaine] and everything." During the rest of the call,
26 Jonathan Harrington continued to discuss the details of the traffic stop. (Session 924.)

27     215.    On March 7, 2021, agents met with a confidential source, CS3, who was
28 familiar with Jonathan Harrington. CS3 advised that Jonathan Harrington is the little

AFFIDAVIT OF SHAWNA MCCANN -– 129
USAO #2019R01083

1  brother of Tyrone Harrington aka Tilt who died a few years ago. Prior to his death,
2  Tyrone Harrington was a mid-level drug trafficker. CS3 reported that Jonathan
3  Harrington, since his brother's death, has taken over Tyrone Harrington's drug trafficking
4  operation and currently traffics narcotics with Derrel Lilly aka Boog. CS3 reported that
5  Jonathan Harrington gets supplied up to nine ounces at a time and sells cocaine out of his
6  house near Garfield High School (**Subject Premises 31**).

7       216.   On March 4, 2021, at approximately 11:52 a.m., March 5, 2021, at
8  approximately 12:07 a.m., and March 8, 2021, at approximately 1:05 a.m., agents
9  observed **Subject Vehicle 30** parked in the driveway of **Subject Premises 31**. On March
10  4, 2021, agents obtained a warrant for GPS location data on Jonathan Harrington's cell
11  phone, TT68, which showed that Jonathan Harrington remained at **Subject Premises 31**
12  overnights from March 5, 2021, to the present. On March 9, 2021, at approximately 5:09
13  p.m., agents observed **Subject Vehicle 30** back into the driveway of **Subject Premises**
14  **31.** Jonathan Harrington, identified based on a comparison to his driver's license
15  photograph, exited **Subject Vehicle 30**, used a set of keys to open the front door of
16  **Subject Premises 31**, and entered the residence, indicating that Jonathan Harrington still
17  resides at this residence. I know based on my training and experience, that drug
18  traffickers frequently keep their narcotics and narcotics proceeds in their residences,
19  vehicles, and stash locations in order to protect their supply and to have the narcotics on
20  hand for transactions.

21       217.   I also know that drug traffickers maintain records and other trafficking-
22  related materials in their premises, including residences, for a long period of time,
23  including current and prior cell phone devices that contain text messages and contact lists
24  of drug trafficking associates and pay-owe sheets. Based on the above-referenced
25  intercepted communications, I believe that Jonathan Harrington is a multi-ounce cocaine
26  trafficker who likely keeps his narcotics supply and proceeds in **Subject Premises 31** and
27  **Subject Vehicle 30**.

28  / / /

AFFIDAVIT OF SHAWNA MCCANN -- 130
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

P.      **Eugene McGee's Residence and Vehicle**

218.    During this investigation, based on physical surveillance, GPS location data for Eugene McGee's cell phone (TT23),[67] and Washington Department of Licensing records, agents identified Eugene McGee's residence as 29112 9th Place South, Federal Way, Washington (**Subject Premises 32**), and his vehicle as a white 2012 Dodge 1500 bearing Washington license C42162U registered to EMC Enterprises LLC[68] at **Subject Premises 32** (**Subject Vehicle 31**). From October 2020 through the beginning of March 2021, except for a couple of weeks in November and again in late January/early February, agents obtained GPS location data on Eugene McGee's cell phone, TT23; that data showed that Eugene McGee remained at **Subject Premises 32** overnights from October 2020 to March 2021. Based on intercepted communications on TT16 used by Larry Collins, agents obtained a court-authorized wire and electronic communications interception on TT23 used by Eugene McGee. During this investigation, and specifically the period of wire and electronic communications interception, agents intercepted communications and/or observed Eugene McGee meet with Larry Collins before and after Larry Collins conducted narcotics transactions. Eugene McGee also openly discussed his history of drug trafficking on intercepted calls and discussed his current money laundering practices on intercepted calls. Some of these intercepted communications and agents' observations are noted below for purposes of establishing probable cause to search **Subject Premises 32** and **Subject Vehicle 31**.

219.    Eugene McGee has federal felony convictions for distribution of cocaine and possession with intent to distribute cocaine, and state felony convictions for transporting/selling narcotics.

---

[67] Agents obtained a search warrant for GPS location data for TT23 and confirmed the user is Eugene McGee based on physical surveillance observing Eugene McGee, identified based on a comparison to his driver's license photograph, in the same area of GPS location data for TT23 at different locations and times.
[68] Eugene McGee is listed as the governing person for "EMC Enterprises, LLC" with UBI 603-489-140, which was opened in March 2015. The records list the email address "jerichom07@yahoo.com" and telephone numbers (206) 280-9706 (TT23) and (206) 957-6209.

AFFIDAVIT OF SHAWNA MCCANN –- 131
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      220.    On September 8, 2020, at approximately 6:35 p.m., Larry Collins using

2 TT16 called Eugene McGee at TT23. (Session 142.) During this call, Larry Collins

3 asked, "What you got goin' on [narcotics supply]?" Eugene McGee replied, "[He] told

4 me he was going to come right back with something [narcotics]. And then the other day,

5 he said he had something but he got 'em wet. Then he said he was going to get back with

6 me. So I've been waiting on [him] to call me back. Cuz he said he can get them whenever

7 he want. But shit. I'm sitting here mad [] because I gave them all way and I didn't really

8 get shit. I was helping [him] out. I just though he was going to hit me right back. I was

9 trying to helping him move them bitches quick [sell narcotics]." Based on my training

10 and experience, I believe that Larry Collins asked Eugene McGee if Eugene McGee had

11 any narcotics supplies or narcotics purchase transactions lined up, and that Eugene

12 McGee discussed working with an unknown male on a drug transaction. I know that

13 "going on" and "moves" are common terms used by drug traffickers to refer to drug

14 transactions.

15      221.    On September 28, 2020, at approximately 9:13 p.m., Larry Collins using

16 TT16 called Eugene McGee at TT23. (Session 808.) During this call, Eugene McGee

17 said, "Waiting on you and Randy [Randolph Brown], but you never came by . . . You

18 know what I'm talking about then, right?" Larry Collins replied, "Oh ok, ok. Tomorrow

19 I'll call you." Based on my training and experience, and the intercepted call discussed

20 below, I believe that Eugene McGee and Larry Collins discussed a meeting that Larry

21 Collins missed that also involved Randolph Brown. Based on intercepted calls between

22 Larry Collins and Randolph Brown (TT24) and the search of Randolph Brown's

23 residence, which resulted in the seizure of several ounces of cocaine and firearms, I know

24 that Larry Collins and Randolph Brown are narcotics traffickers who supply each other

25 based on whomever found the best price and quality of narcotics. Accordingly, I believe

26 the meeting that Eugene McGee referred to during this call was narcotics related. I also

27 know that Eugene McGee was intercepted on previous wiretap investigations discussing

28 narcotics transactions and narcotics trafficking and was likely notified in writing of such

AFFIDAVIT OF SHAWNA MCCANN –- 132
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    interception afterwards; therefore, I believe Eugene McGee is cautious when talking over

2    the phone and avoids explicitly discussing, in detail, narcotics trafficking activities other

3    than referencing a meeting with two known narcotics traffickers—Larry Collins and

4    Randolph Brown.

5         222.   About two minutes after getting off the phone with Eugene McGee, on

6    September 28, 2020, at approximately 9:18 p.m., Larry Collins using TT16 called

7    Randolph Brown at TT24. (Session 809.) During this call, Larry Collins said, "I might

8    have a line tomorrow [able to get narcotics tomorrow] so uh, uh a line for sure tomorrow,

9    so uh . . ." and Randolph Brown interjected, "Something different [different type/batch of

10   narcotics than the previous deal]?" Larry Collins said, "Yup, but I'll come get your stash

11   [money] from you . . . I think it will be like 1350 or something [$1,350 per ounce of

12   cocaine]." Based on my training and experience, I believe that Larry Collins called

13   Randolph Brown to tell him that Larry Collins was expecting to get supplied with

14   narcotics tomorrow. I believe that the "line" Larry Collins referred to during this call was

15   a reference to getting supplied narcotics by Eugene McGee based on the earlier

16   intercepted call between Eugene McGee and Larry Collins in which the parties discussed

17   talking the next day.

18        223.   On September 29, 2020, at approximately 1:43 p.m., Larry Collins using

19   TT16 called Eugene McGee at TT23. (Session 835.) During this call, Eugene McGee

20   asked, "Did you get my text?" Larry Collins replied, "Ok, I'll stop by there." Based on

21   my training and experience, I believe that Eugene McGee sent Larry Collins a text

22   message, again, discreetly discussing narcotics trafficking activities and prompting Larry

23   Collins to meet with him. Investigators reviewed text messages on TT16 and did not

24   observe any text messages from Eugene McGee (TT23) to Larry Collins that day. I know

25   based on other intercepted calls that Larry Collins has another cell phone device and

26   based on my training and experience of drug traffickers, I know that Eugene McGee also

27   likely has other cell phone devices. I also know that sophisticated narcotics traffickers

28

AFFIDAVIT OF SHAWNA MCCANN -- 133
USAO #2019R01083

1  frequently use encrypted communication applications, like Signal and WhatsApp, to

2  discuss narcotics trafficking activities to avoid law enforcement detection.

3      224.   Immediately after getting off the phone with Eugene McGee, Larry Collins

4  using TT16 attempted to call Randolph Brown at TT24 with no answer. (Session 836.)

5  On September 29, 2020, at approximately 2:27 p.m., Larry Collins (TT16) told Eugene

6  McGee (TT23) during an intercepted call that he was about to come out to meet Eugene

7  McGee. (Session 839.) About an hour later, Larry Collins using TT16 called Randolph

8  Brown at TT24. (Session 842.) During this call, Larry Collins said, "it will be the twelve-

9  feezy [$12,500] man . . . . That's what he, that's what I, that's what I grabbed for you . . .

10  A neen [nine ounces of cocaine]." Randolph Brown replied, "Na, I ain't got, I don't got

11  that much [money]. I don't want that much though. I was only trying to get the . . . Yeah.

12  I ain't even got that much [money]. I still got most . . . All of, some of that, most of that

13  other shit [cocaine]. I thought we was going to do the half thing [half of nine ounces]."

14  Larry Collins said, "Naw, he [supplier] wasn't trying to do it like that. I have to call him

15  and tell him. See what he says." Immediately after getting off the phone with Randolph

16  Brown, Larry Collins using TT16 called Eugene McGee at TT23 with no answer.

17  (Session 843.) Based on my training and experience and the intercepted communications,

18  I believe that Larry Collins met with Eugene McGee and picked up at least nine ounces

19  of cocaine[69] for himself and Randolph Brown, and that in the above-referenced call

20  between Larry Collins and Randolph Brown, Larry Collins told Randolph Brown that he

21  had grabbed nine ounces of cocaine for Randolph Brown and the price was $12,500.

22  Randolph Brown told Larry Collins that he did not have enough money to cover the full

23  nine ounces of cocaine for $12,500 and that Randolph Brown was only expecting to get

24  half of the nine ounces of cocaine. Larry Collins then told Randolph Brown that he would

25  call his supplier and see if the supplier agreed to only sell half of the nine ounces of

26

27  _____

28  [69] Based on my training and experience, including experience with intercepted calls in this investigation and in a
prior, related investigation, I know that "nina" refers to nine ounces (a quarter-kilogram) of cocaine; "neen" appears
to be a shortened version of "nina."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

cocaine; immediately after getting off the phone with Randolph Brown, Larry Collins called Eugene McGee at TT23, indicating that Larry Collins's source of supply for the nine ounces of cocaine was Eugene McGee.

225.    On September 30, 2020, about 20 minutes after the interdiction stop on Jonathan Harrington as he was leaving Larry Collins's residence after purchasing cocaine from Larry Collins (as discussed above), agents, via remote video surveillance, observed Eugene McGee arrive at Larry Collins's residence driving **Subject Vehicle 31**. Previously, at approximately 3:24 p.m., investigators intercepted a call (Session 920) on TT16 between Larry Collins and Eugene McGee (TT23). During that call, Larry Collins told Eugene McGee that he was home, and Eugene McGee agreed to come by later. At approximately 4:20 p.m., investigators observed Larry Collins walk to Eugene McGee, who was seated in **Subject Vehicle 31**. Investigators could see that Larry Collins was holding his phone away from his face, indicating that he was on speakerphone. At that time, investigators were intercepting a phone call between Larry Collins using TT16 and Jonathan Harrington, who had just been released by law enforcement from the interdiction stop and who called Larry Collins to discuss the stop. (Session 924.) Larry Collins got into the front passenger seat of **Subject Vehicle 31** while still talking with Jonathan Harrington. On the intercepted call between Larry Collins (TT16) and Jonathan Harrington, agents believed they heard Eugene McGee finishing another call in the background as Larry Collins got into the truck. Larry Collins continued the conversation with Jonathan Harrington for approximately four more minutes while in the truck with Eugene McGee. It appeared Larry Collins kept the phone on speaker so that Eugene McGee could hear the conversation. At approximately 4:48 p.m., investigators observed, via remote video surveillance, Larry Collins get out of **Subject Vehicle 31** and go back inside his house; Eugene McGee drove off.

226.    On February 16, 2021, at approximately 5:13 p.m., agents intercepted a call between Eugene McGee using TT23 and an unknown male using phone number (916) 402-7778 (referred to as UM7778). (Session 1502.) During this call, Eugene McGee said

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that he was "in his white truck, a 1500 Dodge Ram (**Subject Vehicle 31**)." UM7778 asked, "say I need a hard money, what I need to do with that . . . say I want to grab like five little spots [properties] at the same time, but they over in the Louv, one in Texas . . . and Kansas City." Eugene McGee said, "you got to find a hard money launderer that does them out of different states" and that "some do them in just Washington, some do them in 30 states, some do them all over, just depends on who you're fucking with." Based on my training and experience, I believe that UM7778 asked Eugene McGee for advice on how to launder hard cash to clean the money through buying properties with dirty money and then flipping and selling the properties thereby getting clean money from the sale of the property. In particular, I know from other intercepted communications, that Eugene McGee owns and flips (i.e., resells) several different properties in different states.

227.   For example, on February 19, 2021, at approximately 8:19 a.m., agents intercepted a call between Eugene McGee using TT23 and an unknown male using phone number (206) 604-0742 (referred to as UM0742). (Session 2142.) During this call, UM0742 discussed telling a male named Carlos to "stay away from that game [drug dealing]" because "that game [drug dealing] is nothing but a dead end . . . that shit is washed up and it's changed. All N* doing is telling [talking to police], and it's washed up. The technology they [police] have now, man, it's a no win." Eugene McGee said, "it's easy money [drug money] and a lot of cats [drug dealers] are addicted to it . . . you sitting on 200 grand [$200,000] you're in the game, you can start your life off [with the drug proceeds] and do good." UM0742 then talked about a "cat [drug dealer]" from Tacoma who came to him ten years ago and said "I've been in this game [drug dealing] for a long time and I've got $1.3 million [drug money] and I don't want to be in this game no more" and how UM0742 said he could not just "take the $1.3 million" from the male because that would be "money laundering." UM0742 said instead he found the male an apartment building in downtown Tacoma to buy for $1.1 million with the money, the male bought the apartment building and converted the top floors into a penthouse, and the male "got out of the game," opened up an LLC, and UM0742 showed him how "to

1   manage them and do it"; six months later "them people [police] came in and swooped up
2   [arrested] his whole crew, but not him," and now the male is living in the penthouse of
3   that apartment building and living off the rental income. Based on my training and
4   experience, I believe that Eugene McGee and UM0742 are discussing how to launder
5   illegal drug proceeds through buying properties and then renting or selling the properties
6   thereby getting cleaned money from the rental or sale. Based on Eugene McGee's
7   practice of owning and flipping real estate, I know that Eugene McGee understands how
8   to launder money through this method.

9        228.   On February 15, 2021, at approximately 12:44 p.m., Eugene McGee using
10  TT23 had a call with an unknown male using phone number (206) 856-2101 (referred to
11  as UM2101). (Session 1226.) Eugene McGee discussed how a plumber was asking him
12  how he got into the real estate business and the plumber asked "did you have the money
13  before you went on 'vacation' or after. And then it dawned on me what he mean by
14  vacation. 'Did you have the money before you went to prison or after?" Eugene McGee
15  said that "he [the plumber] got it [the information about McGee being in prison] from
16  Jim…and Jim always asks me that all the time [where McGee got his money to invest in
17  real estate]." Based on my training and experience, I believe that Eugene McGee told
18  UM2101 was questioning where Eugene McGee got the money that McGee was using to
19  buy and flip real estate properties and was questioning whether the money came from
20  illicit drug proceeds before Eugene McGee was arrested and incarcerated.

21       229.   On February 16, 2021, at approximately 11:22 a.m., Eugene McGee using
22  TT23 had a call with an unknown male using phone number (985) 969-6262 (referred to
23  as UM6262). (Session 1386.) During this call, Eugene McGee discussed his current real
24  estate flipping project. Eugene McGee discussed how he bought the house for "5
25  something [$500,000]" and put "under $200,000 in it" fixing up the house and how
26  Eugene McGee plans to sell the house for "about $1.2, $1.25…or $1.3 million." Later in
27  the call, Eugene McGee discussed how he got "to take them little coins I got now [from
28  drug trafficking] and just try to invest it the right way and keep me going. So I was like

fuck it, if I get me a few properties and they do good or whatever, I don't get nothing else, shoot that will take me out until I go." Based on my training and experience, I believe that Eugene McGee described how he purchased a house for around $500,000, put about $200,000 of improvements into the house, and intends to sell the house for between $1.2 million and $1.3 million. Agents obtained reported earnings/wages for Eugene McGee from Washington State Employment Security Department, which showed that Eugene McGee had no reported wages from January 1, 2009, to December 31, 2020, and earned a total of $4,311.82 in 2008 from a business called West Courier Express. Accordingly, I believe this is an example of Eugene McGee discussing buying and flipping real estate as a means of using illicit money from drug trafficking to buy the property at $500,000, putting $200,000 of illicit money from drug trafficking into home improvements, and then selling the property at $1.2 -$1.3 million thereby receiving the net profit from the house sale in clean money.

230.    On February 18, 2021, at approximately 8:30 a.m., agents intercepted a call between Eugene McGee using TT23 and an unidentified male using phone number (213) 952-0897 (referred to as UM0897). During this call, the parties engaged in social talk about work and people they knew who went to jail. At one point during the call, UM0897 said to Eugene McGee, "a lot of people don't know, you know, your history on what you've done before you was selling drugs and went to prison, or whatever the fuck. You know before all the drug shit came up . . . ." It was unclear from the conversation and context whether UM0897 was referring to Eugene McGee or speaking in general terms.

231.    On physical surveillance during the wire and electronic intercepts of TT23 from February 8, 2021, through March 9, 2021, agents frequently observed Eugene McGee coming and going from **Subject Premises 32** driving **Subject Vehicle 31**, including seeing **Subject Vehicle 31** parked at **Subject Premises 32** overnights, and GPS location data for TT23 placing McGee at **Subject Premises 32** overnights through March 8, 2021, indicating that Eugene McGee still resides at **Subject Premises 32** and uses **Subject Vehicle 31**. For example, on February 25, 2021, agents observed **Subject**

AFFIDAVIT OF SHAWNA MCCANN -– 138
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Vehicle 31** pulling into the driveway of **Subject Premises 32**. On March 3, 2021, Eugene McGee using TT23 called Larry Collins at TT16 and told Larry Collins that he was "outside." (Session 5224.) Agents observed, via remote video surveillance, **Subject Vehicle 31** parked in front of Larry Collins's residence with only a male driver occupant, believed to be Eugene McGee based on the phone call, investigators' prior observations of Eugene McGee driving **Subject Vehicle 31**, and the fact that **Subject Vehicle 31** is registered to Eugene McGee. Larry Collins exited his residence (**Subject Premises 30**) and talked to Eugene McGee while standing on the sidewalk in front of his residence and leaning on the front passenger window of **Subject Vehicle 31**. Accordingly, I believe Eugene McGee still is using **Subject Vehicle 31** to meet with other Michael Walker DTO members.

232.    Accordingly, agents believe that Eugene McGee is a source of supply of cocaine to Larry Collins and Randolph Brown, among others, and also has engaged in money laundering. I know based on my training and experience, that drug traffickers frequently keep their narcotics, narcotics proceeds, and documents and other evidence of money laundering in their residences, vehicles, and stash locations in order to protect their supply, money, and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, I believe that Eugene McGee is a multi-kilogram cocaine trafficker who likely keeps his narcotics supply, narcotics proceeds, and evidence of money laundering in **Subject Premises 32** and **Subject Vehicle 31**.

### Q.    Jermaine Brooks's Residence

233.    During this investigation, based on physical surveillance, law enforcement database checks, and intercepted communications, agents identified Jermaine Brooks's residence as 3034 South Holden Street, Seattle, Washington (**Subject Premises 48**).

AFFIDAVIT OF SHAWNA MCCANN -- 139
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Agents obtained GPS location data on Jermaine Brooks's cell phone, TT37, which

2   showed that Jermaine Brooks frequented **Subject Premises 48** from around September

3   30, 2020, to November 6, 2020, and from March 1, 2021, to the present, including

4   staying overnight and making brief trips to and from that location. A check of the

5   CLEAR database on March 14, 2021, showed that **Subject Premises 48** was associated

6   with Jermaine Brooks as recently as May 2020. A Kent Police Department incident report

7   from May 18, 2017, showed that TT37 was the contact for Jermaine Brooks who reported

8   he was the victim of credit card fraud. Agents intercepted a communication regarding

9   Jermaine Brooks discussing supplying David Kelley using TT19 (identification discussed

10  above) with cocaine. This intercepted call and agents' observations are noted below for

11  purposes of establishing probable cause to search **Subject Premises 48**.

12       234.   Jermaine Brooks has a prior federal felony conviction for bank fraud.

13       235.   On September 16, 2020, at approximately 3:31 p.m., Jermaine Brooks

14  using phone number (206) 898-7122 (TT37) called David Kelley at TT19. (Session 821.)

15  During this call the following discussion took place:

16       TT37: Calling to check up on you man. See how things was going.

17       TT19: Man shit. Yeah.

18       TT37: [unintelligible]

19       TT19: Waiting on [cocaine supply], you know.

20       TT37: He [supplier] said, you know I was just on the phone with him [supplier].

21            He [supplier] said that everything, everything [cocaine] that I've been asking for

22            should be here within this month. He [supplier] told me he got uh, he told me he

23            got 5 [kilograms of cocaine] for me.

24       TT19: Ok.

25       TT37: It's a start. You heard [unintelligible]

26       TT19: Uh not really. But shoot. But then the [unintelligible] has been slow [drug

27            trafficking has slowed down recently].

28

AFFIDAVIT OF SHAWNA MCCANN -- 140
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  TT37: Yeah, yeah. He [supplier] said, he said. I know from this one Kuddi, he
2  paid 58 [$58,000 per kilogram of cocaine].

3  TT19: Woah.

4  TT37: I said, I said, I said the same thing. I said God damn! And he [supplier]
5  didn't give me no true number [real price per kilogram of cocaine] until they touch
6  down [arrive in Seattle]. That's the crazy part.

7  TT19: Yeah.

8  TT37: You know so, I'm just waiting on him [supplier]. The last time I talked to
9  him [supplier] was like two months ago. And he had said he would be at me for
10 the 48 [$48,000 per kilogram of cocaine].

11 TT19: Yeah.

12 TT37: But none of that never came through. Now [unintelligible] he said
13 [unintelligible] for definite, he said for definite, you know, everything [cocaine]
14 should be in town this month. Before this month is up. And your boy [customer]
15 keep, he [customer] keep bugging me knowing he owe me all the money in the
16 world [drug debt]. But he keep bugging me talking about, man, he trying to get on
17 [get supplier with cocaine].

18 TT19: Mmmm.

19 TT37: But man. You know who I'm talking about right.

20 TT19: Yeah

21 TT37: Your tenant

22 TT19: Right.

23 TT37: I'm like no, I won't be able to do that. I ain't really responded. But I won't
24 be able to do that.

25 TT19: Yeah.

26 TT37: So yeah man, just uh, just uh stay fast. It's [cocaine] coming pimp.

27 TT19: Ok yep.

28 TT37: It's definitely coming.

AFFIDAVIT OF SHAWNA MCCANN -- 141
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

TT19: Alright, yep.

TT37: Alright so I'll be with you [call you soon]. Try to keep your ear close to the street, man.

TT19: Man I be . . .

TT37: As far as, I mean, as far as the, I'm not talking about, you know, someone coming to you. I don't need neither one of us to step out of our comfort zone, but just in terms of numbers [current pricing for negotiating this five-kilogram deal due to fluctuating cocaine prices], as far as numbers go.

TT19: Right, yeah. I [unintelligible]

TT37: Right, right. Just keep your ear close to the ground so when it [cocaine] do come through [to Seattle]. I know what to, I know what [price/quantity] to shoot him [supplier] with, so.

TT19: Yeah, right.

TT37: That's all I'm saying, you know what I mean. So, so when I call you, man, I'm going to be needing your help on that.

TT19: Right yep.

TT37: Alright.

236.    Based on my training and experience, I believe that Jermaine Brooks is a cocaine trafficker who had a supplier that he planned to purchase at least five kilograms of cocaine from and that Jermaine Brooks reached out to David Kelley to get Kelley's assistance with negotiating and completing this cocaine transaction. Jermaine Brooks demonstrated in this call that he had knowledge of the drug trafficking market and pricing at the time of the call, was in contact with a supplier who could sell kilogram amounts of cocaine, and had customers/re-distributors calling him who owed him money, likely from prior drug transactions. Additionally, I know based on my training and experience that obtaining a relationship with a multi-kilogram supplier takes years of being in the drug trafficking world and developing trusted connections and relationships with suppliers and

AFFIDAVIT OF SHAWNA MCCANN -- 142
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   other drug traffickers, such that Jermaine Brooks has likely been a long-term drug

2   trafficker to have a multi-kilogram source of supply of cocaine contact.

3       237.    In September 2020, agents obtained a search warrant for GPS location data

4   on TT37. On September 23, 2020, at approximately 3:03 p.m., GPS location data for

5   TT37 put the device within the city limits of Yakima, Washington. Earlier that day, GPS

6   location data for TT37 had put the device in North Bend, Washington, indicating that

7   Jermaine Brooks was traveling to Yakima from Western Washington. Investigators

8   suspected Jermaine Brooks was traveling to Yakima for the purpose of getting supplied

9   with narcotics to bring back to the Seattle area. Investigators continued to monitor the

10  GPS location data for TT37. At approximately 4:20 p.m., GPS location data for TT37 put

11  the device within range of Interstate 90 and Cle Elum, indicating that Jermaine Brooks

12  had departed Yakima and was traveling westbound towards the Seattle area. Surveillance

13  personnel staged along Interstate 90 from Bellevue towards Snoqualmie Pass to try and

14  locate TT37. Investigators attempted to locate TT37 as it traveled westbound along

15  Interstate 90 but were not successful due to the large GPS ping radii. Based on my

16  training and experience, I know that a major drug trafficking route runs from Mexico,

17  through California, and into Yakima/Eastern Washington and that from Eastern

18  Washington, narcotics are then distributed across Washington state. Accordingly, based

19  on the intercepted call between David Kelley and Jermaine Brooks in which Jermaine

20  Brooks indicated that he had a supplier that had five kilograms of cocaine for Jermaine

21  Brooks, I believe this trip to Yakima, Washington likely was to pick up the cocaine and

22  bring the cocaine to the Seattle area.

23      238.    On September 25, 2020, at approximately 5:08 p.m., GPS location data for

24  TT37 put the device within range of **Subject Premises 48**. Agents arrived at **Subject**

25  **Premises 48** and observed three vehicles parked in front of the residence: a white 2014

26  Audi A4 bearing Washington state license plate number BKU2019 registered to Deborah

27  V. Fletcher at 26344 220th Place Southeast, Maple Valley, Washington; a 1997 Honda

28  Accord bearing Washington state license plate number AFJ8273 registered to Victoria D.

AFFIDAVIT OF SHAWNA MCCANN –- 143
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Fletcher at 26344 220th Place Southeast, Maple Valley, Washington; and a black 2020

2   Ford F150 bearing Washington state license plate number C16484U registered to

3   Enterprise Rental. At approximately 7:39 p.m., agents observed at least one person come

4   out of **Subject Premises 48** and get into the Audi, but it was too dark to identify the

5   individual. At approximately 8:05 p.m., the Audi pulled out of the driveway and left

6   eastbound. Surveillance personnel followed the Audi and observed at least two occupants

7   in the vehicle but, again, it was too dark to identify the occupants. The Audi continued

8   eastbound to Martin Luther King Jr Way South and then went southbound. At

9   approximately 8:11 p.m., GPS location data for TT37 showed that the device had moved

10  southward and was within range of the Audi. The Audi eventually got onto southbound

11  Interstate 5, where it stayed until it reached Interstate 405. The Audi then went eastbound

12  on Interstate 405, continuing until it got off at Exit 4 and entered onto Highway 169

13  towards Maple Valley. GPS location data for TT37 showed that the device continued to

14  be within range as the Audi traveled eastbound. The address on Jermaine Brooks's

15  driver's license was listed at 26344 220th Place Southeast, Maple Valley, Washington. At

16  approximately 8:36 p.m., the Audi was within a few blocks of Jermaine Brook's listed

17  address. Surveillance personnel did not follow the Audi into the residential

18  neighborhood. At approximately 8:43 p.m., agents drove by 26344 220th Place

19  Southeast, Maple Valley, Washington. The Audi was parked and unoccupied in front of

20  the residence. At approximately 9:02 p.m., agents observed the Audi pull back out of the

21  neighborhood. The Audi retraced the same path it took earlier, but in reverse back

22  towards Seattle. Agents were able to momentarily see inside the vehicle. A female was in

23  the front passenger seat and a male with large framed glasses, resembling the driver's

24  license photograph of Jermaine Brooks, was driving, but agents could not positively

25  identify him due to the dark conditions at that time of night. GPS location for TT37

26  showed the device was within range of the Audi as it traveled back towards **Subject**

27  **Premises 48**.

28

AFFIDAVIT OF SHAWNA MCCANN -- 144
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

239.    In February 2021, agents obtained a search warrant for renewed GPS location data on TT37. On March 4, 2021, at approximately 5:30 a.m., agents conducted physical surveillance at **Subject Premises 48**. GPS location data for TT37 placed Jermaine Brooks there overnight, indicating that Jermaine Brooks was still residing at **Subject Premises 48**. Agents observed the same white 2014 Audi A4 bearing Washington license plate BKU2019, the same black 1997 Honda Accord bearing Washington license plate AFJ8273 registered to Victoria Deborah Fletcher, and a 2020 white Nissan Murano bearing Washington license plate BWF9145 registered to Enterprise Rental parked at **Subject Premises 48**. Information provided by Enterprise Rental showed that this Nissan Murano was rented by Jermaine Brooks using address "3034 SW Holden Street" (**Subject Premises 48**), and phone number TT37.

240.    On March 4, 2021, at approximately 3:22 p.m., agents observed the Nissan Murano depart **Subject Premises 48** with a sole male driver wearing glasses. Agents followed this Nissan Murano and identified the driver as Jermaine Brooks based on a comparison to his driver's license photograph and a social media photograph posted on the Facebook account of "Deborah Fletcher," which has several photographs of the user Deborah Fletcher and Jermaine Brooks, wearing glasses, that indicate the two are in a dating relationship. At approximately 3:31 p.m., GPS location data for TT37 showed that the device was travelling with Jermaine Brooks towards downtown Seattle. At approximately, 3:38 p.m., agents observed Jermaine Brooks abruptly pull over on the side the road at Columbia Street and 5th Avenue in downtown Seattle. Agents observed an unknown heavy-set white female walk up to the passenger side window of the Nissan Murano and meet with Jermaine Brooks for about one minute; during this time agents were unable to see whether Jermaine Brooks or the female exchanged any items. The female then walked away from the Nissan Murano, and Jermaine Brooks drove off at approximately 3:39 p.m. Based on my training and experience, I believe this brief interaction between Jermaine Brooks and the unknown female was indicative of a drug transaction because of the short duration of the interaction, the manner of the interaction

AFFIDAVIT OF SHAWNA MCCANN –- 145
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of pulling over abruptly with no other legitimate reason and talking outside the vehicle window, and the location of downtown Seattle. After Jermaine Brooks stopped at a Safeway grocery store and another store near **Subject Premises 48**, agents observed Jermaine Brooks return to **Subject Premises 48** and park the Nissan Murano in the driveway at approximately 4:28 p.m.

241.    I know based on my training and experience, that drug traffickers frequently keep their narcotics, narcotics proceeds, and firearms in their residences, vehicles, and stash locations in order to protect their supply and to have the narcotics on hand for transactions. I also know that drug traffickers maintain records and other trafficking-related materials in their premises, including residences, for a long period of time, including current and prior cell phone devices that contain text messages and contact lists of drug trafficking associates and pay-owe sheets. Based on the above-referenced intercepted communications, there is probable cause to believe that Jermaine Brooks is a cocaine source of supply to David Kelley and that Jermaine Brooks keeps his narcotics supply and proceeds in **Subject Premises 48**.

## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

242.    Based upon my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

      a.    Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed (pay-owe sheets), telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, vehicles, storage lockers, and businesses.

      b.    Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization. Traffickers

commonly maintain this information in books or papers as well as in their cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

c.      Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences, vehicles, and storage lockers. This evidence often includes not only contraband and paraphernalia, but also financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes. Drug traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product. These individuals often maintain these photographs and recordings in their possession or at their premises.

d.      During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings which show ownership, dominion, and control of vehicles, residences, and/or storage units.

e.      Persons trafficking and using controlled substances commonly sell or use more than one type of controlled substance at any one time.

f.      Traffickers frequently maintain items necessary for weighing, packaging, and cutting drugs for distribution. This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

g.      It is common for drug dealers to also be users of their product, and that it is common for the drug user to maintain paraphernalia associated with the use of controlled substances.

h.      Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of

controlled substances, including travel records, in locations convenient to them, such as their residences and vehicles.

i.      Traffickers frequently keep on hand amounts of United States currency in order to maintain and finance their ongoing narcotics business. They commonly deal in currency because of its untraceable nature. They sometimes convert their illicit currency into currency equivalents such as cashier's checks and money orders. Traffickers often conceal in secure locations such as their residences and vehicles currency, financial instruments, precious metals, jewelry, and other items of value which are the proceeds of drug transactions, and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities, and financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, and other records showing the management of such assets. Traffickers often have money counters.

j.      Traffickers often maintain weapons, including guns, ammunition, and body armor, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k.      Traffickers often have false identification documents and identification documents in the names of others in order to conceal their identities.

l.      Traffickers very often place assets in names other than their own, or use fictitious names and identification, to avoid detection of these assets by government agencies, and that even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

m.      Illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate

AFFIDAVIT OF SHAWNA MCCANN -- 148
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

commodity would purchase stock for sale and, similarly, such drug traffickers will have an "inventory" which will fluctuate in size depending upon various factors to include the demand and supply for the product. I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

243.    As noted above, drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

a.    The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the

AFFIDAVIT OF SHAWNA MCCANN –- 149
USAO #2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source or was intercepted on a wiretap here or in another district.

b. The stored list of recent received calls and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors, and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c. Stored text messages, emails, and any social media content/messages (like Facebook messenger) are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d. Photographs and video recordings on a cellular telephone, including metadata, are evidence because they help identify the user, either through his or her own picture/video, or through pictures/videos of friends, family, and associates that can identify the user and the locations the user has been. Pictures/videos also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph/video groups of associates, sometimes posing with

weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

e.   Stored web browsing history is important evidence because it shows the user's activities and places of interest, including if the user looked up addresses, restaurants, and other businesses on a web browser on the cell phone, which can show where coconspirators meet, where they travel, and where assets might be located. Moreover, through web browsing history, a user can also access or look up associates or coconspirators on social media, which is valuable information in a drug investigation because it will identify members of the organization, such as suppliers, distributors and customers.f.   Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

g.   Stored data in money transfer applications, such as Venmo and CashApp, are important evidence because they show from whom and to whom the user is sending money. In the era of digital currency and online money transfers, I know based on my training and experience, and intercepted communications during this investigation that drug traffickers, and specifically drug traffickers within the Michael Walker DTO, use Cash App and other money transfer applications to pay for drug products in lieu of physical cash. Accordingly, any stored data on money transfer applications on cell phones can show the user's drug trafficking associates, customers, and other connections.

h.   Stored location data, including from any map applications on the cell phone, are important evidence because the data can show where the user has been,

1   including addresses of residences and business parking lots, which can show stash

2   house locations, drug transaction meeting locations, or the addresses of a drug

3   trafficker's associates, customers, or suppliers.

## JUSTIFICATION FOR NIGHTTIME SERVICE

5   244.   During the course of this investigation, investigators have seized

approximately 33 firearms during probable cause stops and searches of or the execution

of search warrants on individuals who are the focus of this investigation. Additionally,

during the course of this investigation, subjects of this investigation or those associated

with them have or are suspected to be involved in incidents of shootings, robbery, and

burglary with the use of firearms, and other crimes of violence. Currently, daybreak is

occurring around 6:00 a.m. Investigators intend to serve all of these warrants at 5:00 a.m.,

increasing the likelihood subjects are asleep as those serving the search warrants

approach the residences, decreasing the likelihood of subjects arming themselves,

destroying evidence, or alerting their co-conspirators prior to investigators knocking and

announcing.

## CONCLUSION

17   245.   Based on the above-described information, there is probable cause to

believe that contained within the locations and vehicles, described in Attachments A and

A1 through A50, there exists evidence, fruits, and instrumentalities, as described in

Attachment B, of violations of 21 U.S.C. §§ 841 and 846 (distribution of, and possession

with intent to distribute, controlled substances, and conspiracy to do the same), 21 U.S.C.

§ 843(b) (use of communication facilities to commit, facilitate, or further an act or acts

which constitute a felony), and 18 U.S.C. §§ 1956 and 1957 (money laundering and

conspiracy to do the same), committed by Michael Walker aka BD Miguel aka BG

Miguel aka Binkey, Cesar Clemente, Stevie Allen aka Tiger, Gregory Mason aka Saucy

aka Sauce, Aaron Wood, James Lowe aka Supopo aka Jaguar James, Douglas Wrenn,

Kevin Gipson aka KG aka General, Jimmy Carter aka J-Bone, Kenneth Lee, Kefentse

Olabisi aka KO aka Lil Man aka Kefentse Lumumba-Olabisi, Edward Coleman,

1  Mohammad Safaiezeab aka Brian, Larry Collins aka L-Candy aka L, Jonathan

2  Harrington, and Eugene McGee aka Jericho.

3

4

5

6  Shawna McCann, Affiant
   Special Agent, FBI

7

8       The above-named agent provided a sworn statement to the truth of the foregoing

9  affidavit by telephone on the 31st day of March, 2021.

10

11

12

13

14

15  THE HONORABLE MARY ALICE THEILER
    United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SHAWNA MCCANN -- 153
USAO #2019R01083

**ATTACHMENT A**

**Locations and Vehicles to Be Searched**

This warrant authorizes the government to search the following locations and vehicles for evidence, instrumentalities, and/or fruits of the commission of the following crimes, as further described in Attachment B hereto: distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, and conspiracy to commit the same; use of a communications facility to commit, facilitate, or further acts which constitute a felony drug offense in violation of Title 21, United States Code, Section 843(b); interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of Title 18, United States Code, Section 1952, in violation of Title 21, United States Code, Section 952; possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and prohibited person in possession of a firearm, in violation of Title 18, United States Code, Section 922(g).

With respect to the locations to be searched, where that location is an apartment or multi-family residence, or a business, storage locker, or other unit within a larger multi-unit structure, the search is to include all rooms within the specific residence, business, storage locker, or other unit, and any assigned garages or storage rooms, attached or detached, and any vehicles found within an assigned garage or in any assigned parking space, whether or not particularly named among the vehicles for which specific search authorization is sought.

With respect to the locations to be searched, where that location is a single-family residence, the search is to include all rooms within the residence, and all garages, storage rooms, outbuildings, and other structures, attached or detached, and any vehicles found

1  within the curtilage of the residence, whether or not particularly named among the

2  vehicles for which specific search authorization is sought.

3         With respect to the locations and vehicles to be searched, the search is to include

4  all containers, locked or unlocked, where the items in Attachment B could be found.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A - 2
USAO No. 2019R01083

**ATTACHMENT A1**

**Locations and Vehicles to Be Searched**

18008 114th Avenue Southeast, Renton, Washington (Subject Premises 13), a single-family, two-story residence of Michael Walker with tan and white trim exterior surrounded by wooden and metal gate, as depicted below.



ATTACHMENT A1 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A2**

**Locations and Vehicles to Be Searched**

A 2006 gold Honda Accord bearing Washington license plate BKY5357 (Subject Vehicle 15), registered to Tiarra L. Hodges at 18008 114th Avenue Southeast, Renton, Washington.

ATTACHMENT A2 - 1
USAO No. 2019R01083

1

**ATTACHMENT A3**

2

**Locations and Vehicles to Be Searched**

3

4        A white 2012 Isuzu NPR construction truck bearing Washington license plate

5   C35313N (Subject Vehicle 16), registered to Walker Construction Preservation at 18008

6   114th Avenue Southeast, Renton, Washington.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A4**

2

**Locations and Vehicles to Be Searched**

3

4      12120 SE 186th Street, Renton, Washington (Subject Premises 14), a single-

5  family, two-story residence of Cesar Clemente III with gray exterior, as depicted below.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A5**

**Locations and Vehicles to Be Searched**

A black 2003 BMW X5 bearing Washington license plate BRU7044 (Subject Vehicle 19), registered to Cesar Y. Clemente at 2103 E Republican Street, Seattle, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A6**

**Locations and Vehicles to Be Searched**

A 2014 Audi Q7 bearing Washington license plate BUB0667 (Subject Vehicle 48), registered to Cesar Y. Clemente III at 304 N Wycoft Avenue, Unit 2, Bremerton, Washington.

ATTACHMENT A6 - 1
USAO No. 2019R01083

**ATTACHMENT A7**

**Locations and Vehicles to Be Searched**

3922 S Sullivan Street, Seattle, Washington (Subject Premises 15), a single-family, two-story residence of Stevie Allen with blue exterior, as depicted below.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A8**

**Locations and Vehicles to Be Searched**

4727 Beacon Avenue S, Apt. 2, Seattle, Washington (Subject Premises 16), apartment unit residence of Gregory Mason and drug stash house of Stevie Allen on the first floor, second unit/door in from Beacon Ave S, of a two-story, multi-unit apartment complex named the Valmark Apartments with red brick and tan exterior, as depicted below.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A9**

2

**Locations and Vehicles to Be Searched**

3

4
    A silver 2007 Audi Q7 bearing Washington license plate BQV2133 (Subject

5
Vehicle 20), registered to Stevie T. Allen at 3922 S Sullivan Street, Seattle, Washington.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A9 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A10**

**Locations and Vehicles to Be Searched**

A black 2000 Range Rover bearing Washington license plate BHY1298 (Subject Vehicle 21), registered to Gregory Mason at 13016 14th Avenue S, Burien, Washington.

ATTACHMENT A10 - 1
USAO No. 2019R01083

**ATTACHMENT A11**

**Locations and Vehicles to Be Searched**

2405 E Helen Street, Apt. C, Seattle, Washington (Subject Premises 17), apartment unit residence of Aaron Wood with the marker "C" on the front door, of a three-story, multi-unit apartment complex with tan exterior, as depicted below.

 

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A12**

2

**Locations and Vehicles to Be Searched**

3

4      A 2015 Subaru Forester bearing Washington state license plate number AQR4300

5  (Subject Vehicle 22), registered to Aaron S. Wood at 410 E Denny Way, Seattle,

6  Washington.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A12 - 1
USAO No. 2019R01083

**ATTACHMENT A13**

**Locations and Vehicles to Be Searched**

11463 Rainier Avenue S, Suite B, Seattle, Washington (Subject Premises 51), business of Aaron Wood, located on the second floor of a multi-business commercial building with a brick and tan siding exterior with green trim, as depicted below.



ATTACHMENT A13 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A14**

**Locations and Vehicles to Be Searched**

412 E Novak Lane, Apt. H102, Kent, Washington (Subject Premises 18), apartment unit residence of James Lowe on the first floor of a multi-story, multi-unit apartment complex named the Alderbrook Apartments with beige and white trim exterior, as depicted below. Building H is marked with a marker "H" on the building and apartment 102 within the H building is marked with "102" on the front door.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A15**

**Locations and Vehicles to Be Searched**

11718 64th Lane S, Seattle, Washington (Subject Premises 19), a single-family, two-story, secondary residence of James Lowe with light gray and white trim exterior, as depicted below.

 

ATTACHMENT A15 - 1
USAO No. 2019R01083

**ATTACHMENT A16**

**Locations and Vehicles to Be Searched**

A 2010 Chevy Camaro bearing Washington state license plate number BUE5594 (Subject Vehicle 46), registered to James D. Lowe and Tammi M. June at 11718 64th Lane S, Seattle, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A17**

**Locations and Vehicles to Be Searched**

A white 2011 Jaguar XJL bearing Washington state license plate number BVZ2441 (Subject Vehicle 47), registered to James D. Lowe at 11718 64th Lane S, Seattle, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A18**

**Locations and Vehicles to Be Searched**

18411 36th Avenue W, Apt. B205, Lynnwood, Washington (Subject Premises 20), apartment unit residence of Douglas Wrenn on the second floor of a multi-story, multi-unit apartment complex named Alderbrooke Apartments with a green and tan exterior, as depicted below. Building B is marked with a "B" on the building and unit 205 is marked with a "205" on the front door.



ATTACHMENT A18 - 1
USAO No. 2019R01083

**ATTACHMENT A19**

**Locations and Vehicles to Be Searched**

A blue 2018 Hyundai Sonata bearing Washington state license plate number BWN7793 (Subject Vehicle 43), registered to Jaime A. Petrozzi at 4235 90th Way SE, Olympia, Washington.

ATTACHMENT A19 - 1
USAO No. 2019R01083

**ATTACHMENT A20**

**Locations and Vehicles to Be Searched**

4727 Beacon Avenue S, Apt. 9, Seattle, Washington (Subject Premises 21),
apartment unit residence of Kevin Gipson on the second floor, second unit/door in from
Beacon Ave S, of a two-story, multi-unit apartment complex named the Valmark
Apartments with red brick and tan exterior, as depicted below.



ATTACHMENT A20 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A21**

**Locations and Vehicles to Be Searched**

A red 2003 Ford Explorer bearing Washington state license plate number BGK5297 (Subject Vehicle 24), registered to Bee K. Gibson at 4727 Beacon Avenue S, Seattle, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A22**

**Locations and Vehicles to Be Searched**

19301 5th Avenue East, Spanaway, Washington (Subject Premises 23), a single-family, two-story, residence of Jimmy Carter with green and white trim exterior, as depicted below.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A23**

**Locations and Vehicles to Be Searched**

12805 Occidental Avenue South, Burien, Washington (Subject Premises 24), a single-family, two-story, stash house of Jimmy Carter with beige and white trim exterior, as depicted below.



ATTACHMENT A23 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A24**

**Locations and Vehicles to Be Searched**

12902 SE 312th Street, Apt. K207, Auburn, Washington (Subject Premises 33), apartment unit frequented by Jimmy Carter on the second floor in a four-story, multi-unit apartment complex named Promenade Apartments with tan and blue exterior, as depicted below. The apartment building has a marker with "K" on the front exterior, and the apartment unit door has a marker with "207" next to the door.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A25**

**Locations and Vehicles to Be Searched**

Glacier West Self Storage, 1407 Central Avenue South, Kent, Washington, Unit 176 (Subject Premises 25), a storage unit rented by Jimmy Carter.

ATTACHMENT A25 - 1
USAO No. 2019R01083

**ATTACHMENT A26**

**Locations and Vehicles to Be Searched**

A gray 2009 Chevrolet Silverado bearing Washington state license plate number C32244G (Subject Vehicle 25), registered to Jimmy J. Carter at 19301 5th Avenue East, Spanaway, Washington.

ATTACHMENT A26 - 1
USAO No. 2019R01083

**ATTACHMENT A27**

**Locations and Vehicles to Be Searched**

A 2013 Audi Q7 bearing Washington license plate BWK4351 (Subject Vehicle 49) registered to Byron Hunter and Jimmy J. Carter at 19301 5th Avenue East, Spanaway, Washington.

ATTACHMENT A27 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A28**

**Locations and Vehicles to Be Searched**

3584 Portland Avenue East, Tacoma, Washington (Subject Premises 26), a single-family residence of Kenneth Lee with beige, green, and white trim exterior and a detached structure on the property, as depicted below.



ATTACHMENT A28 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A29**

**Locations and Vehicles to Be Searched**

2542 55th Avenue NE, Tacoma, Washington (Subject Premises 27), a single-family, two-story residence of Kefentse Olabisi with white exterior, as depicted below.



ATTACHMENT A29 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A30**

2

**Locations and Vehicles to Be Searched**

3

4          A blue 2007 Chevrolet Impala bearing Washington license plate number BOJ4787

5    (Subject Vehicle 26), registered to Kefentse Lumumba-Olabisi at 2904 East Republican

6    Street, Seattle, Washington.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A30 - 1
USAO No. 2019R01083

**ATTACHMENT A31**

**Locations and Vehicles to Be Searched**

5008 East Q Street, Tacoma, Washington (Subject Premises 28), an apartment unit residence of Edward Coleman that is part of a multi-unit apartment building with beige exterior, a front door with the numbering "5008" above the door, and a small, exterior storage unit next to the back door, as depicted below.



ATTACHMENT A31 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A32**

**Locations and Vehicles to Be Searched**

14518 22nd Place West, Lynnwood, Washington (Subject Premises 29), a single-family, two-story residence of Mohammad Safaiezeab aka Brian with red and pink exterior, as depicted below.



ATTACHMENT A32 - 1
USAO No. 2019R01083

**ATTACHMENT A33**

**Locations and Vehicles to Be Searched**

A black 2003 Honda Accord coupe bearing Washington state license plate number AGS9353 (Subject Vehicle 27), registered to Mohammad Safaiezeab at 14518 22nd Place West, Lynnwood, Washington.

ATTACHMENT A33 - 1
USAO No. 2019R01083

**ATTACHMENT A34**

**Locations and Vehicles to Be Searched**

10409 56th Avenue South, Seattle, Washington (Subject Premises 30), a single-family residence of Larry Collins with blue and white trim exterior, as depicted below.

 

ATTACHMENT A34 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A35**

**Locations and Vehicles to Be Searched**

A black 2006 Kia Sedona bearing Washington license plate BPV7873 (Subject Vehicle 28), registered to Larry W. Collins at 10409 56th Avenue South, Seattle, Washington.

ATTACHMENT A35 - 1
USAO No. 2019R01083

1

**ATTACHMENT A36**

2

**Locations and Vehicles to Be Searched**

3

4
     A 2020 Acura MDX bearing Washington state license plate number BQW9453

5
(Subject Vehicle 29), registered to Marriah Collins at 10409 56th Avenue South, Seattle,

6
Washington.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A37**

**Locations and Vehicles to Be Searched**

212 24th Avenue, Seattle, Washington (Subject Premises 31), a single-family

residence of Jonathan Harrington with red and white trim exterior, as depicted below.



ATTACHMENT A37 - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A38**

2

**Locations and Vehicles to Be Searched**

3

4      A blue 2002 Buick Park Avenue bearing Washington license plate AAN7807

5  (Subject Vehicle 30), registered to Jonathan F. Harrington at 5717 33rd Avenue S,

6  Seattle, Washington.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A38 - 1
USAO No. 2019R01083

**ATTACHMENT A39**

**Locations and Vehicles to Be Searched**

29112 9th Place South, Federal Way, Washington (Subject Premises 32), a single-family, multi-story residence of Eugene McGee with a gray exterior, as depicted below.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A40**

**Locations and Vehicles to Be Searched**

A white 2012 Dodge 1500 bearing Washington license C42162U (Subject Vehicle 31), registered to EMC Enterprises LLC at 29112 9th Place South, Federal Way, Washington.

ATTACHMENT A40 - 1
USAO No. 2019R01083

**ATTACHMENT A41**

**Locations and Vehicles to Be Searched**

3034 South Holden Street, Seattle, Washington (Subject Premises 48), a single-family, two-story residence of Jermaine Brooks with a brown and white trim exterior, as depicted below.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A42**

**Person to Be Searched**

The person of Cesar Y. Clemente III, date of birth 12/03/1980.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A43**

**Person to Be Searched**

The person of Stevie T. Allen, date of birth 09/28/1975.

**ATTACHMENT A44**

**Person to Be Searched**

The person of Gregory D. Mason, date of birth 04/23/1969.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A45**

**Person to Be Searched**

The person of Aaron S. Wood, date of birth 07/31/1974.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A46**

**Person to Be Searched**


The person of James D. Lowe, date of birth 06/20/1973.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A47**

**Person to Be Searched**


The person of Douglas E. Wrenn-El, date of birth 01/21/1980.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A48**

**Person to Be Searched**


The person of Mohammad Safaiezeab, date of birth 09/18/1982.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A49**

**Person to Be Searched**

The person of Jermaine A. Brooks, date of birth 05/30/1973.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A50**

**Person to Be Searched**

The person of Michael L. Walker, date of birth 08/21/1978.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

## Items to Be Seized

From the locations and vehicles listed in Attachment A, and A1 through A50 of this warrant, the government is authorized to search for and seize the following items, which are evidence, instrumentalities, and/or fruits of the commission of the following crimes: distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, and conspiracy to commit the same; use of a communications facility to commit, facilitate, or further acts which constitute a felony drug offense in violation of Title 21, United States Code, Section 843(b); interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of Title 18, United States Code, Section 1952, in violation of Title 21, United States Code, Section 952; possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and prohibited person in possession of a firearm, in violation of Title 18, United States Code, Section 922(g), including the following:

1.      Any controlled substances and suspected controlled substances, including but not limited to cocaine, crack cocaine, and marijuana.

2.      Drug paraphernalia, meaning items used or intended to be used to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, chemicals or similar items used to test the purity and/or quality of controlled substances, and similar items.

3.      Drug transaction records, meaning documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances.

ATTACHMENT B - 1
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4.      Customer and supplier information, including items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

5.      Financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents/titles, financial instruments, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, business records, documents related to the purchase, sale, and improvement of real estate, and any other records that show income and expenditures, net worth, or relate to obtaining, transferring, secreting, laundering, or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances

6.      Cash, precious metals, jewelry, and other similar items of value, and/or proceeds of drug transactions, as well as money counters.

7.      Documents and other property, such as photographs, mail, or other items, tending to show who resides in and has dominion and control over the location.

8.      Firearms or parts thereof, ammunition, firearms magazines, firearms accessories, body armor, firearms boxes, firearms manuals, records of the purchase of firearms, or other items related to the ownership or use of firearms.

9.      Cell phones and other communications devices. If such cell phones or other communications devices are seized, the government may search them without further authorization for the following items:

a.      Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.      Stored list of recent received, sent, and missed calls;

c.      Stored contact information;

d.      Stored photographs, videos, addresses, calendar notes, notes, map history, or documents/files of or related to narcotics, currency, firearms or other

ATTACHMENT B - 2
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data or other metadata associated with those photographs, videos, and other items;

e.      Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services where the data is stored on the telephone;

f.      Stored emails related to the aforementioned crimes of investigation;

g.      Stored voicemails related to the aforementioned crimes of investigation;

h.      Stored web browsing history related to the aforementioned crimes of investigation;

i.      Stored social media content/history related to the aforementioned crimes of investigation;

j.      Stored banking or money transfer history, including application-based money transfer data/history (i.e. Venmo or CashApp account data/history); and

k.      Stored location data, including from any map applications on the cell phone.

The applied-for warrant authorizes the forensic examination of any seized cell phone or other communication device for the purpose of identifying electronically stored data described herein. This review may be conducted by any federal or local government personnel, sworn or non-sworn, assisting in the investigation, who may include, in addition to law enforcement officers and agents, federal and local contractors and support staff, attorneys for the government, attorney support staff, and technical experts. Pursuant to the requested warrant, the FBI may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

ATTACHMENT B - 3
USAO No. 2019R01083

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970